**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Benjamin Zakarin
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
bzakarin@barclaydamon.com

*Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| GETSWIFT, INC., *et al.*, | : | Case No. 22-11057 (MEW) |
| | : | Lead Case |
| Debtors. | : | Jointly Administered |
| | : | |
| GETSWIFT, INC.  and | : | |
| GETSWIFT TECHNOLOGIES LIMITED, | : | |
| | : | |
| Plaintiffs, | : | Adv. No. 23-_____ (MEW) |
| | : | |
| v. | : | |
| | : | |
| RETAIL ECOMMERCE VENTURES, LLC, | : | |
| | : | |
| Defendant. | : | |

## **COMPLAINT**

GetSwift, Inc., ("GSI") one of the above-captioned debtors and debtors-in-possession, and

GetSwift Technologies, Limited, the plaintiffs herein ("Debtors" or "Plaintiffs"), as and for their

complaint against Retail Ecommerce Ventures, LLC ("REV" or "Buyer"), through their

undersigned attorneys, allege the following:

## NATURE OF THE ADVERSARY PROCEEDING

1.      This is an action based upon REV's repudiation of its irrevocable, Court-approved bid to purchase the Debtors' SaaS business pursuant to the letter and spirit of sections 105(a) and 363(b) of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

2.      The Debtors' SaaS business was a delivery and workforce management software-as-service (SaaS) platform that was utilized by clients in over 70 countries and across more than 70 different verticals to automate and manage their local delivery operations and delivery drivers (the "SaaS business").

3.      The SaaS business offered a suite of software, products, and services and focused on business and logistics automation, and further included ecommerce and marketplace ordering, workforce management, data analytics and augmentation, business intelligence, route optimization, cash management, task management, shift management, asset tracking, real-time alert, and cloud communications, among other features.

4.      Prior to and at the scheduled auction held on September 28, 2022, REV made the highest and best bid for the Debtors' SaaS business through its binding offer to purchase it for: (i) $2,800,000 in cash consideration; (ii) an unsecured promissory note in the principal amount of $1,500,000, and (iii) the assumption of up to $1,000,000 in assumed accounts payable and cure costs, for total consideration of $5,300,000 (the "REV Bid").  The Debtors accepted REV's offer, subject to higher and better bids at the auction, together with REV's required $280,000.00 deposit (the "REV Deposit").

5.      Before making its Bid, REV had access to Debtors' data room full of information about its SaaS business (which was available to any potential purchaser that signed a non-disclosure agreement), and was permitted to conduct as much due diligence regarding Debtors' assets as REV saw fit.

6.      After performing its due diligence, REV submitted the binding and irrevocable REV Bid to purchase Debtors' SaaS business from the Debtors.

7.      REV and the Debtors negotiated and entered into an Asset Purchase Agreement ("APA") for the purchase of Debtors' SaaS business on an "As Is, Where Is, and With All Faults" basis; that APA, along with the proposed transaction itself, was approved by this Court on September 30, 2022.  A copy of the APA is attached hereto as Exhibit A.

8.      In making its Bid, REV represented that it was committed to, and had the financial wherewithal to close on, the purchase of Debtors' SaaS business.

9.      As a result of these and other required representations and actions by REV, the Debtors declared REV a "qualified bidder" under the Court-ordered bidding and sale procedures.

10.     REV repeated its representation regarding its financial capacity to close on the purchase through its binding representations in the APA attesting to its financial ability to close. APA § 4.7.

11.     Following the Court's approval of the Sale and APA on September 30, 2022, REV sought and obtained two extensions of the deadline for REV to close on the Sale.

12.     Prior to the expiration of that extended period, counsel for REV sent an email to counsel for the Debtors on October 13, 2022 stating that REV would not close because it had determined – weeks after its due diligence period expired and it made its irrevocable "as-is, where-is, with all faults" binding commitment to buy the SaaS business – that a vendor, Eplexity, an IT and cloud services consultant, had too much "control" over certain aspects of the SaaS business.

13.     Although the time for REV's due diligence in connection with the SaaS business had long passed at that point, in that October 13, 2022 email, REV emphatically and unequivocally told the Debtors that it would **never** close on the Court-approved Sale.

14.     Specifically, REV stated: "**Given what it has learned in the last two weeks**, with regard to GetSwift's business arrangements with Eplexity and the control that Eplexity has over GetSwift's assets and otherwise, **REV will not be closing on the transaction tomorrow, or ever**." A copy of the referenced communication is attached hereto as Exhibit B (emphasis added).

15.     Since informing the Debtors that it would never close on the Sale, REV has stated in communications to its investors its intent to "temporarily pause all interest and principal payments on [its] notes and all cash payments on [its] PDUs and preferred stock."

16.     These communications demonstrate that the real reason why REV failed to close on the Sale was because of financial troubles it had communicated to its investors that it was experiencing – rather than anything to do with Eplexity, a vendor to the SaaS business.

17.     Ultimately, and at great additional expense to their bankruptcy estates, the Debtors sold their SaaS business to SF2 GSW, LLC, the "Stalking Horse" Bidder and the backup bidder ("SF2"), at a significantly lower total price than REV's binding offer.

18.     The Debtors' ability to close on the Sale to SF2, which assumed the Eplexity contract as part of the Sale without objection, demonstrates that it was possible for Eplexity to close on the Sale.

19.     As a result of REV's unjustified, unilateral breach of the APA, Debtors were forced to accept an inferior offer for the SaaS business that, among other things, reduced the cash Debtors were to receive from the sale from $2,500,000 under the APA down to $1,370,000.

20.     This adversary proceeding seeks to recover the difference in value between the REV Bid and SF2's "Stalking Horse" bid ("SF2 Bid").

21.     The relief sought is necessary to place the Debtors' estates and their creditors in no worse position than they would have been in if REV had fulfilled its obligations and upheld its representations under the Court-approved APA.

22.     The cash component of the Debtors' damages – before the additional attorneys' fees, costs, and expenses directly incurred by the Debtors' estates and creditors as a result of REV's failure to close on the Sale and to close on the SF2 Bid – is $1,130,000.

## JURISDICTION AND VENUE

23.     The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

24.     This adversary proceeding arises in the cases entitled *In re Getswift Inc., et al.,* Case No. 22-11057 (MEW), under subchapter V of chapter 11 of the Bankruptcy Code, pending in the United States Bankruptcy Court for the Southern District of New York (the "Court").

25.     This is a core proceeding under 28 U.S.C. § 157 and with respect to any claims hereunder which may be deemed non-core, the Debtors consent to the entry of final orders and judgments by this Court.

26.     Venue is proper under 28 U.S.C. §§ 1408 and 1409.

27.     The statutory predicates for this adversary proceeding are sections 105 and 363 of the Bankruptcy Code.

## PARTIES

28.     Plaintiffs are debtors-in-possession in the above-captioned cases pending in this Court.

29.     Defendant is a corporation organized and existing under the laws of Delaware with an address under the APA for notice purposes of c/o Taft Stettinius & Hollister LLP, 200 Public Square, #3500, Cleveland, OH 44114, Attention: Mark Fazio, Esq.

## **BACKGROUND**

30.     On August 2, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter V of chapter 11 the Bankruptcy Code in the Court by commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

31.     No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases and no statutory committees have been appointed or designated.

32.     On the Petition Date, the Debtors filed a motion to approve, *inter alia*, bid procedures for the sale of the Debtors' SaaS business to SF2 (the "Stalking Horse") or another buyer, and ultimately the sale of such business [Docket No. 9] (the "Sale Motion").

33.     On August 12, 2022 the Court entered an order approving the bid procedures set forth in the Sale Motion [Docket No. 34] (the "Bid Procedures Order"), which set September 14, 2022 as the deadline for the submission of bids.

34.     On August 23, 2022, pursuant to the Bid Procedures Order, the Debtors filed their Notice of Assumption or Assumption and Assignment of Assigned Contracts [Docket No. 46] (the "Cure Notice"), which identified, among other things, each Contract that may become an Assigned Contract as that term is used in the APA.

35.     For each Contract in the Cure Notice, the Debtors estimated the Cure Amount owed under such Contract as of August 22, 2022.  The deadline for any party to file an objection to the Cure Amounts, adequate assurances of future performance, and/or the proposed assumption or assumption and assignment of an Assigned Contract to SF2 was September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) (the "Contract Objection Deadline").  No objections were filed or received by the Contract Objection Deadline.

36.     Debtors received one competing bid for the Assets – the REV Bid – which was delivered via letter from REV's counsel on September 14, 2022 and stated that:

the Purchase Agreement does not include any conditions precedent to our client's ability to enter into the Purchase Agreement . . . The Sale will be on an As-Is, Where-Is Basis in accordance with Section 8 of the Bid Procedures. . . That Bid is also not subject to any financing contingency and REV has demonstrated, or will demonstrate, to your satisfaction its ability to consummate the proposed transaction on or before October 3, 2022.

37.     In accordance with the Bid Procedures Order, REV provided the Debtors and its contract counterparties with adequate assurance of future performance information that, among other things, led the Debtors to deem REV a "qualified bidder."

38.     Per the irrevocable REV Bid, REV committed to buy the Debtors' SaaS business on the following economic terms: (i) $2,800,000 in cash consideration (compared to $2,500,000 in the Stalking Horse Bid); (ii) an unsecured promissory note in the principal amount of $1,500,000 (compared to $1,000,000 in the Stalking Horse Bid), and (iii) the assumption of up to $1,000,000 in assumed accounts payable and cure costs (equal to the Stalking Horse Bid), for total consideration of $5,300,000 compared to the $4,500,000 in consideration under the Stalking Horse Bid.  In conjunction with its bid, REV submitted a cash deposit of $280,000 (the "REV Deposit").

39.     The REV Bid triggered an Auction under the Bid Procedures Order, which was conducted on September 28, 2022 at noon (EST).

40.     With no additional bids made, the Debtors declared the REV Bid to be the highest and best bid and, thus, the Successful Bidder at the end of the Auction.

41.     The Debtors declared the Stalking Horse Bid to be the Backup Bid and the Stalking Horse Bidder the Backup Bidder, and the Auction concluded.

42.     On September 30, 2022, the Court conducted the Sale Hearing and approved the Sale to REV on the terms set forth in the REV Bid and pursuant to the APA [Docket No. 95] (the "Sale Order").

43.     At REV's request, the Debtors, SF2, the Debtors' DIP lender, Galactic Ventures LLC ("Galactic"), and REV entered into the Agreement to Amend (i) REV APA, (ii) SF2 APA and (iii) DIP Loan Agreement [Docket No. 96] to extend certain deadlines in order to preserve REV's ability to timely close on the Sale through October 3, 2022.

44.     Again at REV's request, the Debtors, SF2, Galactic, and REV entered into the Further Agreement to Amend (i) REV APA, (ii) SF2 APA and (iii) DIP Loan Agreement [Docket No. 98] to further extend certain deadlines in order to preserve REV's ability to timely close on the Sale through October 7, 2022.

45.     On October 13, 2022, REV informed the Debtors via email that it would not close on the Court-approved sale (the "Failure to Close").  Specifically, REV stated: "REV will not be closing on the transaction tomorrow, **or ever**." (emphasis added).

46.     Later that same day, the Debtors advised SF2, the Backup Bidder under the Sale Order, that due to REV's Failure to Close, SF2 was now required to purchase the Debtors' SaaS business pursuant to the Sale Order under the terms of its Stalking Horse Bid.

47.     On October 14, 2022, the Debtors and Galactic entered into the Agreement to Further Amend DIP Loan Agreement [Docket No. 99] to further extend certain deadlines in the DIP Loan Agreement following discussions with SF2 and Galactic.

48.     Thereafter, the Debtors worked with SF2 to enter into an amended asset purchase agreement.

49.     On November 15, 2022, the Court entered a supplemental sale order approving the sale of the Debtors' SaaS business to SF2 [Docket No. 113] (the "Supplemental Sale Order").  The Supplemental Sale Order approved the Debtors' sale to SF2 under the following economic terms, as compared to the REV Sale Court-approved terms:

| Consideration Offered | REV Bid | SF2 Bid | Loss to Estates |
|---|---|---|---|
| Cash component of the purchase price: | $2,500,000 | $1,370,000 | ($1,130,000) |
| Promissory note: | $1,000,000 | $ 750,000 | ($ 250,000) |
| Cure Cost Cap increase: | $1,000,000 | $1,130,000 | $ 130,000 |
| **TOTAL LOSS TO ESTATES** | | | **($1,250,000)** |

50.     The difference between the consideration that the Debtors' estates were entitled to receive under the REV Sale and what they ultimately received in connection with the sale of the Assets under the SF2 Sale, includes, without limitation, the loss of $1,130,000 in immediately accessible cash.

51.     If the Debtors' estates solely recover the lost cash compensation from this lawsuit, the Debtors expect that GSI's creditors are likely to receive a significant distribution their allowed claims against the estates.

52.     Despite demand, REV has failed to pay or reimburse the Debtors' estates for the damages it caused by failing to close on the Sale pursuant to, and as required by, the REV APA and the Sale Order.

53.     REV has never asked that the REV Deposit be returned to it.

54.     The Supplemental Sale Order also authorized the Debtors to assume and assign their  contract with Eplexity (the "Eplexity Contract") to SF2.

55.     Effective November 30, 2022, the Eplexity Contract was assumed by the Debtors and assigned to and accepted by SF2.

56.     SF2 is currently operating the SaaS business it bought from the Debtors and is using Eplexity's services pursuant to the assigned Eplexity Contract.

## **FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT**

57.     To the extent applicable, the Debtors incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

58.     After the time for it to conduct any additional due diligence of the Debtors' SaaS business expired, REV submitted an offer to the Debtors, in the form of the irrevocable REV Bid, to purchase the SaaS business from the Debtors.

59.     Thereafter, the Debtors accepted the REV Bid and the parties prepared and executed the APA memorializing the terms of the Sale, the terms of which were approved by the Court in the Sale Order.

60.     Accordingly, the parties entered into a binding contract for the sale of Debtors' SaaS business and received the Court's approval to proceed with the transaction.

61.     Once the Sale Order entered, REV was contractually and legally obligated to close on the Court-approved Sale pursuant to the APA and the Sale Order.

62.     Before the Sale transaction could be completed, REV unilaterally repudiated the REV Bid and affirmatively stated that it would "never" close on the Court-approved Sale.

63.     On October 13, 2022, REV informed the Debtors via email that it would not close on the Court-approved sale (the "Failure to Close").

64.     Specifically, REV stated: "REV will not be closing on the transaction tomorrow, **or ever**." (emphasis added).

65.     At the time REV repudiated its contract obligations, the Debtors had fully performed under the APA, satisfied the express closing conditions thereunder, and were thus ready, willing, and able to complete the Asset Sale to REV pursuant to the APA.

66.     REV's actions in connection with the REV APA and Sale Order were without justification.

67.     REV materially breached the Court-authorized REV APA by failing and refusing to purchase the SaaS business.

68.     The Debtors and their bankruptcy estates have been damaged by REV's breach of the REV APA and refusal to perform thereunder.

69.     Pursuant to the Bid Procedures Order, the REV APA and the REV Sale Order, the REV Deposit has been forfeited to the Debtors.

70.     Beyond the difference between the consideration that the Debtors' estates were entitled to receive under the REV Sale and what they ultimately received in connection with the sale of the Assets under the SF2 Sale, the Debtors have also been caused to suffer damages including, without limitation, incurring the net cost of operating the SaaS business for the additional time, expense, and loss of value, until the November 30, 2022 closing of the SF2 Sale, and all attorneys' fees that the Debtors' estates have incurred in connection with REV's breach of the REV APA and REV Sale Order.

## SECOND CLAIM FOR RELIEF – ATTORNEYS' FEES AND COSTS AWARD

71.     To the extent applicable, the Debtors incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

72.     The Debtors have incurred attorneys' fees, expenses, and costs in connection with this action, including spending time attempting to consummate the REV Sale and close on the SF2 APA, and time that otherwise would not have been incurred but for the Defendant's breaches of the APA.

73.     Therefore, the Debtors are entitled to an award of attorneys' fees and costs in an amount to be determined at trial, but no less than $100,000.

**WHEREFORE**, the Debtors respectfully request that this Court enter judgment in favor of the Debtors and against Defendant REV as follows:

a)      On the First Claim for Relief, damages to be determined at trial but in an amount no less than $1,250,000;

b)      On the Second Claim for Relief, damages to be determined at trial but in an amount no less than $100,000; and

c)      Such other and further relief as this Court deems just and proper.

Dated: New York, New York
      February 27, 2023

**BARCLAY DAMON LLP**

By:    _Ilan Markus_
Janice B. Grubin
Ilan Markus
Benjamin Zakarin
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
bzakarin@barclaydamon.com

*Counsel to Debtors and Debtors-in-Possession*

# EXHIBIT A

*Execution Version*

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of September 19, 2022 (this "**Agreement**"), among **[_____]**, a **[_____]**[1] (the "**Buyer**"), **GETSWIFT, INC.**, a Delaware corporation (the "**Seller**"), and **GETSWIFT TECHNOLOGIES LIMITED**, a British Columbia corporation ("**Ultimate Parent**" and together with the Seller, the "**Selling Parties**").

## RECITALS

A.      **GETSWIFT TECHNOLOGIES LIMITED, (**the "**Ultimate Parent"**), a Canadian technology and services company, owns 100% of the issued and outstanding capital stock of GETSWIFT LIMITED (the "**Parent**"), which owns 100% of the issued and outstanding capital stock of Seller.

B.      The Seller is engaged in the business of developing and distributing services in connection with the GetSwift SaaS platform, the Scheduling Plus SaaS platform and the Delivery Biz Pro SaaS platform, as further described at https://www.getswift.co (collectively, the "**Business**").

C.      The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the Seller, the Business, and in connection therewith the Buyer is willing to assume certain liabilities and obligations of the Seller relating thereto, all upon the terms and subject to the conditions set forth herein.

D.      The Seller and its Affiliates intend, on or around August 1, 2022, to file voluntary petitions (the "**Petition Date**") for relief under subchapter V of chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, as amended, and collectively with the Federal Rules of Bankruptcy Procedure, the "**Bankruptcy Code**"), commencing bankruptcy proceedings (as may be jointly administered, the "**Bankruptcy Cases**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

E.      The parties intend to effectuate this Agreement and the transactions contemplated hereby under Sections 105, 363, and 365 of the Bankruptcy Code.

F.      This Agreement is subject to approval of the Bankruptcy Court and will be consummated only under the Sale Order (as defined below) to be entered in the Bankruptcy Cases.

---

[1] **Note to Draft:** Special Purpose Vehicle to be formed by Retail Ecommerce Ventures LLC or affiliate prior to Closing.

# AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties agree as follows:

# ARTICLE I
# PURCHASE AND SALE

**Section 1.1     Purchase and Sale of the Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell and deliver to the Buyer, Free and Clear of all Encumbrances (both as defined below), all of the Seller's right, title and interest, direct or indirect, in and to the following (the "**Purchased Assets**"), in each case excluding any Excluded Assets (as defined below):

(a)     all accounts or notes receivable held by the Seller, and any security, claim, remedy, or other right related to any of the foregoing;

(b)     all Contracts (as defined in **Section 2.15**), including, without limitation, IP Agreements, listed on **Schedule 1.1(b)**, as such schedule may be amended by Buyer pursuant to **Section 1.9**, to which the Seller is a party (the "**Assigned Contracts**");

(c)     all Intellectual Property (as defined in **Section 2.14**) either (i) owned by Seller or (ii) purported to be owned by Seller and which is used in connection with the Business, including, without limitation, software, domain name registrations, websites, email addresses, social networking accounts, customer lists, and vendor lists("**Assigned Intellectual Property**");

(d)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories;

(e)     all furniture, fixtures, equipment, hardware, machinery, tools, office equipment, computers, and other tangible personal property;

(f)     all of Seller's rights under warranties, indemnities, and all similar rights against third parties arising from or relating to the Business or the Purchased Assets;

(g)     all insurance benefits, including rights and proceeds, arising from or relating to the Business or the Purchased Assets;

(h)     originals, or where not available, copies, of all books and records relating to the Business;

(i)     all Permits;

(j)     all goodwill associated with the Business; and

(k)     all other assets, properties and rights of every kind that are either (i) owned by Seller or (ii) purported to be owned by Seller and which are used in connection

with the Business, whether tangible or intangible, real, personal or mixed, accrued or contingent (including goodwill), related to, used or held for use in connection with the Business, as the same shall exist on the Closing Date, in each case other than Contracts (which Contracts to be included in the Purchased Assets are described in **Section 1.1(b)**).

To the extent that the Ultimate Parent has any right, title or interest, direct or indirect, in or to any of the foregoing assets, properties, or rights related to, used or held for use in connection with the Business, as the same shall exist on the Closing Date ("**Business Related Assets**"), then such Business Related Assets shall be deemed Purchased Assets, and at the Closing, Ultimate Parent shall sell and deliver to the Buyer, Free and Clear of all Encumbrances, all of the Ultimate Parent's right, title and interest, direct or indirect, in and to, such Purchased Assets.

**Section 1.2    Excluded Assets**.  Notwithstanding anything contained in **Section 1.1** to the contrary, the Seller is not selling, and the Buyer is not purchasing, any of the following assets of the Seller, all of which shall be retained by the Seller (collectively, the "**Excluded Assets**"):

(a)    all of the Seller's cash and cash equivalents;

(b)    all rights of the Seller under this Agreement and the Ancillary Agreements (as defined in **Section 1.5**);

(c)    all books and records relating to the corporate organization of Seller including its minute books;

(d)    the stock or other equity interests of Logo, d.o.o., a Serbia corporation, owned by the Seller;

(e)    the Contracts set forth on **Schedule 1.2(e)** as such schedule may be amended by Buyer pursuant to **Section 1.9** (the "**Excluded Contracts**");

(f)    the stock or other equity interests of GetSwift, d.o.o., a Serbia corporation, owned by the Seller;

(g)    causes of action arising under chapter 5 of the Bankruptcy Code; and

(h)    the assets set forth in **Schedule 1.2(h)**.

**Section 1.3    Assumed Liabilities**.  In connection with purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the Buyer shall not assume any liabilities or obligations of the Seller, however or whenever arising, except for the following specified liabilities (collectively, the "**Assumed Liabilities**"):

(a)    all liabilities under any Assigned Contract set forth on **Schedule 1.1(b)** other than liabilities under the Excluded Contracts, to the extent incurred in the ordinary course of business and required to be performed after the Closing; *provided*, *however*, that Assumed Liabilities shall not include any liabilities arising out of or relating

to any breach by the Seller of any provision of any such Contract prior to the Closing in excess of the Cure Cost Cap (as defined below); and

(b)    up to $1,000,000 (such amount, the "**Cure Cost Cap**"), in Buyer's sole discretion, of the software related accounts payable or Cure Costs (as defined below) of the Business set forth in **Schedule 1.3(b)** (the "**Assumed Accounts Payable**").

**Section 1.4    Excluded Liabilities**.    Except for the Assumed Liabilities, notwithstanding any other provision of this Agreement to the contrary or any disclosure to the Buyer, the Buyer is not assuming (and the Seller shall retain without recourse to the Buyer) any liability, debt, obligation, deficiency, tax, penalty, assessment, fine, claim, cause of action, or other loss, fee, cost, or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted (collectively, "**Liabilities**") of the Seller whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, and currently existing or hereinafter arising (the "**Excluded Liabilities**"). Without limiting the foregoing, Buyer shall not assume any Liabilities incurred by the Seller or any Affiliate of Seller for which the Seller or such Affiliate is responsible for payment in connection with the negotiation of the transactions contemplated by this Agreement (the "**Transactions**") or other sale or disposition of, or exploration of strategic alternatives of, the Business, including: (A) any change-of-control, severance, retention, transaction, stay, incentive, bonus, or similar payment or increased cost that is triggered, accelerated, accrues, or becomes payable in whole or in part in connection with the Transactions, including any employer-side payroll, fees, expenses, social security, unemployment, or similar taxes payable in connection with such payments; (B) any Liability of the Seller under deferred compensation plan, phantom stock plan, severance or bonus plan, or similar arrangement made payable in whole or in part as a result of the Transactions, including any employer-side payroll taxes payable in connection with such payments; or (C) professional fees associated with the Transactions (collectively, the foregoing, ("**Transaction Expenses**") and any such liability or costs shall constitute Excluded Liabilities.

**Section 1.5    Ancillary Agreements**.    On or prior to the Closing Date, the Seller Parties and the Buyer shall execute, and file as necessary, such other documents as are necessary to complete the transfer of the Purchased Assets to, and the assumption of the Assumed Liabilities by, the Buyer (collectively, the "**Ancillary Agreements**") including without limitation:

(a)    a Bill of Sale,

(b)    an Assignment and Assumption Agreement,

(c)    an Intellectual Property Assignment Agreement; and

(d)    the Seller Note (as defined below).

**Section 1.6    Consideration**.    In full consideration for the Purchased Assets, at the Closing, the Buyer shall pay, or cause to be paid, to the Seller a purchase price of up to

$5,300,000 (the "**Purchase Price**") as set forth below.  Specifically, at the Closing, Buyer shall:

        (a)     pay an amount in cash equal to $2,800,000 (such net amount, the "**Closing Cash Payment**"), in immediately available funds by wire transfer to the account or accounts set forth in the funds flow statement in form and substance reasonably acceptable to Buyer delivered to Buyer at least two (2) business days prior to the Closing (the "**Funds Flow Statement**") ;

        (b)     issue to the Seller an unsecured promissory note in the principal amount of $1,500,000, in the form attached hereto as **EXHIBIT A** (the "**Seller Note**");

        (c)     assume up to $1,000,000 Assumed Accounts Payable and Cure Costs; and

      **Section 1.7**    **Closing**.  Subject to the conditions set forth in **ARTICLE VI**, the closing of the sale and purchase of the Purchased Assets (the "**Closing**") will take place at the offices of Koenig, Oelsner, Taylor, Schoenfeld & Gaddis, PC, 2475 Broadway, Boulder, Colorado 80304, at 10:00 a.m. local time on the second business day following the satisfaction or waiver of the conditions set forth in **ARTICLE VI**, or at such other place and time as the parties may otherwise agree, including remotely by exchange of signatures via facsimile, electronic mail (including delivery of a PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com), or any other transmission method, which signatures shall be deemed to have been duly and validly delivered and be valid and effective for all purposes (the date of the Closing, the "**Closing Date**").

      **Section 1.8**    **Intended Tax Treatment; Allocation of Purchase Price**.

        (a)     The parties intend that the transactions contemplated by this Agreement constitute, for U.S. federal, state and local income Tax purposes, a taxable purchase by Buyer from the Seller of the Purchased Assets, subject to Sections 483, 1274 and 1275 of the Internal Revenue Code of 1986, as amended (the "**Code**") and Treasury Regulations thereunder  (the "**Intended Tax Treatment**"). The Company and the Selling Parties shall, to the extent consistent with applicable Law, report the federal, state, local and other Tax consequences of the transactions contemplated by this Agreement consistently with the Intended Tax Treatment, and, except as required by applicble Law, neither Buyer nor the Selleing Parties shall take any position inconsistent with the Intended Tax Treatment on any tax return or as part of any tax audit except pursuant to a "determination" within the meaning of Code Secton 1313 or similar provision of applicable state or local applicable Law.

        (b)     The parties agree to allocate the consideration paid for the Purchased Assets for tax purposes (to the extent treated as sold in a taxable sale) in accordance with the applicable provisions of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and in accordance with **Schedule 1.8(b)** (the "**Allocation Schedule**").  Buyer shall provide a written schedule showing allocated amounts not specifically set forth in the

Allocation Schedule as soon as reasonably practicable following the Closing (the "**Additional Allocations**"). The Additional Allocations shall, to the maximum extent possible, be consistent with the Allocation Schedule and shall in no event change any of the amounts of allocations specifically set forth in the Allocation Schedule. No party will file any tax return (including any information return) with any Governmental Authority or other document with, or make any statement or declaration to, any Governmental Body that is inconsistent with the Allocation Schedule or the Additional Allocations except pursuant to a good faith settlement of a tax controversy.

> **Section 1.9     Assigned Contracts and Cure Costs.**

> (a)     At the Closing, Seller and Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, their respective portion of any and all cure and reinstatement costs or expenses that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "**Cure Costs**"). Buyer shall pay all Cure Costs up to an amount not to exceed the Cure Cost Cap. Seller shall pay all Cure Costs, if any, in excess of the Cure Cost Cap. For the avoidance of doubt, the payment of any Cure Costs called for by this Agreement payable by Buyer shall be made by Buyer in cash at Closing and shall not be deducted from the Closing Cash Payment, but in no event shall Buyer be required to make any payment of Cure Costs for, and shall not assume any liabilities with respect to, any Excluded Contract. In the event Seller fails to timely pay any Cure Costs called for by this Agreement payable by Seller, Buyer may, but is not required to, pay such amount on behalf of Seller and without limiting any of Buyer's other remedies under this Agreement, Buyer may set off and deduct from the Purchase Price any such amount in excess of the Cure Cost Cap.

> (b)     **Schedule 1.9(b)** sets forth each Executory Contract and Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Contract (and if no Cure Cost is estimated to be payable in respect of any particular Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00"). Seller shall update the estimated Cure Costs listed in **Schedule 1.9(b)** periodically no later than five (5) days prior to the Bid Deadline and periodically thereafter. For the avoidance of doubt, except as expressly set forth above with respect to **Schedule 1.9(b)**, Seller may not update, modify, or amend any schedule hereto without the express written consent of Buyer, which may be withheld, conditioned, or delayed in Buyer's sole discretion. Furthermore, and notwithstanding anything to the contrary, no representation or warranty of Seller or the Selling Parties shall be affected or deemed waived by reason of any investigation made by or on behalf of the Buyer or by reason of the fact that the Buyer knew or should have known that any such representation or warranty is, was or might be inaccurate, and such representations and warranties are qualified solely by reference to the applicable schedule hereto.

> (c)     Ten (10) Business Days after Seller has made available to Buyer correct and complete copies of all Contracts listed on **Schedule 1.9(b)**, and subject to Buyer's rights under **Section 1.9(e)** below to subsequently amend such designations, Buyer will deliver to Seller **Schedule 1.1(b)**, to be determined in Buyer's sole discretion, which

shall be a schedule of the Contracts to be assumed by Seller and assigned to Buyer (as Assigned Contracts) at the Closing. For the avoidance of doubt, Buyer may update **Schedule 1.2(e)** in its sole discretion to reflect any Contracts to be removed from **Schedule 1.9(b).** The Seller shall provide sufficient notice under the Bankruptcy Code and local rules of the Bankruptcy Court to all counterparties to the Assigned Contracts of their assumption and, with respect to the Assigned Contracts to be assumed, also provide a schedule of Cure Costs.

(d)      On the date that is no later than five (5) days after entry of the Bidding Procedures Order (as defined below), the Seller shall deliver a written notice in a form reasonably acceptable to Buyer of the proposed assignments of the Contracts and the proposed Cure Costs for each Contract to all non-debtor parties of Contracts, which notice shall notify each non-debtor party of (i) the proposed Cure Cost for such Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost.

(e)      At any time prior to three (3) business days before Closing (the "**Designation Deadline**"), Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "**Contract Notice**") of Buyer's election to designate any Contract (including any Contract that is an Assigned Contract immediately before such designation) (i) as an Excluded Contract, and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (ii) to the extent not already rejected, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract. If, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Assigned Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs filed by Seller with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than two (2) business days after entry of an order by the Bankruptcy Court setting such Cure Costs, to provide Seller a Contract Notice of Buyer's election to revoke its designation of any such Contract as an Assigned Contract and thereupon such Contract shall be deemed to be an Excluded Contract for all purposes of this Agreement. The Parties shall amend and **Schedule 1.9(b)** to reflect changes made pursuant to this **Section 1.9(e)**. Notwithstanding the foregoing, that certain CXOS Managed Services Contract and Statement of Work, dated September 14, 2020, between Seller and Eplexity, LLC, a Colorado limited liability company (the "**Eplexity Agreement**"), shall constitute an Assigned Contract.

(f)      If Buyer exercises its rights in **Section 1.9(e)** above to change the designation of a Contract from an Assigned Contract to an Excluded Contract, or to change the designation of an Excluded Contract to an Assigned Contract, there shall be no reduction in the Purchase Price as a result of such change in designation.

**Section 1.10   Withholding**. Buyer will be entitled to deduct and withhold, or from any amounts payable or otherwise deliverable pursuant to this any taxes or other amounts required to be deducted or withheld therefrom under the Code or any applicable Law. To the extent that any such amounts are so deducted or withheld and paid over to the applicable Governmental Authority, such amounts will be treated for all purposes of this Agreement as

having been paid to the person in respect of which such deduction, withholding and payment were made.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER[2]

The Seller hereby represents and warrants, jointly and severally, to the Buyer as of the date hereof and as of the Closing Date as provided below in this **ARTICLE II**. All of the below representations and warranties shall expire and be of no further force and effect as of the conclusion of the Closing.

**Section 2.1     Organization and Qualification**. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority to own, lease and operate the Purchased Assets and to carry on the Business. The Seller is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the ownership or operation of the Purchased Assets or the nature of the Business makes such qualification or licensing necessary, except as would not, individually or in the aggregate, have a material adverse effect on the Purchased Assets or the business, financial condition or results of operations of the Business (a "**Material Adverse Effect**").

**Section 2.2     Authority**. The Seller has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements. This Agreement has been, and upon their execution each of the Ancillary Agreements will have been, duly executed and delivered by the Seller, and is, and upon their execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable upon and against the Seller.

**Section 2.3     No Conflict; Required Filings and Consents**. The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the certificate of incorporation or bylaws of the Seller; (ii) violate any federal, state or local statute, law, regulation, order, injunction or decree ("**Law**") applicable to the Seller, the Business or the Purchased Assets; (iii) except for the Contracts set forth on **Schedule 2.3** (the "**Contracts Requiring Consent**"), conflict with, create a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Purchased Assets pursuant to, any contract, agreement, license, permit or other instrument to which the Seller is a party or by which the Seller, the Business or any of the Purchased Assets may be bound, affected or benefited; (iv) allow the imposition of any fees or penalties or require the offering or making of any payment to a third party on the part of the Seller or the Business; or (v) require any consent or approval of, registration or filing with, or notice to any federal, state or local

---

[2]

74820387v1

governmental authority or any agency or instrumentality thereof (a "**Governmental Authority**").

Section 2.4 **Title to, Condition and Sufficiency of Assets**. Except as set forth on **Schedule 2.14(b)**, the Seller has good and valid title to or a valid leasehold interest in all of the Purchased Assets, and, following entry of the Sale Order, will convey the Purchased Assets to Buyer free and clear, to the maximum extent permitted by Section 363 of the Bankruptcy Code as expressed in the Sale Order ("**Free and Clear**"), of any charge, limitation, condition, mortgage, lien, security interest, adverse claim, encumbrance, Liability, or restriction of any kind (collectively, "**Encumbrances**"), other than Encumbrances for current taxes not yet past due and any other limitations expressly contained in the Sale Order (collectively, "**Permitted Encumbrances**"). Pursuant to the Sale Order, this Agreement and the Ancillary Agreements, the Buyer will acquire good and valid title to or a valid leasehold interest in all of the Purchased Assets, Free and Clear of any Encumbrances other than Permitted Encumbrances. The Purchased Assets constitute all of the assets and rights used in or necessary for the conduct of the Business as currently conducted. All tangible personal property included in the Purchased Assets is in all material respects in good operating condition and repair, ordinary wear and tear excepted, and is adequate for the uses to which it is being put.

Section 2.5 **Financial Statements**.

(a) Seller has electronically delivered to Buyer, with receipt confirmed in writing, within three (3) days prior to the date of this Agreement, copies of the audited consolidated balance sheet of the Business as at December 31, 2019, the audited consolidated balance sheet of the Business as at December 31, 2020, and the audited consolidated balance sheet of the Business as at December 31, 2021, and the related audited consolidated statements of income, retained earnings, stockholders' equity and changes in financial position of the Business, together with all related notes and schedules thereto, accompanied by the reports thereon of the Seller's independent auditors (collectively referred to as the "**Financial Statements**") and the unaudited consolidated balance sheet of the Business as at April 30, 2022, and the related consolidated statements of income, retained earnings, stockholders' equity and changes in financial position of the Business, together with all related notes and schedules thereto (collectively referred to as the "**Interim Financial Statements**"). Each of the Financial Statements and the Interim Financial Statements (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of the Seller pertaining to the Business, (ii) have been prepared in accordance with IFRS Standards, high quality global accounting principles used in Canada as in effect from time to time applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and (iii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of the Business as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments that will not, individually or in the aggregate, be material.

(b)    The books of account and financial records of the Seller pertaining to the Business are true and correct and have been prepared and are maintained in accordance with sound accounting practice.  The Seller has not made any changes in its accounting practice since December 31, 2021.

**Section 2.6    Absence of Undisclosed Liabilities**.  Except as and to the extent adequately accrued or reserved against in the audited consolidated balance sheet of the Business as at December 31, 2021 (such balance sheet together with all related notes and schedules thereto, the "**Balance Sheet**"), the Seller does not have any liability or obligation of any nature arising out of, relating to or affecting the Business, whether accrued, absolute, contingent or otherwise, and whether or not required by IFRS Standards to be reflected on a balance sheet of the Business, except for liabilities and obligations incurred in the ordinary course of business consistent with past practice since the date of the Balance Sheet.

**Section 2.7    Absence of Certain Changes or Events**.  Since the date of the Balance Sheet:  (i) the Seller has conducted the Business only in the ordinary course consistent with past practice; (ii)  other than the filing of the Bankruptcy Case, no event or development has had or is reasonably likely to have a Material Adverse Effect; (iii)  neither the Business nor the Purchased Assets have suffered any loss, damage, destruction or other casualty affecting any material properties thereof or included therein, whether or not covered by insurance; and (d) the Seller has not taken any action that, if taken after the date of this Agreement, would constitute a violation of **Section 5.1**.

**Section 2.8    Compliance with Law; Permits**.  The Seller is and has been in compliance in all material respects with all Laws applicable to it in connection with the conduct or operation of the Business and the ownership or use of the Purchased Assets.  The Seller is in possession of all permits, licenses and other authorizations of any Governmental Authority ("**Permits**") necessary for it to own, lease and operate the Purchased Assets and to carry on the Business as currently conducted, and is and has been in compliance in all material respects with all such Permits.  There is no basis for the revocation or withdrawal of any Permit, either as a consequence of the transactions contemplated hereby or otherwise.  All such Permits are transferable to the Buyer pursuant to their terms and applicable Law.

**Section 2.9    Litigation**.  Except as set forth on **Schedule 2.9**, there is no claim, action, suit, proceeding, inquiry, investigation or arbitration by or before any governmental, regulatory, administrative, judicial or arbitral body (an "**Action**") pending or threatened (i) in connection with the Business or the Purchased Assets or the Seller's ownership or operation thereof; (ii) to restrain or prevent the consummation of the transactions contemplated hereby; or (iii) that might affect the right of the Buyer to own and operate the Business or the Purchased Assets, nor is there any basis for any of the foregoing.

**Section 2.10    Employee Benefit Plans**.  Except as set forth on **Schedule 2.10**, there are no current employment contracts or consulting agreements by which the Seller in connection with the Business is bound, and no deferred compensation, bonus, incentive compensation, stock option, severance or termination pay agreement or plan or any other employee benefit plan, agreement, arrangement or commitment, whether formal or informal, maintained, entered into or contributed to, or which is required to be maintained, entered

into or contributed to, by the Seller for the benefit of any current or former employee, officer or director of the Business, or with respect to which the Seller has any liability, contingent or otherwise, in connection with the Business (collectively, "**Benefit Plans**"). None of the Benefit Plans is a multiemployer plan (as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), is subject to Title IV of ERISA or Section 412 of the Code, or provides post-employment welfare benefits (except to the extent required by Section 4980B of the Code). All of the Benefit Plans currently comply, and have complied in the past, both as to form and operation, with the terms of such Benefit Plans and with the applicable provisions of ERISA, the Code and other applicable Law.

     **Section 2.11   Labor and Employment Matters**. The Seller is not a party to any contract or collective bargaining agreement with any labor organization that pertains to any employees, officers or directors of the Business. No organization or representation question, labor dispute or unfair labor practice or complaint is pending or has been threatened in connection with the Business in the past five years, including, without limitation, with respect to the Seller's classification or misclassification of employees and contractors for purposes of applicable laws, including wage and hour laws. Nothing herein shall be construed as an obligation of the Buyer to continue the employment of any employee, officer or director of the Business or otherwise to assume any liability for salary, benefits, pension or other benefit plans relating thereto.

     **Section 2.12   Real Property**. The Seller owns no real property. **Schedule 2.12** sets forth a true and complete list of all real property and interests in real property included in the Purchased Assets and leased or subleased by the Seller or which the Seller otherwise has a right to use or occupy (the "**Leased Real Property**")[3]. The Seller has good and marketable leasehold title to all Leased Real Property, in each case together with all plants, buildings, improvements and fixtures thereon, free and clear of all Encumbrances other than Permitted Encumbrances. No parcel of Leased Real Property is or is threatened to become subject to any governmental decree or order to be sold or is or is threatened to being condemned, expropriated or otherwise taken by any public authority. True and complete copies of all leases and title documents (including all amendments) in respect of or affecting any Leased Real Property have been delivered to the Buyer.

     **Section 2.13   Taxes**. The Seller in a timely manner has filed all income tax returns that it was required to file under all federal, state, local and foreign tax laws and all other tax returns and other reports required of it under all federal, state, local and foreign tax laws in connection with the Business and the Purchased Assets. All such returns and reports are correct and complete in all material respects. The Seller has paid in full all taxes or other amounts due whether or not shown as due on such tax returns, including without limitation (i) all taxes that the Seller is obligated to withhold from amounts paid or payable to or benefits conferred upon employees, creditors and third parties in connection with the Business and the Purchased Assets, and (ii) all amounts of transfer, sales, use and similar taxes that Seller was obligated to collect from third parties. No tax examinations or audits

---

[3].

of the Seller in connection with the Business or the Purchased Assets are in progress or have taken place during the past 10 years. None of the Purchased Assets are subject to a lien for taxes other than liens that qualify as Permitted Encumbrances. None of the Purchased Assets include an interest in an entity or arrangement classified as a partnership or as a corporation (or association taxable as a corporation) for U.S. federal income tax purposes. None of the Purchased Assets consist of an interest in assets or a business located outside the United States. The Seller has and will have no unpaid property or similar taxes attributable to the Purchased Assets for any taxable period (or portion thereof) ending on or prior to the Closing Date, which (in the case of a taxable period that includes but does not end on the Closing Date) will be deemed to be the amount of such Taxes for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period. To the extent Seller has any such unpaid property or similar taxes, such taxes are and shall be Excluded Liabilities.

Section 2.14 **Intellectual Property**.

(a) As used in this Agreement:

(i) "**Intellectual Property**" means all algorithms, application programming interfaces ("**APIs**"), audiovisual components and objects, data, databases, data collections, designs, diagrams, documentation, drawings, flow charts, formulae, images, mask works, models, net lists, network configurations and architectures, schematics, software and firmware code (in any form, including source code and object code), specifications, subroutines, test vectors, uniform resource identifiers including uniform resource locaters ("**URLs**"), user interfaces, web sites (and associated internet domain names), works of authorship, marks (including brand names, product names, logos, and slogans), business forecasts and strategies, customer and supplier lists, financial data, know-how, materials, marketing and development plans, personnel information, procedures, processes, protocols, technical information, tools, trade secrets, apparatuses, concepts, developments, discoveries, ideas and inventions (whether or not patentable or reduced to practice), methods, techniques, and all other forms of information or technology.

(ii) "**Intellectual Property Rights**" means all past, present, and future rights in or relating to Intellectual Property that may exist or be created under the laws of any jurisdiction in the world (including all rights accruing by virtue of treaties and conventions), including: (A) copyrights, exclusive exploitation rights, moral rights (including all rights of paternity, integrity, disclosure, and withdrawal), mask work rights, and other rights associated with works of authorship (including software, firmware, data, databases, and other data collections); (B) trademark, service mark, trade dress, trade name rights, and internet domain name registrations, together with the goodwill of the business connected with the use of, and symbolized by, the foregoing; (C) trade secret rights; (D) patent and industrial property rights; (E) all other proprietary rights in or relating to, or forms of protection of, Intellectual Property (whether registered or unregistered); (F) all rights in or relating to applications for, and registrations, reissues, renewals, extensions, combinations, continuations (including continuations-in-part), reversions, restorations, recordations, and divisions of, any of the rights referred to in clauses (A) through (E) of this

sentence; and (G) all rights in or relating to past, present, and future income, royalties, damages, and payments due with respect to any of the foregoing, including rights to damages and payments for past, present, or future infringements, misappropriations, or other violations thereof.

(b) **Schedule 2.14(b)** lists all (i) Assigned Intellectual Property that is the subject of any issuance, registration, application, or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction (including trademark registrations, domain names, and copyright registrations, issued and reissued patents) and pending registrations or applications for any of the foregoing ("**IP Registrations**"); and (ii) Assigned Intellectual Property that is not registered but that is material to the operation of the Business and is documented or readily capable of being documented, excluding: (A) any information in the memory of any person that constitutes education, research and development techniques, personal skillsets or technical expertise; and (B) any other undocumented information that is not codified or implemented within the infrastructure of the Business. Except for the IP Registrations that are indicated as expired, lapsed, abandoned, dead or inactive in **Schedule 2.14(b)**, all required filings and fees related to IP Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all IP Registrations are otherwise in good standing. The file histories of the United States unexpired, live, pending, or otherwise active IP Registrations are accessible to the public at www.uspto.gov by entry of the application number of the applicable IP Registration. For each such United States IP Registration, **Schedule 2.14(b)** sets forth the due dates, if any, that will occur over a period of six (6) months from the date of execution of this Agreement. Seller's patent counsel possesses legal files of materials related to all IP Registrations that constitute patent applications. A copy of such materials shall be owned and accessible by Buyer by virtue of this Agreement.

(c) **Schedule 2.14(c)** lists all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions, and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Assigned Intellectual Property or to which the Seller is a party, beneficiary, or otherwise bound ("**IP Agreements**") other than Contracts solely related to: (i) General Software Agreements (defined below); or (ii) the use of any Assigned Intellectual Property by any retailer, reseller, distributor, advertiser, marketer or contractor performing services for or on behalf of Seller in the ordinary course of Business [4]. The term "**General Software Agreement**," as used herein, shall mean shrink-wrap, click-wrap, or other similar agreements for commercially available off-the-shelf software or software-as-a-service (including platform services and data subscription services), publicly-accessible websites, online portals, online platforms, mobile applications and software preloaded onto personal computers, workstations and servers) in each of the foregoing cases that is provided by any third party at no charge or for a fee less than Five Thousand Dollars ($5,000.00) per year or for a total replacement value less than such amount, including any of the foregoing items that are configurable through the use of settings selectable according to user preferences. Seller has provided Buyer true and complete copies

---

[4]

74820387v1

of all such IP Agreements required to be listed on **Schedule 2.14(c)**, including all modifications, amendments, and supplements thereto and waivers thereunder. Each IP Agreement is valid and binding on Seller and is in full force and effect. Other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, neither Seller nor, to the Seller's knowledge after reasonable investigation, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of breach or default of or any intention to terminate, any IP Agreement. Other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any IP Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(d)      Except as set forth on **Schedule 2.14(b)**, Seller is the sole and exclusive legal and beneficial, (and with respect to the IP Registrations, record) owner of all right, title, and interest in and to the Assigned Intellectual Property, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances, other than Permitted Encumbrances and technology usage restrictions imposed by third parties under IP Agreements. Except as set forth on **Schedule 2.14(b)**, Seller's rights in the Assigned Intellectual Property are valid, subsisting, and enforceable.

(e)      The Assigned Intellectual Property and Intellectual Property licensed under the IP Agreements constitute all of the Intellectual Property necessary to operate the Business as presently conducted. Except as set forth on **Schedule 2.14(b)**, and other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, the consummation of the Transaction will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other individual or entity in respect of, Buyer's right to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

(f)      There is no Action (including any oppositions, interferences or re-examinations) settled, pending, or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property Rights of any individual or entity by Seller; (ii) challenging the validity, enforceability, registrability, or ownership of any Assigned Intellectual Property or Intellectual Property Rights therein or Seller's rights with respect to any Assigned Intellectual Property; or (iii) by Seller or, to Seller's Knowledge any other individual or entity, alleging any infringement, misappropriation, dilution, or violation by any individual or entity of any Assigned Intellectual Property or Intellectual Property Rights therein.

(g)      The conduct of the Business as currently and formerly conducted, and the Assigned Intellectual Property and Intellectual Property licensed under the IP Agreements as currently or formerly owned, licensed, or used by Seller, have not infringed,

misappropriated, diluted, or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate, or otherwise violate, the Intellectual Property Rights or other rights of any individual or entity. Except as set forth on **Schedule 2.14(b)**, no individual or entity has infringed, misappropriated, diluted, or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Assigned Intellectual Property or Intellectual Property Rights therein.

Section 2.15   **Contracts**.   **Schedule 2.15** lists all agreements, arrangements or understandings, whether written or oral, relating to the Business or the Purchased Assets, including IP Agreements (each, a "**Contract**"). Each Contract is valid, binding and enforceable, and is in full force and effect. Except as expressly set forth on **Schedule 2.15**, no party thereto is in default (with or without notice or lapse of time or both). The Seller has delivered to the Buyer true and complete copies of all Contracts, including any amendments thereto.

Section 2.16   **Related Party Interests and Transactions**. Except as set forth on **Schedule 2.16**, there is no agreement, arrangement or understanding in connection with the Business between the Seller and any of its Affiliates, or any officer, director or employee of the Seller or any of its Affiliates or any family member of the foregoing (each of the foregoing Affiliates, officers, directors, employees and family members, a "**Related Party**"), nor any advances or other amounts owing to the Seller or the Business by any Related Party. No Related Party (i) owns or has owned any interest in any property, assets or rights used in the Business, (ii) is or has been involved in any business dealings or transactions in connection with the Business or any of the Purchased Assets, other than in the ordinary course of business on prevailing market terms or (iii) is or has been employed in the Business.

Section 2.17   **Subsidiaries**. Except as set forth on **Schedule 2.17**, Seller does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. Seller is not a participant in any joint venture, partnership or similar arrangement.

Section 2.18   **Brokers**. No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Seller.

Section 2.19   **Disclosure**. None of the representations or warranties of the Seller contained in this Agreement or any Ancillary Agreement or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES REGARDING ULTIMATE PARENT

The Seller Parties hereby represent and warrant, jointly and severally, to the Buyer as of the date hereof and as of the Closing Date as provided below in this **ARTICLE III**.

74820387v1

All of the below representations and warranties shall expire and be of no further force and effect as of the conclusion of the Closing:

  **Section 3.1 Organization**.  Ultimate Parent is duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of formation.

  **Section 3.2 Authority**.  Ultimate Parent has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements.  This Agreement has been, and upon its execution each of the Ancillary Agreements will have been, duly executed and delivered by Ultimate Parent, and is, and upon its execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable upon and against Ultimate Parent.

  **Section 3.3 No Conflict; Required Filings and Consents**.  The execution, delivery and performance by Ultimate Parent of this Agreement and the Ancillary Agreements and the consummation by Ultimate Parent of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the certificate of incorporation or bylaws of Parent or Ultimate Parent; (ii) violate any Law applicable to Ultimate Parent; or (iii)  require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

  **Brokers**.  No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of Ultimate Parent.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

  The Buyer hereby represents and warrants to the Seller Parties as of the date hereof and as of the Closing Date as provided below in this **ARTICLE IV**.  All of the below representations and warranties shall expire and be of no further force and effect as of the conclusion of the Closing:

  **Section 4.1 Organization**.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

  **Section 4.2 Authority**.  The Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it will be a party.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer, and is, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will be, legal, valid, binding and enforceable upon and against the Buyer.

  **Section 4.3 Required Filings and Consents**.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party and the consummation by the Buyer of the transactions

contemplated hereby and thereby do not and will not require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

> **Section 4.4     Brokers**.  No broker, finder or agent will have any claim against the Seller for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Buyer.

> **Section 4.5     Sufficiency of Funds.** Buyer has sufficient cash on hand or will have prior to the Closing other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

> **Section 4.6     Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

> **Section 4.7     No Other Representations and Warranties.** BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND ONLY TO THE EXTENT PROVIDED HEREIN, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF, IT BEING UNDERSTOOD THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT.

## ARTICLE V
## COVENANTS

> **Section 5.1     Conduct of Business Prior to the Closing**.  Except as may be required by the Bankruptcy Court and except as inconsistent with Seller's obligation to seek higher and better offers in the Bankruptcy Cases, between the date of this Agreement and the Closing, unless the Buyer shall otherwise agree in writing, the Seller Parties shall use reasonable best efforts: (i) to cause the Business to be conducted only in the ordinary course consistent with past practice;  (ii) to preserve substantially intact the Purchased Assets and the organization of the Business; (iii) to keep available the services of the current officers, directors, employees and consultants of the Business; and (iv) to preserve the current relationships of the Business with customers, suppliers and other persons with which it has significant business relations.  Without limiting the foregoing, the Seller shall not take (and the Seller Parties shall not consent to any action that would result in Seller taking), without Buyer's prior written consent, on a case by case basis, any action, directly or indirectly (including through a subsidiary or by amendment, merger, consolidation, or otherwise) that:

(a)  results in the redemption or repurchase of any shares of capital stock or other securities of the Seller (other than repurchases of such securities pursuant to agreements with service providers giving Seller the right to repurchase such securities upon the termination of services at no greater than fair market value or the original purchase price therefor (whichever is less);

(b)  except for the filing of the Bankruptcy Cases, results in liquidation, dissolution, or winding up of Seller or any other deemed liquidation event under Seller's charter or other organizational documents;

(c)  results in the declaration or payment to stockholders of any dividend or other distribution;

(d)  results in the acquisition of another company or any of the equity or assets of another company;

(e)  incurs additional indebtedness, excluding debtor-in-possession financing approved by the Bankruptcy Court, trade payables incurred in the ordinary course of business and equipment leases with third parties entered into in the ordinary course of business and with Buyer's prior written consent;

(f)  authorizes any transaction with any stockholder of Seller or any affiliate of any stockholder;

(g)  makes any loan or advance to, or results in the ownership or acquisition of any stock or other securities of, any corporation, partnership, or other entity;

(h)  makes any loan or advance to any person, including, any employee or officer;

(i)  guarantees any indebtedness;

(j)  creates or amends any equity plan, profit sharing plan, phantom equity plan, or other benefit plan or similar plan of Seller;

(k)  materially changes the nature of the Business; or

(l)  makes any change which is otherwise material to the Business other than commencing the Bankruptcy Cases.

**Section 5.2  Covenants Regarding Information**.  From the date of this Agreement until the Closing Date, the Seller Parties shall afford the Buyer and its officers, directors, principals, employees, advisors, auditors, agents, bankers and other representatives (collectively, "**Representatives**") complete access (including for inspection and copying) at all reasonable times to the Purchased Assets and the Seller Parties' Representatives, properties, offices, plants and other facilities, and books and records relating to the Business and the Purchased Assets, and shall furnish the Buyer with such

financial, operating and other data and information in connection with the Business and the Purchased Assets as the Buyer may reasonably request.

**Section 5.3    Notification of Certain Matters**.  The Seller Parties shall give prompt written notice to the Buyer of (i) the occurrence or non-occurrence of any event that would render any representation or warranty of the Seller Parties herein, if made on or immediately following the date of such event, untrue or inaccurate, including any change required with respect to the schedules hereto; (ii) any event, change or development that has had or is reasonably likely to have a Material Adverse Effect; (iii) any failure of the Seller Parties to comply with any covenant or agreement to be complied with by it hereunder or any event or condition that would otherwise result in the nonfulfillment of any of the conditions to the Buyer's obligations hereunder; (iv) any notice or other communication from any person or entity alleging that the consent of such person or entity is or may be required in connection with the consummation of the transactions contemplated by this Agreement; or (e) any Action pending or threatened in connection with the transactions contemplated by this Agreement.  No such notice shall be deemed to cure any breach of any representation or warranty made in this Agreement or have any effect for purposes of determining the satisfaction of the conditions set forth in **Section 6.1**, the compliance by the Seller Parties with any covenant set forth herein.

**Section 5.4    Confidentiality**.  The Seller Parties shall, and shall cause their respective Affiliates and Representatives to, keep confidential, disclose only to its Affiliates or Representatives and use only in connection with the transactions contemplated by this Agreement all information and data obtained by them from the Buyer or its Affiliates or Representatives relating to the Buyer or its Affiliates or the transactions contemplated hereby (other than information or data that is or becomes available to the public other than as a result of a breach of this section), unless disclosure of such information or data is required by applicable Law.  Notwithstanding anything to the contrary, this section shall survive any termination of this Agreement.

**Section 5.5    Further Assurances**.  Each of the parties agrees to work diligently, expeditiously and in good faith to consummate the transactions contemplated by this Agreement.  From time to time after the Closing Date, the Seller and its Affiliates shall execute and deliver to the Buyer such instruments of sale, transfer, conveyance, assignment, consent, assurance, power of attorney, and other such instruments as may be reasonably requested by the Buyer in order to vest in the Buyer all right, title, and interest in and to the Purchased Assets and the Business.  The Buyer and the Seller Parties shall each provide the other with such assistance as reasonably may be requested by the other in connection with the transition of the Business and the preparation of any tax return, an audit or examination of any such return by any taxing authority or any judicial or administrative proceeding relating to liability for taxes and provide the other with any records or other information which may be relevant to such a return, audit, examination or proceeding.  Before disposing of any such records or other information, Buyer and Seller shall each provide the other with the opportunity to receive copies of such items.  Seller's obligations under this **Section 5.5** shall be limited to the extent that Seller has employees or agents available for such purposes and nothing in this **Section 5.5** shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

**Section 5.6    Certain Tax Matters.**  All transfer, documentary, sales, use, stamp, registration and other such taxes, and any conveyance fees or recording charges incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), will be paid by Seller when due, and Seller will prepare and file all necessary tax returns and other documentation with respect to all such taxes, fees and charges and, if required by applicable Law, Buyer will execute any such tax returns and other documentation.  The Buyer and the Seller agree, upon the request of any party hereto and at such party's sole expense, to use their commercially reasonable efforts to obtain any certificates or other documents from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Transfer Taxes.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.1    Conditions to the Obligations of the Buyer**.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

(a)    The representations and warranties of the Seller Parties contained in this Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality, which representations and warranties shall be true and correct in all respects), both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.  The Seller Parties shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing.  The Buyer shall have received a certificate of a duly authorized officer of the Seller to the effect set forth in the preceding sentences.

(b)    No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(c)    No Action shall be pending or threatened (i) challenging the transactions contemplated by this Agreement or otherwise seeking damages in connection therewith or (ii) seeking to prohibit or limit the ability of the Buyer to own, operate or control the Business or the Purchased Assets.

(d)    The Seller shall have delivered to the Buyer copies of authorizing resolutions of its Board of Directors, Parent (to the extent required) and Ultimate Parent, authorizing the filing of the Bankruptcy Cases and the execution, delivery and performance of this Agreement and the transactions contemplated thereby.

(e)    The Buyer shall have received executed originals of all consents, waivers, approvals and authorizations required by law, statute, rule, regulation, contract or agreement to be obtained by the Seller Parties in connection with the consummation of the transactions contemplated by this Agreement.

74820387v1

(f)　　　Substantially all of the employees of the Business as of the date this agreement is signed shall have accepted offers of employment with Buyer pursuant to offer letters in such form as provided by the Buyer.

(g)　　　The Buyer shall have received an executed original of each of the Ancillary Agreements.

(h)　　　The Buyer shall have received such other documents relating to the Business, the Purchased Assets and the transactions contemplated hereby as the Buyer may reasonably request.

(i)　　　Since the date of the Interim Financial Statements and except as disclosed on **Schedule 2.7**, no event or circumstance shall have occurred that, with or without notice or lapse of time or both, would constitute or be reasonable likely to constitute a Material Adverse Effect.

(j)　　　The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect, shall be a final order in all respects, shall not have been modified, amended, rescinded or vacated in any material respect, and shall not be subject to a stay pending appeal.

(k)　　　The Eplexity Agreement shall, upon payment of applicable Cure Costs, be assumed, in full force and effect, and no defaults shall exist.

(l)　　　Seller shall have delivered to the Buyer a properly completed and executed Internal Revenue Service Form W-9 certifying Seller's status as a U.S. person as defined in the instructions to such form.

**Section 6.2　　　Conditions to the Obligations of the Seller**.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Seller in its sole discretion:

(a)　　　The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date. The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing.  The Seller shall have received a certificate of a duly authorized officer of the Buyer to the effect set forth in the preceding sentences.

(b)　　　No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(c)　　　The Seller shall have received an executed original of each of the Ancillary Agreements.

## ARTICLE VII
## TERMINATION

**Section 7.1** **Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer upon written notice to the Seller:

(i)    if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Seller in this Agreement, in each case which would result in the failure of any of the conditions specified in **Section 6.1** and such breach, inaccuracy, or failure cannot reasonably be cured by Seller on or before October 3, 2022 (the **"Drop Dead Date"**);

(ii)    for any reason or for no reason at any time after the Drop Dead Date;

(c)    by Seller upon written notice to Buyer if Seller is not then in material breach of any provision of this Agreement (including, without limitation, **Section 5.5**) and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Buyer in this Agreement, in each case which would result in the failure of any of the conditions specified in **Section 6.2**, and such breach, inaccuracy, or failure cannot reasonably be cured by Buyer on or before the Drop Dead Date; or

(d)    by Seller or Buyer upon written notice to the other party:

(i)    if the Sale Order is not entered by the Drop Dead Date;

(ii)    if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to a proceeding under chapter 7 of the Bankruptcy Code; or

(iii)    if the Seller consummates, with any party other than Buyer, (x) the sale of a substantial portion of the Purchased Assets or (y) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving all or a substantial portion of the Purchased Assets (collectively, an "**Alternative Transaction**"); *provided*, that Buyer's right to terminate under this **Section 7.1(d)(iii)** is subject to **Section 8.3**.

**Section 7.2**    **Effect of Termination.**

(a)     In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except that:

(i)     **Section 5.4**, this **ARTICLE VII**, and **ARTICLE VIII** shall survive; and

(ii)     that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

(b)     *Omitted.*

## ARTICLE VIII
## GENERAL PROVISIONS

### Section 8.1     Bankruptcy Court Approval.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts and are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the Assigned Contracts.

(b)     *Omitted.*

(c)     From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with **Section 8.1**, Seller shall not take any action which is intended to (or is reasonably likely to) or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

### Section 8.2     Bankruptcy Filings.

(a)     Seller shall file the form of the Order (A) Authorizing the Sale of Substantially All of the Assets of GetSwift, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief, which is attached hereto as **EXHIBIT B** (acceptable in form an substance to Buyer in its reasonable discretion, the "**Sale Order**"), a proposed version of which shall be filed in the Bankruptcy Case as soon as reasonably practicable prior to the hearing on the entry of the Sale Order.  Subject to **Section 9.1**, Seller shall pursue diligently the entry of the Sale Order.  Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court

for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation). Notwithstanding the foregoing, any resulting changes to this Agreement or any related document or resulting material changes to the Sale Order shall be subject to the approval of Buyer in its reasonable discretion. Seller shall (i) provide Buyer with drafts of the motion seeking entry of the Sale Order and the bidding procedures, the form of which is attached hereto as **EXHIBIT C** (the "**Bidding Procedures**"), the motion seeking entry of the Bidding Procedures, the form of order approving the Bidding Procedures, the form of which is attached hereto as **EXHIBIT D** (the "**Bidding Procedures Order**").

(b)     Seller acknowledges and agrees, and the Sale Order shall provide, among other things, that, on the Closing Date and concurrently with the Closing, all then existing or thereafter Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) of, against or created by Seller or the bankruptcy estates and in existence on or prior to the Closing Date shall be fully released from and with respect to the Purchased Assets, which shall be transferred to Buyer Free and Clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities).

**Section 8.3     Back-Up Bidder.** If an Auction (as defined in the Bidding Procedures) is conducted and Seller does not choose Buyer as the Successful Bidder (as defined in the Bidding Procedures), but instead chooses Buyer as the Back-Up Bidder (as defined in the Bidding Procedures), Buyer will be the Back-Up Bidder. If Buyer is chosen as the Back-Up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with both Parties' written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Purchased Assets to the Successful Bidder; *provided* that in no event shall Buyer be required to keep its bid to consummate the transactions contemplated by this Agreement open and irrevocable after the Drop Dead Date. If the Successful Bid with the Successful Bidder is terminated prior to closing but before the Drop Dead Date, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be amended with both Parties' written consent prior to or at the Auction). In the event that the transaction with the Successful Bidder timely closes and Buyer remains as the Back Up Bidder, however, Buyer's deposit shall be returned in full as provided in the Bidding Procedures.

**Section 8.4     Fees and Expenses**. Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the party incurring such fees or expenses, whether or not such transactions are consummated; *provided*, that no such fees and expenses payable by the Seller shall be paid from any assets otherwise transferable to the Buyer pursuant hereto.

**Section 8.5     Amendment and Modification**.   This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party.

**Section 8.6     Waiver**.  No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof.  Any such waiver by a party shall be valid only if set forth in writing by such party.

**Section 8.7     Notices**.  All notices and other communications hereunder shall be in writing and shall be deemed duly given if delivered personally or sent by facsimile, email, overnight courier or registered or certified mail, postage prepaid, to the address set forth on the signature pages hereto opposite the party to receive such notice, or to such other address as may be designated in writing by such party.

**Section 8.8     Entire Agreement**.   This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements and understandings and all prior and contemporaneous oral agreements, arrangements and understandings between the parties with respect to the subject matter of this Agreement.  No party to this Agreement shall have any legal obligation to enter into the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the parties.

**Section 8.9     Third-Party Beneficiaries**.   Except as provided in Article VI, nothing in this Agreement shall confer upon any person other than the parties and their respective successors and permitted assigns any right of any nature.

**Section 8.10   Governing Law**.  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

**Section 8.11   Assignment; Successors**.  This Agreement may not be assigned by either party without the prior written consent of the other party, except that the Buyer may assign this Agreement to any of its Affiliates.  Subject to the preceding sentence, this Agreement will be binding upon the parties and their respective successors and assigns.

**Section 8.12   Definition of "Affiliate."**  For the purposes of this Agreement, the term "**Affiliate**" shall mean any entity controlling, controlled by or under common control with the named party.

**Section 8.13   Severability**.  If any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

{00650926 - 2}                                        25

74820387v1

**Section 8.14   Counterparts**.  This Agreement may be executed in counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

**IN WITNESS WHEREOF**, the Buyer and the Seller have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**                                              **BUYER:**

**GETSWIFT, INC.**                                       [_____]⁵

                                                         By: _____
By: _____                     Name:_____
Name:  Joel Macdonald                                    Title:_____
Title:  President

                                                         Address for Notices:

                                                         c/o Taft Stettinius & Hollister LLP
Address for Notices:                                     200 Public Square, #3500
                                                         Cleveland, OH 44114
c/o Barclay Damon LLP                                    Attention:  Mark Fazio
1270 Avenue of the Americas, Suite 501
New York, NY 10020
Attention:  Janice B. Grubin
**ULTIMATE PARENT:**

**GETSWIFT TECHNOLOGIES LIMITED**

By: _____

Name:  Joel Macdonald
Title:  President

Address for Notices:

c/o Barclay Damon LLP
1270 Avenue of the Americas, Suite 501
New York, NY 10020
Attention:  Janice B. Grubin

_____

⁵ **Note to Draft**: Special purpose vehicle to be formed by Retail Ecommerce Ventures LLC or affiliate prior to Closing.

**EXHIBIT A**

**SELLER NOTE**

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE SECURITY, FILED AND MADE EFFECTIVE UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND SUCH APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER TO THE EFFECT THAT REGISTRATION UNDER SUCH ACT AND SUCH APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

## PROMISSORY NOTE

**$1,500,000.00**                                        **Issue Date: _____, 2022**

**FOR VALUE RECEIVED**, the undersigned, **[NEWCO][1]**, a Delaware limited liability company ("Maker"), promises to pay to the order of **GETSWIFT, INC.**, a Delaware corporation ("Payee"), the principal sum of One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00) (the "Principal Amount"), together with interest thereon as set forth herein. This Promissory Note (the "Note") is being issued pursuant to Section 1.6(b) of the Asset Purchase Agreement, dated as of [●], 2022, between Maker and Payee (the "Purchase Agreement"), as partial consideration for Maker's purchase of substantially all of Payee's assets associated with the Business. Additional rights and obligations of Maker and Payee are set forth in the Purchase Agreement, and all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

1. **INTEREST AND PAYMENT.**

    **1.1    Interest.** Interest shall accrue on the unpaid Principal Amount at a rate of six percent (6%) per annum, compounded annually and calculated on an annual basis regardless of the actual number of days elapsed (or the maximum rate permissible by law, whichever is less). For the avoidance of doubt, and notwithstanding the foregoing, in no event shall the interest rate or rates payable under this Note, plus any other amounts paid in connection herewith and therewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Maker and Payee, in executing and delivering this Note, intend legally to agree upon the rate or rates of interest and manner of payment stated within it.

    **1.2    Maturity Date.** Unless earlier paid in accordance with this Note, the Principal Amount and accrued interest thereon shall become due and payable on the five (5) year anniversary of the Issue Date (the "Maturity Date").

    **1.3    Payments.** All payments of principal and interest under this Note shall be made in lawful money of the United States of America, in immediately available funds, to the bank account(s) designated in writing by Payee from time to time or to such other account or place of payment specified in writing in advance by Payee. All payments shall be applied first to accrued

---

[1] NTD:  Will be a newly-formed subsidiary of Retail Ecommerce Ventures LLC

interest, including any interest that accrues after the commencement of a proceeding by or against Maker under Title 11 of the United States Code, and thereafter to the outstanding principal balance hereof. If any payments on this Note become due on a Saturday, Sunday, or a public holiday under the laws of the State of Delaware, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest in connection with such payment.

      **1.4**    **Prepayment.** The outstanding Principal Amount and accrued interest thereon under this Note may be voluntarily prepaid, in whole or in part, without penalty, by Maker at any time.

      **1.5**    **Waiver.** Maker hereby waives demand, notice, presentment, protest, and notice of dishonor.

      **1.6**    **Right of Set-off.** Maker shall be entitled to withhold, and set off against, any amounts owed pursuant to this Note any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "<u>Losses</u>") which the Maker may be entitled to recover from Payee pursuant to, in connection with, or arising from the Purchase Agreement,. All such amounts shall be credited first against accrued and unpaid interest, and second against the unpaid Principal Amount.

**2.**    **DEFAULT.**

      **2.1**    **Event of Default.** Each of the following events shall be an "<u>Event of Default</u>" hereunder:

      (a)    the liquidation, dissolution, or winding up of Maker;

      (b)    Maker files any petition or action for relief under any bankruptcy, reorganization, insolvency, or moratorium law, or any other law for the relief of, or relating to, the relief of debtors, now or hereafter in effect ("<u>Debtor Relief Law</u>"); or makes any assignment for the benefit of creditors; or takes any corporate action in furtherance of any of the foregoing;

      (c)    an involuntary petition is filed against Maker under any Debtor Relief Law, which remains undismissed, undischarged, or unbonded for a period of sixty (60) days;

      (d)    a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody, or control of any property of Maker;

      (e)    Maker fails to pay, within fifteen (15) business days of written notice to Maker, any and all unpaid principal, accrued interest, and other amounts then payable hereunder; and

2

   (f)  Maker breaches any representation, warranty, or covenant made by Maker herein or in the Purchase Agreement (except as set forth in <u>Section 2.1(f)</u> above) and, as to any breach that is capable of cure, fails to cure such breach within 30 days of becoming aware of the occurrence of such breach.

   **2.2**  **Effects of Default.** Upon the occurrence of any Event of Default hereunder: all unpaid principal, accrued interest, and other amounts owing hereunder shall, at the option of Payee, and, in the case of an Event of Default pursuant to <u>Sections 2.1(b)-2.1(d)</u> above, automatically, be immediately due, payable, and collectible by Payee pursuant to applicable law; and (ii) Maker shall pay all reasonable attorneys' fees and court costs incurred by Payee in connection with enforcing and collecting this Note.

   **3.**  **REPRESENTATIONS AND WARRANTIES.** Maker is a limited liability company duly incorporated, validly existing, and in good standing under the laws of the State of Delaware. Maker has all necessary power and authority to execute, deliver, and perform its obligations under this Note. This Note, when duly executed and delivered by Maker, will constitute valid and binding obligations of Maker enforceable in accordance with its terms except as such enforceability (1) may be limited by bankruptcy, insolvency, moratorium or other similar laws of general application affecting or relating to the enforcement of creditors' rights generally, (2) is subject to the principles of equity and (3) with respect to rights to indemnity, may be subject to federal and state securities laws. The execution and delivery of this Note by Maker, and the performance of its obligations under this Note, does not violate, conflict with, constitute or result in a breach, violation, or default under (or an event that with notice or passage of time, or both, would constitute a breach, violation, or default), or give rise to any right of termination, cancellation, or acceleration under, or result in the creation of any Encumbrance upon any of Maker's properties or assets under: (i) its certificate of formation, operating agreement, or other governing documents; (ii) any applicable law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, arbitrator, administrative agency, or other governmental body applicable to Maker or any of its properties or assets; or (iii) any contract, agreement, or other obligation by which Maker is bound; except, with respect to clauses (ii) and (iii), where such violation, conflict, breach, default, termination, cancellation, acceleration, or Encumbrance would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Maker. As used herein, the term "<u>Encumbrance</u>" means any lien, charge, encumbrance, equity, claim, option, proxy, pledge, security interest, or other similar right of any nature other than statutory liens securing payments not yet due and payable or due but not yet delinquent.

   **4.**  **GENERAL.**

   **4.1**  **Governing Law.** This Note and any claim (whether in contract, tort or otherwise) or other matter arising out of or relating to this Note shall be governed by and construed in accordance with the laws of the state of Delaware, without giving effect to any choice or conflict of law principle or rule (whether of the state of Delaware or any other jurisdiction).

   **4.2**  **Severability.** If any term or provision of this Note is held by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable ("<u>Invalid</u>") in any jurisdiction, then such term or provision will be interpreted in such jurisdiction so as to accomplish its objectives to the greatest extent possible under applicable law; *provided*, that the Invalid term or provision will

3

not affect any other term or provision of this Note or cause the term or provision to be Invalid in any other jurisdiction.

**4.3     Notices.** All notices required or permitted by this Agreement shall be in writing and shall be deemed effectively given when given in accordance with Section 9.7 of the Purchase Agreement.

**4.4     Amendment and Modification; Waiver.** No amendment to, or modification or rescission of, this Note is effective unless it is in writing and signed by each party. No waiver of any provision of this Note is effective unless it is in writing, identified as a waiver to this Note, and is signed by the party waiving its right. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Note shall operate or be construed as a waiver thereof; nor shall any single or partial waiver or exercise of any right, remedy, power, or privilege hereunder preclude or limit any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**4.5     Assignment; Successors and Assigns.** Maker may not assign any rights or delegate any obligations under this Note without the prior written consent of Payee. Except as otherwise expressly provided herein, this Note shall inure to the benefit of and be binding upon the parties' respective permitted successors and permitted assigns. Any attempted assignment or delegation in violation of this provision shall be void and without effect.

**4.6     Cumulative Remedies.** The rights and remedies of each party under this Note are cumulative, and are in addition to, and not in substitution for, any other rights and remedies available at law, in equity, or otherwise.

**4.7     Time of the Essence.** Time is of the essence of each and every provision of this Note.

**4.8     Interpretation.** The headings used in this Note are for informational purposes and convenience only and in no way define, limit, construe, or describe the scope of the sections. Unless the context otherwise requires, (i) each term stated in either the singular or the plural shall include the singular and the plural, (ii) the words "herein," "hereof," or any variation thereof refer to this Note as a whole and not merely to any subdivision hereof, and (iii) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any preceding general statement. The parties have participated jointly in the negotiation and drafting of this Note, and in the event an ambiguity or question of intent or interpretation arise, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Note.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4

**IN WITNESS WHEREOF**, Maker has executed this **PROMISSORY NOTE** as of the date first written above.

**MAKER:**                                          **PAYEE:**

**[NEWCO]**                                         **GETSWIFT, INC.**

By: _____         By: _____
Name: _____          Name: _____
Title: _____         Title: _____

Address for Notices:                                Address for Notices:

_____          _____
_____          _____
_____          _____

5

**EXHIBIT B**

**SALE ORDER**

**EXHIBIT C**

**BIDDING PROCEDURES**

**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
In re:                                          :   Chapter 11, Subchapter V
                                                :
    GETSWIFT, INC., *et al.*,                :   Case No. 22-11057
                                                :   Main Case
                       Debtors.   x   Jointly Administered
-------------------------------------------------------------- x

## BID PROCEDURES

These bid procedures (the "Bid Procedures") set forth the process by which GetSwift, Inc. ("GSI" or "Seller") and GetSwift Technologies Limited ("GTL" and together with GSI, the "Debtors"), debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Court"), shall market to interested parties and conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of GSI's assets (the "Assets"). The Sale will be subject to bidding as set forth herein and subject to the approval of the Court, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures Relating to the Sale of Substantially all of the Assets of GetSwift, Inc., (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief; and (II)(A) Authorizing the Sale of Substantially all of the Assets of GetSwift, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief* [Docket No. 9] (the "Motion"). The portion of the Motion requesting approval of the Bid Procedures and related relief was heard by the Court on August 12, 2022. The Debtors' request for approval of the Sale and certain other matters relating to the Motion will be heard on September 23, 2022 at 11:00 a.m. (prevailing Eastern Time) (the "Sale Hearing").

1

On _____ __, 2022, the Court entered an *Order (A) Approving Bid Procedures Relating to the Sale of Substantially all of the Assets of GetSwift, Inc., (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protection, and (E) Granting Related Relief* [Docket No. ] (the "<u>Bid Procedures Order</u>"), thereby approving these Bid Procedures.

The Debtors have entered into an Asset Purchase Agreement by and between the Debtors and SF2 GSW LLC (the "<u>Stalking Horse Bidder</u>"), dated August 2, 2022, a copy of which will be made available to interested parties and serve as the form of asset purchase agreement (the "<u>APA</u>") and basis for bids in connection with this process. Capitalized terms used in these Bid Procedures and not otherwise defined shall have the meanings ascribed to such terms in the APA or Bid Procedures Order, as applicable.

The APA contemplates that the Stalking Horse Bidder will acquire all of the Assets.[2] The Debtors will consider competing bids seeking to acquire the Assets to the extent such bids comply with these Bid Procedures and the Bid Procedures Order.

Any party desiring to obtain a copy of the APA, a form of Non-Disclosure Agreement (as defined below) or other information regarding the sale process may do so by contacting Debtors' counsel at:

> **Barclay Damon LLP**
> Janice B. Grubin
> Ilan Markus
> Scott L. Fleischer
> 1270 Avenue of the Americas, Suite 501
> New York, New York 10020
> (212) 784-5800
> jgrubin@barclaydamon.com
> imarkus@barclaydamon.com
> sfleischer@barclaydamon.com

The Debtors provide these Bid Procedures for use by Potential Bidders (defined below) and Qualified Bidders (defined below) in submitting bids proposing a transaction to purchase the Assets, and, as necessary, qualifying for and participating in the Auction.

1.      <u>Important Dates.</u>

The following is a table setting forth key dates and deadlines with respect to the sale process:

---

[2] Assets refers to all of the personal property associated with the Debtors' SaaS business, defined as Purchased Assets in the APA attached as Exhibit A to the Motion's Exhibit B (Docket No. 9).

| Event or Deadline | Date and Time |
|---|---|
| Deadline to File Notice of Assumption and Assignment | On or before August 23, 2022 |
| Deadline to Object to Cure Amounts, Stalking Horse Adequate Assurance of Future Performance, and Sale (for all objections other than stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder)) | On or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | On or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline to Designate Qualified Bids | On or before September 19, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | On or before September 20, 2022 at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to File Notice Designating Successful Bidder | One (1) business day following conclusion of the Auction |
| Deadline to Object to Non-Stalking Horse Adequate Assurance of Future Performance and Raise Any Additional Cure Cost Objections (if initial cure objection was filed timely) | Until the commencement of the Sale Hearing |
| Deadline to Object to Sale Based on Identity of Successful Bidder (if different than the Stalking Horse Bidder) | Until the commencement of the Sale Hearing |
| Sale Hearing | September 23, 2022 at 11:00 a.m. (prevailing Eastern Time) |

     2.     <u>Assets to be Sold.</u>

The Debtors seek to sell the Assets.

     3.     <u>Qualified Bidders, Non-Disclosure Agreements and Access to Data Room.</u>

Any person or entity wishing to bid on the Assets (each a "<u>Potential Bidder</u>") must execute and deliver (unless previously delivered) to the Debtors a confidentiality and nondisclosure agreement (a "<u>Non-Disclosure Agreement</u>") in form and substance acceptable to the Debtors.

3

The Debtors, in their discretion, will afford a Potential Bidder who executes and delivers a Non-Disclosure Agreement due diligence access or such additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate, including, without limitation, access to the Debtors' confidential electronic data room, reasonable access, during normal business hours, to the Debtors' management, and access to all relevant information regarding the Assets reasonably necessary to enable a Potential Bidder to evaluate the proposed Sale; provided that, prior to accessing such information, any such Potential Bidder has evidenced the financial wherewithal and ability to consummate the Sale. Debtors' counsel will coordinate all due diligence access and requests for additional information from such Potential Bidders. The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the Auction other than to the Successful Bidder (defined below) or any Backup Bidder. Neither the Debtors (nor their members, partners, affiliates, and shareholders), their counsel nor their advisors are responsible for, or will bear any liability with respect to, any information obtained by Potential Bidders in connection with due diligence. Notwithstanding anything contained herein to the contrary, to the extent the Debtors believe that providing access to Potential Bidders to certain sensitive commercial information is not advisable, the Debtors, in their business judgment, will decide what, if any, diligence information to make available to a particular Potential Bidder, and neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

A "**Qualified Bidder**" is any Potential Bidder that (a) delivers to the Debtors a Non-Disclosure Agreement, (b) demonstrates to the Debtors a reasonable certainty of its ability to close the Sale in a timely manner (including the financial capability to close the Sale and the ability to obtain the necessary governmental, licensing, regulatory, or other approvals necessary for such Sale, if any), and (c) submits a Written Offer (as defined below) that satisfies all requirements of a Qualified Bid as set forth below, provided, however, that, except for the requirements set forth in sections 4(viii) and 4(x)–4(xii) of these Bid Procedures, the Debtors may waive one or more requirements for a Qualified Bidder. As promptly as practicable after a Potential Bidder delivers a Non-Disclosure Agreement and submits a Written Offer, and in any event not later than September 19, 2022 at 5:00 p.m. (prevailing Eastern Time), the Debtors shall determine, and the Debtors shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate the proposed Sale. Notwithstanding anything to the contrary herein or in the Sale Order, the Stalking Horse Bidder shall be a Qualified Bidder.

4.     Requirements for a Qualified Bid.

In order to become a Qualified Bidder and participate in the Auction, if any, a Potential Bidder must deliver to counsel to the Debtors a written offer (each, a "Written Offer") that is deemed to be a Qualified Bid. To be deemed a "Qualified Bid", a Written Offer must meet each of the requirements listed below:

(i)     Delivery:  Be delivered no later than 5:00 p.m. (prevailing Eastern Time) on September 14, 2022 (the "Bid Deadline").

(ii)    <u>Executed Agreement</u>:  Be accompanied by (i) a clean and duly executed and binding asset purchase agreement (together with the exhibits and schedules thereto, a "<u>Modified APA</u>"), and (ii) a marked Modified APA reflecting any variations from the APA, both of which shall be subject to section 4(xii) hereof.

(iii)    <u>Designation of Assumed or Assumed and Assigned Contracts and Leases and Adequate Assurance of Future Performance</u>:  Contain a list of any and all executory contracts and unexpired leases of the Debtors that are to be assumed and assigned in connection with a Sale (each a "<u>Contract</u>" and, collectively, the "<u>Contracts</u>" and once assumed, or assumed and assigned, an "<u>Assigned Contract</u>") to the extent such list is not included in the Modified APA. The Potential Bidder must also include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance for the benefit of the non-debtor parties to the Contracts on the list, including, without limitation, (i) the specific name of the entity to whom the Contract will be assigned; (ii) if available, audited financial statements and annual reports of the proposed purchaser and any other assignee for the past three (3) years, including all supplements or amendments thereto; (iii) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, and any financial projections, calculations and/or pro formas prepared in contemplation of purchasing the assets, including the Assigned Contacts; (iv) all documents and other evidence of the proposed assignee's experience in the Debtors' industry; and (v) a contact person for the proposed assignee whom non-debtor parties may contact directly in connection with adequate assurance of future performance. Should the Potential Bidder be a newly formed entity (a "<u>Newco</u>"), written evidence of adequate assurance of future performance should also include when such Newco was formed, the relevant financial information of the equity sponsors of the Newco, how it will be financed together with evidence of firm financial commitments, and identify what credit enhancements, if any, will be available to guarantee the obligations under the Assigned Contracts. Non-debtor parties to the Contracts may object on adequate assurance grounds at or before the Sale Hearing.

(iv)    <u>Proof of Financial Ability to Perform</u>:  Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, which evidence is satisfactory to the Debtors, including, without limitation, such financial and other information setting forth adequate assurance under section 365 of the Bankruptcy Code in a form requested by the Debtors. Should the Potential Bidder be a Newco, such information shall be provided in respect of the Newco's equity sponsors.

(v) <u>Identification of Parties to Participate</u>:  To the Debtors' satisfaction, (i) fully disclose the identity of each entity or person that will be bidding for the Assets or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval, if necessary, in connection with the consummation of any Sale.

(vi) <u>Irrevocable</u>:  State that the Written Offer is irrevocable until (i) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (ii) if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Backup Bidder (as defined below), until the earlier of (x) two (2) business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid (as defined below) have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (y) sixty (60) days after the date of the Auction (the "<u>Backup Bid Expiration Date</u>").

(vii) <u>No Break-Up Fee or Expense Reimbursement</u>:  Not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; <u>provided</u>, <u>however</u>, that the APA with the Stalking Horse Bidder shall contain a break-up fee as approved in the Bid Procedures Order.

(viii) <u>Contingencies</u>:  Not contain any due diligence or financing contingencies.

(ix) <u>Authorization to Consummate Sale</u>:  Provide evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if any, with respect to the submission, execution, delivery and closing of the Modified APA to the Debtors' satisfaction.

(x) <u>Purchase Price</u>:  Bids must provide for a Purchase Price equal to or greater than the Purchase Price stated in the APA (which is comprised of (A) $2.5 million in cash plus an Estimated Working Capital Adjustment Amount, (B) issuance of an unsecured promissory note to Seller in the principal amount of $1 million, and (C) assumption of up to $1 million in Assumed Accounts Payable and Cure Costs, <u>plus</u> (x) the amount of the Break-Up Fee ($75,000)(as defined and set forth in the APA), <u>plus</u> (y) a minimum overbid amount of $50,000.00, which in the aggregate is a minimum overbid amount of approximately $125,000.  Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee.

(xi)    <u>Good Faith Offer</u>:  Constitute a good faith, bona fide offer to purchase all of the Assets.

(xii)    <u>Same or Better Terms</u>:  Be on terms that, in their totality, are determined by the Debtors, in their business judgment, to be the same or better than the terms set forth in the APA in their totality.

(xiii)    <u>Good Faith Deposit</u>:  Provide a good faith deposit (the "<u>Good Faith Deposit</u>") submitted via federal wire transfer in immediately available funds in accordance with the wire instructions to be provided by the Debtors, or such other form as is acceptable to the Debtors, in an amount equal to 10% of the cash purchase price set forth in the Written Offer.

(xiv)    <u>Anticipated Timeline</u>:  Set forth the anticipated timeframe for (i) obtaining any required government, regulatory or other approvals, and (ii) consummating the Sale within the requirements of subparagraph (xvii) herein.

(xv)    <u>Agreement with Bid Procedures, Provision of Additional Information and Submission to Bankruptcy Court Jurisdiction</u>  Include a written acknowledgement by such Potential Bidder that it (i) agrees to the terms of the Bid Procedures; (ii) agrees to provide such other information as may be reasonably requested in writing by the Debtors prior to the Auction; and (iii) confirms that the Potential Bidder submits to the jurisdiction of the Court.

(xvi)    <u>As-Is, Where-Is</u>:  Include a disclaimer acknowledging that the Sale will be conducted on an As-Is, Where-Is Basis in accordance with section 8 of these Bid Procedures.

(xvii)    <u>Closing Date</u>:  Provide for a closing date (the "<u>Closing Date</u>") as set forth in section 1.8 of the APA.

Between the Bid Deadline and the Auction, the Debtors may (i) negotiate or seek clarification of any Written Offer from a Qualified Bidder, (ii) request information from any Qualified Bidder, (iii) engage in discussions with any Qualified Bidder, and/or (iv) take such other actions contemplated under these Bid Procedures. Without the consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Written Offer. All changes to the form of APA reflected in the Modified APA will be evaluated by the Debtors and must be acceptable to the Debtors, in their business judgment. Any Good Faith Deposit accompanying a Written Offer that the Debtors determine not to be a Qualified Bid shall be returned promptly following such determination.

For the avoidance of doubt, the Stalking Horse Bid shall be deemed a Qualified Bid regardless of the foregoing requirements. Furthermore, a bid of the Stalking Horse Bidder at the Auction will be deemed a Qualified Bid notwithstanding that such a bid (A) entitles the Stalking Horse Bidder to a break-up fee on the same terms as the Stalking Horse Bid, (B) does not include a Good Faith Deposit, and (C) does not include information set forth in clauses (iii), (iv), (v), (ix), (xii), or (xiii).

5.      Bid Deadline.

All Qualified Bids must be received by each of the parties listed below prior to the Bid Deadline.

**Debtors**:

Joel Macdonald
Robert Bardunias
1185 Sixth Avenue, 3rd Floor
New York, New York 10036
joel@getswift.co
rob@getswift.co

**Debtors' Counsel**:

Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
(212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

6.      Determination of Qualified Bidders.

The Debtors shall, by no later than 5:00 p.m. (prevailing Eastern Time) on September 19, 2022, (i) determine, in their business judgment, whether a Potential Bidder is a Qualified Bidder, (ii) notify each such Potential Bidder that its Written Offer is a Qualified Bid and that such Potential Bidder is a Qualified Bidder, and (iii) provide a copy of the Opening Qualified Bid (defined below) to each Qualified Bidder.

7.      No Break-Up Fee or Bid Protections.

No Modified APA may include any break-up fee or expense reimbursement or other similar bid protections.

8.      "As Is, Where Is".

Except as otherwise provided in the Final APA (as defined below), the Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors or their estates except to the extent set forth in the Final APA as approved by the Court. Except as otherwise provided in the Final APA, all of the Debtors' right, title and interest in the Assets subject thereto, as applicable, shall be sold free and clear of all liens,

claims, interests and encumbrances (collectively, the "Liens") in accordance with sections 363 and 365 of the Bankruptcy Code, with such Liens to attach to the net proceeds of the Sale.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and inspection of any documents relating to the Assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Procedures or, as to the Successful Bidder(s) and the Backup Bidder(s), the terms of the Sale(s) as set forth in the final form of the applicable APA or Modified APA (the "Final APA"), which shall be on terms mutually acceptable to the Successful Bidder and Backup Bidder, on the one hand, and the Debtors, on the other hand.

9. Auction.

If the Debtors have determined that there are one or more Qualified Bidders (other than the Stalking Horse Bidder), the Debtors shall conduct an Auction to determine the highest and otherwise best Qualified Bid. This determination shall take into account any factors the Debtors, in their business judgment, reasonably deem relevant and may include, among other things, the following: (i) the amount and type of the consideration; (ii) the number, type and nature of any changes to the APA requested by a Qualified Bidder in its respective Modified APA; (iii) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; and (v) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof.

The Auction shall commence at 10:00 a.m. (prevailing Eastern Time) on September 20, 2022, at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 501, New York, New York 10020, or such other place and time as determined by the Debtors, and continue thereafter until completed. The Debtors reserve the right to cancel, postpone, or continue the Auction or conduct the Auction virtually by video conference.

Except as otherwise permitted in the Debtors' discretion, only the Debtors, the Qualified Bidders, and any creditor that submits a written request to attend to the Debtors in advance of the Auction, and, in each case, their respective professionals, shall be entitled to attend the Auction. Only a Qualified Bidder is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

(i) Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative, unless alternate arrangements are made with the Debtors to attend the Auction virtually.

(ii) Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules

are (i) not inconsistent with the Bid Procedures Order, the APA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any order of the Court entered in connection with these Chapter 11 Cases, (ii) disclosed to each Qualified Bidder, and (iii) designed, in the Debtors' business judgment, to result in the highest and otherwise best offer for the Assets.

(iii) The Debtors will arrange for the actual bidding at the Auction to be transcribed. Each Qualified Bidder shall designate a single individual to be its spokesperson during the Auction.

(iv) Each Qualified Bidder participating in the Auction must confirm on the record, at the commencement of the Auction and again at the conclusion of the Auction, that it has not engaged in any collusion with the Debtors or any other Qualified Bidder regarding these Bid Procedures, the Auction or any proposed transaction relating to the Assets.

(v) Prior to the Auction, the Debtors shall identify the highest and best of the Qualified Bids received (the "Opening Qualified Bid"). Subsequent bidding will continue in minimum increments valued at not less than $50,000 cash or in such amounts as to be determined by the Debtors prior to, and announced at, the Auction.  Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee. Each Qualified Bidder (other than the Stalking Horse Bidder) shall provide evidence of its financial wherewithal and ability to consummate the Sale at the increased Purchase Price.

(vi) All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then-current highest and best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then-current highest and best bid.

(vii) In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction in accordance with the terms and provisions of these Bid Procedures; provided, however, that any such modifications to the APA or Modified APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors in their business judgment.

(viii) Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, (i) identify and determine in their business judgment the highest and best Qualified Bid for the Assets (a "Successful Bid") and the entity or entities submitting such Successful Bid (the "Successful Bidder"), (ii) advise the Qualified Bidders of such

determination, and (iii) require the Successful Bidder to deliver an executed Final APA, which reflects its bid and any other modifications submitted and agreed to during the Auction, prior to commencement of the Sale Hearing.

(ix)    The Debtors will also determine which Qualified Bid, if any, is the next highest and best Qualified Bid to the Successful Bid, and will designate such Qualified Bid as a "<u>Backup Bid</u>" in the event the Successful Bidder fails to consummate the contemplated Sale. A Qualified Bidder who submitted a Qualified Bid and is designated a Backup Bid is a "<u>Backup Bidder</u>". Each Backup Bid shall remain open and binding until the Backup Bid Expiration Date.

10.    <u>Sole Qualified Bidder.</u>

If, by the Bid Deadline, there is no Qualified Bidder other than the Stalking Horse Bidder, (i) the Stalking Horse Bid shall be deemed the Successful Bid and the Stalking Horse Bidder shall be deemed the Successful Bidder, (ii) the Debtors shall not hold an Auction, and (iii) the Debtors shall proceed at the Sale Hearing and seek approval from the Court of the Stalking Horse Bid.

11.    <u>Bid Protection.</u>

In the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors shall pay to the Stalking Horse Bidder, in consideration of its being the Stalking Horse Bidder, the Break-Up Fee in accordance with the terms and conditions set forth in the APA and as approved by the Court in the Bid Procedures Order; *provided*, *however*, that the Stalking Horse Bidder shall have the right (but not the obligation) to increase its Stalking Horse Bid at the Auction by using, as a credit, the amount of the Break-Up Fee. No other bidder will be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.

12.    <u>Sale Hearing.</u>

The Sale Hearing will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge on September 23, 2022 at 11:00 a.m. (prevailing Eastern time), at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom No. 617, New York, NY 10004 or by way of a telephonic hearing through Court Solutions. At the Sale Hearing, the Debtors shall present the results of the Auction, if one is held, to the Court and seek approval of the Successful Bid and any related Backup Bid.

Following the Sale Hearing and entry of a Sale Order approving the Sale of the Assets to a Successful Bidder, if such Successful Bidder fails to consummate the Sale for any reason, the Backup Bidder shall be designated the Successful Bidder and the Debtors shall be authorized to close such Sale with the Backup Bidder without further order of the Court; <u>provided</u>, <u>however</u>, counterparties to any Contracts for which a Backup Bidder is deemed the new Successful Bidder shall receive written notice of the identity of the Backup Bidder being deemed the Successful Bidder, and shall have seven (7) days to object to the Backup Bidder's adequate assurance of future performance under any Assigned Contract to be assumed and assigned, with the Court to hold a subsequent hearing, if necessary, to determine any unresolved objections. The Successful Bidder and Backup Bidder (if any) should be represented by counsel at the Sale Hearing.

13.     <u>Consummation of the Purchase.</u>

(a)     Closing Date; Good Faith Deposit

The Successful Bidder shall consummate the Sale contemplated by the Successful Bid (the "<u>Purchase</u>") on or before the Closing Date. If the Successful Bidder successfully consummates the Purchase by the Closing Date, such Successful Bidder's Good Faith Deposit, if any, shall be applied to the purchase price of the Purchase.

If the Successful Bidder either: (i) fails to consummate the Purchase on or before the Closing Date, (ii) breaches the Final APA, or (iii) otherwise fails to perform, the Debtors shall, without further order of the Court, deem such Successful Bidder to be a "<u>Defaulting Buyer</u>."

The Debtors shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Buyer and (b) seek all available damages from such Defaulting Buyer occurring as a result of such Defaulting Buyer's failure to perform in accordance with the terms of the APA or Modified APA, as applicable, and the Sale Order.

(b)     <u>Backup Purchaser.</u>

Upon a determination by the Debtors that the Successful Bidder is a Defaulting Buyer, the Debtors may consummate a Sale with the Backup Bidder on the terms and conditions of the Backup Bid (the "<u>Backup Purchase</u>") without further order of the Court.

If the Backup Bidder consummates the Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price of the Backup Purchase. In the event that the Debtors seek to consummate the Backup Purchase with the Backup Bidder and such Backup Bidder (i) fails to consummate the Backup Purchase, (ii) breaches the Final APA, or (ii) otherwise fails to perform, the Debtors may, in their discretion, and without further order of the Court, deem such Backup Bidder to be a "<u>Defaulting Backup Buyer</u>" and shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Backup Buyer, and (b) to the extent provided for under the APA or Modified APA, seek all available damages from such Defaulting Backup Buyer occurring as a result of such Defaulting Backup Buyer's failure to perform in accordance with the terms of the APA or Modified APA, as applicable, and the Sale Order.

14.     <u>Return of Good Faith Deposits.</u>

Good Faith Deposits shall be held in a non-interest bearing escrow account. Except for those of the Successful Bidder and Backup Bidder(s), the Debtors shall promptly return the Good Faith Deposits of (i) all Qualified Bidders within five (5) business days following conclusion of the Auction; and (ii) the Backup Bidder after the Backup Bid Expiration Date.

15.    DIP Lender Credit Bid.

The DIP Lender shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the then outstanding DIP Obligations in support of the Stalking Horse Bid.

16.    Consent to Jurisdiction and Authority as a Condition to Bidding

All Potential Bidders shall be deemed to have (i) consented to the core jurisdiction of the Court to enter an order or orders, which shall be binding in all respects, in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale; (ii) waived any right to jury trial in connection with any disputes relating to the Bid Procedures, the Auction, the construction and enforcement of any purchase agreement or any other document relating to the Sale; and (iii) consented to entry of a final order or judgment in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

17.    Reservation of Rights.

The Debtors shall retain all rights to any of their assets that are not subject to the Sale that is approved by the Court at the Sale Hearing.

18.    Modifications.

Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may modify the Bid Procedures in any manner that is not inconsistent with or otherwise in contravention of the other terms of these Bid Procedures, the Bid Procedures Order, or the APA, including, without limitation, (a) waiving the terms and conditions set forth herein with respect to any or all potential bidders, (b) imposing additional terms and conditions with respect to any or all potential bidders, (c) extending the deadlines set forth herein or the date for the Auction and/or Sale Hearing (which may occur in open court); or (d) amending the Bid Procedures as they may determine to be in the best interests of their estates; *provided that* all material modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction.

Dated: _____, 2022          Respectfully submitted,
          New York, New York

                                  **BARCLAY DAMON LLP**

                                  *By:* _____
                                  Janice B. Grubin
                                  Ilan Markus
                                  Scott L. Fleischer
                                  1270 Avenue of the Americas, Suite 501
                                  New York, New York 10020
                                  Telephone: (212) 784-5800
                                  jgrubin@barclaydamon.com
                                  imarkus@barclaydamon.com
                                  sfleischer@barclaydamon.com

                                  *Proposed Counsel to Debtors and*
                                  *Debtors-in-Possession*

**EXHIBIT D**

**BIDDING PROCEDURES ORDER**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
In re:                                    : Chapter 11, Subchapter V
                                          :
GETSWIFT, INC., *et al.*,                 : Case No. 22-11057
                                          : Main Case
                          Debtors.        x Jointly Administered
------------------------------------------------------------

**ORDER (A) APPROVING BID PROCEDURES RELATING TO THE
SALE OF SUBSTANTIALLY ALL THE ASSETS OF GETSWIFT, INC.,
(B) ESTABLISHING PROCEDURES IN CONNECTION WITH THE
ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(C) APPROVING NOTICE PROCEDURES, (D) APPROVING THE
STALKING HORSE BID AND BID PROTECTIONS, AND
(E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of GetSwift, Inc. ("GSI" or "Seller") and GetSwift

Technologies Limited ("GTL"), the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors"), pursuant to sections 105, 363 and 365 of title 11 of the United States

Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy

Rules for the Southern District of New York (the "Local Rules"), for entry of an order (this "Bid

Procedures Order"): (i) approving the bid procedures in the form annexed hereto as **Exhibit 1** (as

amended or modified, the "Bid Procedures") to be implemented in connection with a sale (the

"Sale") of substantially all of GSI's assets (the "Assets"); (ii) establishing procedures in connection

with the Debtors' assumption, or assumption and assignment to the Successful Bidder or Backup

Bidder, of certain executory contracts and unexpired leases (each an "Assigned Contract" and,

collectively, the "Assigned Contracts") and the corresponding cure amounts (the "Cure Amounts")

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Motion, the APA, or the Bid Procedures, as applicable. In the event of a discrepancy between the definitions contained in the Motion, the APA and the Bid Procedures, those contained in the APA shall control.

1

required to be paid in connection with the assumption or assumption and assignment, (iii) approving the notice procedures (the "Notice Procedures") to advise parties in interest and Potential Bidders of the Bid Procedures, the auction for the Assets (the "Auction"), the hearing on approval of the Sale (the "Sale Hearing"), and the Debtors' intent to assume or assume and assign to the Successful Bidder or Backup Bidder the Assigned Contracts and the corresponding Cure Amounts; and (iv) granting related relief; the Debtors' motion to shorten the time for the Motion to be heard with respect to the Bid Procedures Order; the Court, having determined that the relief provided herein is in the best interests of the Debtors, their estates, creditors and other parties in interest and calculated to result in the highest or otherwise best offer for the Assets, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and all objections and responses to the Motion having been resolved and otherwise withdrawn or overruled; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing on the Motion, and the full record of these Chapter 11 Cases; and after due deliberation thereon; and good and sufficient cause appearing therefore:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The Motion and the Bid Procedures comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

C.      The notice given by the Debtors of the Motion and the hearings with respect to the Motion constitutes proper, timely, adequate and sufficient notice thereof and complies with the

Bankruptcy Code, the Bankruptcy Rules and Local Rules, and no other or further notice is necessary, except as set forth herein.

D.     A reasonable opportunity to object or be heard regarding the relief provided herein with respect to the Motion has been afforded to parties in interest.

E.     The proposed Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Bid Procedures to be employed in connection therewith, the Sale, and the Sale Hearing. The Notice Procedures comply with Bankruptcy Rule 2002 and constitute sufficient notice to all interested parties and provide sufficient notice of the proposed Sale.

F.     The Notice of Assumption or Assumption and Assignment is reasonably calculated to provide all counterparties to Assigned Contracts with proper notice of the potential assumption or assumption and assignment of their respective Assigned Contract(s) and any Cure Amount(s) relating thereto, provided, however, that the mere listing of any Assigned Contract on the Notice of Assumption or Assumption and Assignment does not require or guarantee that such Assigned Contract is executory or will be assumed or assumed and assigned, and all rights of the Debtors with respect to such Assigned Contracts are reserved.

G.     The Debtors have articulated good and sufficient business reasons for this Court to approve (i) the Bid Procedures, (ii) the scheduling of the Auction and the Sale Hearing, (iii) the establishment of procedures to fix the Cure Amounts to be paid under section 365 of the Bankruptcy Code in connection with the assumption or assumption and assignment of the Assigned Contracts; (iv) the Break-Up Fee; and (v) related deadlines in connection with each of the foregoing. Such good and sufficient reasons were set forth in the Motion or have been described at the hearing, are incorporated by reference herein, and, among other things, form the basis of the

findings of fact and conclusions of law set forth herein. The Debtors have demonstrated that the Bid Procedures are fair, reasonable and appropriate and are designed to maximize the value of the Debtors' estates.

H.     The Asset Purchase Agreement, dated August 2, 2022 (including its exhibits and schedules, the "APA"), between the Debtors and SF2 GSW LLC (the "Stalking Horse Bidder" and the bid submitted by the Stalking Horse Bidder, the "Stalking Horse Bid") represents the highest or otherwise best offer the Debtors have received to date for Sale. Approval of the Stalking Horse Bidder as a "stalking horse" bidder and the APA as a "stalking horse" sale agreement is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment. The APA provides the Debtors with the opportunity to sell the Assets to preserve and realize the going concern value of the Debtors' business. The APA will enable the Debtors to secure a fair baseline price for the Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties-in-interest.

I.     The Bid Protections, which consists of, among other things, the Break-Up Fee, has been negotiated by the Stalking Horse Bidder and the Debtors, and their respective advisors, at arms' length and in good faith. The Bid Protections were a material inducement to, and express condition of, the Stalking Horse Bidder's willingness to submit a bid through execution of the APA that will serve as a minimum or floor bid on which the Debtor, their creditors, suppliers, vendors, and other bidders may rely. Without the Bid Protections, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale or otherwise be bound under the APA (including the obligation to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bid Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that, given the

circumstances, the best possible price for the Assets will be received. Accordingly, the Bid Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

J.      The Bid Protections: (i) shall, if triggered, be deemed actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) are reasonable and appropriate, including in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed Sale is subject to better and higher offers; and (iv) were necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the APA. The Debtors' decision to enter into the APA and grant the Bid Protections is a sound exercise of business judgment. The Bid Protections are an actual and necessary cost and expense of preserving the Debtors' estates, and the Stalking Horse Bidder has provided an actual and necessary benefit to the Debtors, their estates, and their creditors by providing a baseline value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood the Debtors will receive the best possible price and terms for the Assets.

K.      The Stalking Horse Bidder is not an "insider" or an "affiliate" of either of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, managers or controlling shareholders exist between the Stalking Horse Bidder and the Debtors. All negotiations between the Stalking Horse Bidder, the Debtors and their

respective advisors with respect to the Bid Procedures have been in good faith, at arm's length, and without collusion.

L.      The Bid Procedures are reasonably designed to enable the Debtors to receive bids for the Assets and represent the best method for maximizing the realizable value of the Assets and serve to maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and parties in interest.

M.      Entry of this Bid Procedures Order and the granting of the relief set forth herein are in the best interests of the Debtors, their estates, creditors and other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion as it relates to the Bid Procedures, the Assigned Contract procedures, the Notice Procedures, the Bid Protections and the scheduling of and notice to be approved with respect to the Auction and the Sale Hearing is granted and approved as set forth in this Bid Procedures Order.

2.      All objections and responses to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits.

3.      The Bid Procedures, attached hereto as **Exhibit 1**, are incorporated herein and are approved in their entirety, and shall apply with respect to the sale of the Assets. The failure to specifically include or reference a particular provision of the Bid Procedures in the Motion or in this Bid Procedures Order shall not diminish or impair the effectiveness of such provision. The Debtors are authorized to take all actions necessary or appropriate to implement the Bid Procedures. Notwithstanding the foregoing, the consummation of the Sale shall remain subject to entry of a further order of this Court (the "Sale Order") which shall serve as an order approving

the Sale of the Assets, free and clear of any interests, liens, claims, or encumbrances under section 363 of the Bankruptcy Code. In the event of an inconsistency between this Bid Procedures Order and the Bid Procedures, the Bid Procedures Order shall prevail.

4.     The Debtors are hereby authorized to pursue a Sale of the Assets in accordance with the Bid Procedures.

5.     SF2 GSW LLC is approved to be the stalking horse bidder. The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the APA is deemed a Qualified Bid.

6.     The Bid Protections are approved.

7.     The Debtors are hereby authorized to pay the Break-Up Fee in accordance with the terms of the APA without further order of the Court. The Break-Up Fee shall constitute an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code. The Debtors' obligation to pay the Break-Up Fee shall be the joint and several obligations of the Debtors and shall survive termination of the APA, dismissal or conversion of any of the Chapter 11 Cases, and confirmation of any plan of reorganization or liquidation.

8.     The process for submitting Qualified Bids (as defined in the Bid Procedures) is fair, reasonable, and appropriate and is designed to maximize recoveries for the benefit of the Debtors' estates, their creditors and other parties-in-interest. Any disputes as to the selection of a Qualified Bidder and the Successful Bidder shall be resolved by this Court.

9.     All information relating to the Assets provided to assist a person or entity in evaluating whether to participate in the Auction is confidential. Any person or entity that is provided with such information shall: (i) use such information solely for the purpose of evaluating

whether to participate in the Auction; (ii) not use such information for any other purpose; (iii) shall hold such information in strict confidence; (iv) not, directly or indirectly, disclose any of such information, subject to certain limited exceptions; (v) undertake reasonable precautions to protect the confidentiality of such information; and (vi) be solely responsible for any ramifications resulting from any disclosure of such information.

10.     As further described in the Bid Procedures, the deadline for submitting Written Offers for the Assets (the "Bid Deadline") is **September 14, 2022 at 5:00 p.m. (prevailing Eastern Time)**.

11.     The Debtors are authorized to conduct the Auction in the event they receive one or more timely and acceptable Qualified Bids (besides the Stalking Horse Bid). If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), then (a) the Debtors will not hold the Auction; (b) the Stalking Horse Bidder will be deemed to be the Successful Bidder; and (c) the Debtors shall seek approval of the APA at the Sale Hearing.

12.     If there is one or more Qualified Bid (besides the Stalking Horse Bid) received in accordance with the Bid Procedures, the Auction shall take place on **September 20 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 501, New York, NY 10020, or such other place and time as the Debtors shall notify all parties in interest attending the Auction.

13.     The Auction shall be conducted in accordance with the Bid Procedures.

14.     The Auction will be conducted openly.

15.     Bidding at the Auction will be transcribed.

16.     The Sale Hearing shall be held before this Court on **September 23, 2022 at 11:00 a.m. (prevailing Eastern Time)** or as soon thereafter as counsel and interested parties may be

heard. Objections, if any, to the Sale of the Assets to any Successful Bidder and/or the relief

requested in the Motion, other than the relief approved in this Order, must be in writing and filed

with the Court **on or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time)**;

provided, however, that objections solely stemming from the identity of the Successful Bidder (if

different than the Stalking Horse Bidder) may be filed at any time prior to the commencement of

the Sale Hearing or may be made orally at the Sale Hearing.

17.     The notice procedures described in subparagraphs (a) – (e) below are approved and

shall be good and sufficient, and no other or further notice shall be required if given as follows:

    a.     On or before three (3) business days after entry of this Bid Procedures Order, or as soon thereafter as such parties can be identified, the Debtors will cause (a) a notice in substantially the form annexed hereto as **Exhibit 2** (the "Notice of Bid Procedures, Auction Date and Sale Hearing") and (b) a copy of the Bid Procedures Order to be sent by first-class mail to the following: (i) the United States Trustee; (ii) the Subchapter V Trustee; (iii) the Stalking Horse Bidder; (iv) the Lender; (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (vii) the non-debtor parties to the Assigned Contracts; (viii) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within the last six (6) months; (ix) all taxing authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested by the Motion; (x) all parties to any litigation involving the Debtors; and (xi) any other persons reasonably requested to be noticed by the Stalking Horse Bidder.

    b.     On or before three (3) business days after entry of the Bid Procedures Order, the Debtors will serve the Notice of Bid Procedures, Auction Date and Sale Hearing on all known creditors of the Debtors.

    c.     By August 23, 2022, the Debtors shall file and serve, by first class mail or hand delivery, a notice, substantially in the form attached hereto as **Exhibit 3**, of the potential assumption or assumption and assignment of the Assigned Contracts (the "Notice of Assumption or Assumption and

Assignment") on all non-debtor parties to the Assigned Contracts. The Notice of Assumption or Assumption and Assignment (or a Supplemental Notice of Assumption or Assumption and Assignment (defined below)) shall (i) identify the amount of the Cure Amounts that the Debtors believe must be paid to cure all prepetition defaults under the Assigned Contracts, and (ii) provide instructions for the timing and procedure governing the filing of any objections to (a) the proposed Cure Amounts and (b) the proposed assumption or assumption and assignment of any Assigned Contract in connection with the Sale, as approved by the Court in the Bid Procedures Order. In addition, if the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors or assumed by the Debtors and assigned to the Successful Bidder or Backup Bidder, as applicable, that are not included in the original Notice of Assumption or Assumption and Assignment, the Debtors shall promptly send a supplemental notice (a "Supplemental Notice of Assumption or Assumption and Assignment") to any such applicable counterparties to such additional Assigned Contracts.

d.     On or before seven (7) days after entry of this Bid Procedures Order, subject to applicable submission deadlines, the Debtors will publish an abbreviated version of the Notice of Bid Procedures, Auction Date and Sale Hearing in (i) one or more national publication and (ii) one or more trade publication, that the Debtors, in their business judgment, deem appropriate.

e.     In addition to the foregoing, electronic notification of the Motion, the Bid Procedures Order, the Notice of Bid Procedures, Auction Date and Sale Hearing, and the Notice of Assumption or Assumption and Assignment, will be posted on the main case docket on the Court's electronic case filing (ECF) website.

19.     The Notice of Bid Procedures, Auction Date and Sale Hearing, and the Notice of Assumption or Assumption and Assignment to be issued in connection with the proposed Sale, substantially in the forms annexed hereto as **Exhibits 2 and 3**, respectively, are approved.

20.     Unless the non-debtor party to an Assigned Contract files an objection (the "Contract Objection") to (a) their scheduled Cure Amount and/or (b) to the proposed assumption or assumption and assignment of such Assigned Contract, as applicable, by **5:00 p.m. (prevailing Eastern Time) on September 14, 2022**, then such non-debtor party (i) will be forever barred and estopped from objecting to the Cure Amount, and the Debtors, the Successful Bidder or Backup Bidder, as applicable, shall be entitled to rely solely upon the Cure Amount, and (ii) if the Assigned

Contract is identified as being assumed or assumed and assigned to the Successful Bidder or Backup Bidder, as applicable, in connection with the Sale, will be deemed to have consented to the assumption or assumption and assignment of such Assigned Contract and will be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or the Backup Bidder, as applicable, or any other assignee of the relevant Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption or assumption and assignment must be satisfied, under such Assigned Contract. Notwithstanding the foregoing, as provided below, each non-debtor party to such Assigned Contract shall retain the right to object, until the commencement of the Sale Hearing, to the assumption or assumption and assignment of its Assigned Contract based solely on the issue of whether the Debtors or Successful Bidder or Backup Bidder, as applicable, can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

21. If any non-debtor party to an Assigned Contract, through a Contract Objection, challenges a Cure Amount (or asserts any other objection to assumption or assumption and assignment of an Assigned Contract), the Contract Objection must set forth the Cure Amount being claimed by the objecting party with appropriate documentation in support thereof, and specify (with appropriate supporting documentation) the factual and legal basis for any other objection. Upon receipt of a timely filed Contract Objection, the Debtors, with the consent of the Successful Bidder or Backup Bidder, as applicable, are authorized, but not directed, to resolve any Contract Objection by mutual agreement with the objecting counterparty to any Assigned Contract without further order of the Court. In the event that the Debtors and any objecting party are unable to resolve consensually any timely filed Contract Objection, the Court will resolve any such Contract Objection at the Sale Hearing or at such other hearing set by this Court.

22.     Notwithstanding anything to the contrary contained in this Bid Procedures Order, the Debtors, and the Successful Bidder or Backup Bidder, as applicable, may determine to exclude any Assigned Contract from the Sale upon written notice to any such non-debtor counterparties.

23.     Within one (1) business day after the conclusion of the Auction (if an Auction is held), the Debtors will file a statement with the identity of the Successful Bidder and Backup Bidder for the Assets and the total consideration received for the Assets (the "Notice Designating Successful Bidder"), and serve such Notice Designating Successful Bidder on the United States Trustee in satisfaction of Bankruptcy Rule 6004(f)(1).

24.     Within one (1) business day after the conclusion of the Auction, the Debtors will serve the Notice Designating Successful Bidder to the non-debtor parties to the Assigned Contracts that have been identified in such Successful Bid and Backup Bid. The non-debtor parties to such Assigned Contracts will have until the commencement of the Sale Hearing (the "Adequate Assurance/Supplemental Cure Objection Deadline") to object to the assumption or assumption and assignment of such Assigned Contract solely on the issues of (i) whether the Successful Bidder or Backup Bidder, as applicable, can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, and (ii) any alleged change to the Cure Amount between the filing of an initial, timely filed Contract Objection and the Sale Hearing.

25.     Except as otherwise provided in this Bid Procedures Order, the Debtors, in their business judgment, further reserve the right as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures, to: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Written Offers are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal – the Successful Bid – and which is the next highest or otherwise best proposal – the Backup Bid; (d)

reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bid Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under the Bid Procedures; (f) impose additional terms and conditions with respect to all Qualified Bidders other than the Stalking Horse Bidder; (g) extend the deadlines set forth herein; (h) adjourn or cancel the Auction and/or Sale Hearing, provided that the Debtors shall use reasonable efforts to provide notice of adjournment or cancellation to all Qualified Bidders 24 hours before the commencement of the Auction; and (i) modify the Bid Procedures or withdraw the request to sell the Assets to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice. For the avoidance of doubt, the foregoing neither provides the Debtors with any rights to modify the Stalking Horse Bid without the written consent of the Stalking Horse Bidder, nor the right to modify this Bid Procedures Order or the Bid Procedures in any manner that is inconsistent with the terms of the APA and the other terms of the Bid Procedures.

26.     For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Bid Procedures Order, the Bid Procedures, or the Motion shall, or shall be construed to, in any way amend, impair, prejudice, alter or otherwise modify the terms of the APA or the Stalking Horse Bidder's rights thereunder, and the APA shall remain in full force and effect unless terminated in accordance with its terms.

27.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived and this Bid Procedures Order shall be effective immediately upon its entry.

28.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of the Court, to

allow the Stalking Horse Bidder to deliver any notice provided for in the APA, and allow the Stalking Horse Bidder to take any and all actions permitted under the APA in accordance with the terms and conditions thereof.

29.     All time periods set forth in this Bid Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

30.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Bid Procedures Order.

Dated:   New York, New York
         August 12, 2022

                            /s/ **Michael E. Wiles**
                            UNITED STATES BANKRUPTYC JUDGE

## Exhibit 1

**Bid Procedures**

**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x
In re:                             :   Chapter 11, Subchapter V
                                      :
    GETSWIFT, INC., *et al.*,            :   Case No. 22-11057
                                        :   Main Case
                         Debtors.         x   Jointly Administered
--------------------------------------------------------------- x

## BID PROCEDURES

These bid procedures (the "Bid Procedures") set forth the process by which GetSwift, Inc. ("GSI" or "Seller") and GetSwift Technologies Limited ("GTL" and together with GSI, the "Debtors"), debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Court"), shall market to interested parties and conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of GSI's assets (the "Assets"). The Sale will be subject to bidding as set forth herein and subject to the approval of the Court, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures Relating to the Sale of Substantially all of the Assets of GetSwift, Inc., (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief; and (II)(A) Authorizing the Sale of Substantially all of the Assets of GetSwift, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief* [Docket No. 9] (the "Motion"). The portion of the Motion requesting approval of the Bid Procedures and related relief was heard by the Court on August 12, 2022. The Debtors' request for approval of the Sale and certain other matters relating to the Motion will be heard on September 23, 2022 at 11:00 a.m. (prevailing Eastern Time) (the "Sale Hearing").

On _____ __, 2022, the Court entered an *Order (A) Approving Bid Procedures Relating to the Sale of Substantially all of the Assets of GetSwift, Inc., (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protection, and (E) Granting Related Relief* [Docket No. ] (the "<u>Bid Procedures Order</u>"), thereby approving these Bid Procedures.

The Debtors have entered into an Asset Purchase Agreement by and between the Debtors and SF2 GSW LLC (the "<u>Stalking Horse Bidder</u>"), dated August 2, 2022, a copy of which will be made available to interested parties and serve as the form of asset purchase agreement (the "<u>APA</u>") and basis for bids in connection with this process. Capitalized terms used in these Bid Procedures and not otherwise defined shall have the meanings ascribed to such terms in the APA or Bid Procedures Order, as applicable.

The APA contemplates that the Stalking Horse Bidder will acquire all of the Assets.[2] The Debtors will consider competing bids seeking to acquire the Assets to the extent such bids comply with these Bid Procedures and the Bid Procedures Order.

Any party desiring to obtain a copy of the APA, a form of Non-Disclosure Agreement (as defined below) or other information regarding the sale process may do so by contacting Debtors' counsel at:

> **Barclay Damon LLP**
> Janice B. Grubin
> Ilan Markus
> Scott L. Fleischer
> 1270 Avenue of the Americas, Suite 501
> New York, New York 10020
> (212) 784-5800
> jgrubin@barclaydamon.com
> imarkus@barclaydamon.com
> sfleischer@barclaydamon.com

The Debtors provide these Bid Procedures for use by Potential Bidders (defined below) and Qualified Bidders (defined below) in submitting bids proposing a transaction to purchase the Assets, and, as necessary, qualifying for and participating in the Auction.

1. <u>Important Dates.</u>

The following is a table setting forth key dates and deadlines with respect to the sale process:

---

[2] Assets refers to all of the personal property associated with the Debtors' SaaS business, defined as Purchased Assets in the APA attached as Exhibit A to the Motion's Exhibit B (Docket No. 9).

| Event or Deadline | Date and Time |
|---|---|
| Deadline to File Notice of Assumption and Assignment | On or before August 23, 2022 |
| Deadline to Object to Cure Amounts, Stalking Horse Adequate Assurance of Future Performance, and Sale (for all objections other than stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder)) | On or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | On or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline to Designate Qualified Bids | On or before September 19, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | On or before September 20, 2022 at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to File Notice Designating Successful Bidder | One (1) business day following conclusion of the Auction |
| Deadline to Object to Non-Stalking Horse Adequate Assurance of Future Performance and Raise Any Additional Cure Cost Objections (if initial cure objection was filed timely) | Until the commencement of the Sale Hearing |
| Deadline to Object to Sale Based on Identity of Successful Bidder (if different than the Stalking Horse Bidder) | Until the commencement of the Sale Hearing |
| Sale Hearing | September 23, 2022 at 11:00 a.m. (prevailing Eastern Time) |

2.      Assets to be Sold.

The Debtors seek to sell the Assets.

3.      Qualified Bidders, Non-Disclosure Agreements and Access to Data Room.

Any person or entity wishing to bid on the Assets (each a "Potential Bidder") must execute and deliver (unless previously delivered) to the Debtors a confidentiality and nondisclosure agreement (a "Non-Disclosure Agreement") in form and substance acceptable to the Debtors.

3

The Debtors, in their discretion, will afford a Potential Bidder who executes and delivers a Non-Disclosure Agreement due diligence access or such additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate, including, without limitation, access to the Debtors' confidential electronic data room, reasonable access, during normal business hours, to the Debtors' management, and access to all relevant information regarding the Assets reasonably necessary to enable a Potential Bidder to evaluate the proposed Sale; provided that, prior to accessing such information, any such Potential Bidder has evidenced the financial wherewithal and ability to consummate the Sale. Debtors' counsel will coordinate all due diligence access and requests for additional information from such Potential Bidders. The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the Auction other than to the Successful Bidder (defined below) or any Backup Bidder. Neither the Debtors (nor their members, partners, affiliates, and shareholders), their counsel nor their advisors are responsible for, or will bear any liability with respect to, any information obtained by Potential Bidders in connection with due diligence. Notwithstanding anything contained herein to the contrary, to the extent the Debtors believe that providing access to Potential Bidders to certain sensitive commercial information is not advisable, the Debtors, in their business judgment, will decide what, if any, diligence information to make available to a particular Potential Bidder, and neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

A "**Qualified Bidder**" is any Potential Bidder that (a) delivers to the Debtors a Non-Disclosure Agreement, (b) demonstrates to the Debtors a reasonable certainty of its ability to close the Sale in a timely manner (including the financial capability to close the Sale and the ability to obtain the necessary governmental, licensing, regulatory, or other approvals necessary for such Sale, if any), and (c) submits a Written Offer (as defined below) that satisfies all requirements of a Qualified Bid as set forth below, provided, however, that, except for the requirements set forth in sections 4(viii) and 4(x)–4(xii) of these Bid Procedures, the Debtors may waive one or more requirements for a Qualified Bidder. As promptly as practicable after a Potential Bidder delivers a Non-Disclosure Agreement and submits a Written Offer, and in any event not later than September 19, 2022 at 5:00 p.m. (prevailing Eastern Time), the Debtors shall determine, and the Debtors shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate the proposed Sale. Notwithstanding anything to the contrary herein or in the Sale Order, the Stalking Horse Bidder shall be a Qualified Bidder.

4.      Requirements for a Qualified Bid.

In order to become a Qualified Bidder and participate in the Auction, if any, a Potential Bidder must deliver to counsel to the Debtors a written offer (each, a "Written Offer") that is deemed to be a Qualified Bid. To be deemed a "Qualified Bid", a Written Offer must meet each of the requirements listed below:

> (i)      Delivery:  Be delivered no later than 5:00 p.m. (prevailing Eastern Time) on September 14, 2022 (the "Bid Deadline").

(ii) <u>Executed Agreement</u>:  Be accompanied by (i) a clean and duly executed and binding asset purchase agreement (together with the exhibits and schedules thereto, a "<u>Modified APA</u>"), and (ii) a marked Modified APA reflecting any variations from the APA, both of which shall be subject to section 4(xii) hereof.

(iii) <u>Designation of Assumed or Assumed and Assigned Contracts and Leases and Adequate Assurance of Future Performance</u>:  Contain a list of any and all executory contracts and unexpired leases of the Debtors that are to be assumed and assigned in connection with a Sale (each a "<u>Contract</u>" and, collectively, the "<u>Contracts</u>" and once assumed, or assumed and assigned, an "<u>Assigned Contract</u>") to the extent such list is not included in the Modified APA. The Potential Bidder must also include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance for the benefit of the non-debtor parties to the Contracts on the list, including, without limitation, (i) the specific name of the entity to whom the Contract will be assigned; (ii) if available, audited financial statements and annual reports of the proposed purchaser and any other assignee for the past three (3) years, including all supplements or amendments thereto; (iii) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, and any financial projections, calculations and/or pro formas prepared in contemplation of purchasing the assets, including the Assigned Contacts; (iv) all documents and other evidence of the proposed assignee's experience in the Debtors' industry; and (v) a contact person for the proposed assignee whom non-debtor parties may contact directly in connection with adequate assurance of future performance. Should the Potential Bidder be a newly formed entity (a "<u>Newco</u>"), written evidence of adequate assurance of future performance should also include when such Newco was formed, the relevant financial information of the equity sponsors of the Newco, how it will be financed together with evidence of firm financial commitments, and identify what credit enhancements, if any, will be available to guarantee the obligations under the Assigned Contracts. Non-debtor parties to the Contracts may object on adequate assurance grounds at or before the Sale Hearing.

(iv) <u>Proof of Financial Ability to Perform</u>:  Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, which evidence is satisfactory to the Debtors, including, without limitation, such financial and other information setting forth adequate assurance under section 365 of the Bankruptcy Code in a form requested by the Debtors. Should the Potential Bidder be a Newco, such information shall be provided in respect of the Newco's equity sponsors.

(v) <u>Identification of Parties to Participate</u>: To the Debtors' satisfaction, (i) fully disclose the identity of each entity or person that will be bidding for the Assets or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval, if necessary, in connection with the consummation of any Sale.

(vi) <u>Irrevocable</u>: State that the Written Offer is irrevocable until (i) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (ii) if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Backup Bidder (as defined below), until the earlier of (x) two (2) business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid (as defined below) have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (y) sixty (60) days after the date of the Auction (the "<u>Backup Bid Expiration Date</u>").

(vii) <u>No Break-Up Fee or Expense Reimbursement</u>: Not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; <u>provided</u>, <u>however</u>, that the APA with the Stalking Horse Bidder shall contain a break-up fee as approved in the Bid Procedures Order.

(viii) <u>Contingencies</u>: Not contain any due diligence or financing contingencies.

(ix) <u>Authorization to Consummate Sale</u>: Provide evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if any, with respect to the submission, execution, delivery and closing of the Modified APA to the Debtors' satisfaction.

(x) <u>Purchase Price</u>: Bids must provide for a Purchase Price equal to or greater than the Purchase Price stated in the APA (which is comprised of (A) $2.5 million in cash plus an Estimated Working Capital Adjustment Amount, (B) issuance of an unsecured promissory note to Seller in the principal amount of $1 million, and (C) assumption of up to $1 million in Assumed Accounts Payable and Cure Costs, <u>plus</u> (x) the amount of the Break-Up Fee ($75,000)(as defined and set forth in the APA), <u>plus</u> (y) a minimum overbid amount of $50,000.00, which in the aggregate is a minimum overbid amount of approximately $125,000. Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee.

    (xi)    <u>Good Faith Offer</u>:  Constitute a good faith, bona fide offer to purchase all of the Assets.

    (xii)    <u>Same or Better Terms</u>:  Be on terms that, in their totality, are determined by the Debtors, in their business judgment, to be the same or better than the terms set forth in the APA in their totality.

    (xiii)    <u>Good Faith Deposit</u>:  Provide a good faith deposit (the "<u>Good Faith Deposit</u>") submitted via federal wire transfer in immediately available funds in accordance with the wire instructions to be provided by the Debtors, or such other form as is acceptable to the Debtors, in an amount equal to 10% of the cash purchase price set forth in the Written Offer.

    (xiv)    <u>Anticipated Timeline</u>:  Set forth the anticipated timeframe for (i) obtaining any required government, regulatory or other approvals, and (ii) consummating the Sale within the requirements of subparagraph (xvii) herein.

    (xv)    <u>Agreement with Bid Procedures, Provision of Additional Information and Submission to Bankruptcy Court Jurisdiction</u>  Include a written acknowledgement by such Potential Bidder that it (i) agrees to the terms of the Bid Procedures; (ii) agrees to provide such other information as may be reasonably requested in writing by the Debtors prior to the Auction; and (iii) confirms that the Potential Bidder submits to the jurisdiction of the Court.

    (xvi)    <u>As-Is, Where-Is</u>:  Include a disclaimer acknowledging that the Sale will be conducted on an As-Is, Where-Is Basis in accordance with section 8 of these Bid Procedures.

    (xvii)    <u>Closing Date</u>:  Provide for a closing date (the "<u>Closing Date</u>") as set forth in section 1.8 of the APA.

Between the Bid Deadline and the Auction, the Debtors may (i) negotiate or seek clarification of any Written Offer from a Qualified Bidder, (ii) request information from any Qualified Bidder, (iii) engage in discussions with any Qualified Bidder, and/or (iv) take such other actions contemplated under these Bid Procedures. Without the consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Written Offer. All changes to the form of APA reflected in the Modified APA will be evaluated by the Debtors and must be acceptable to the Debtors, in their business judgment. Any Good Faith Deposit accompanying a Written Offer that the Debtors determine not to be a Qualified Bid shall be returned promptly following such determination.

For the avoidance of doubt, the Stalking Horse Bid shall be deemed a Qualified Bid regardless of the foregoing requirements. Furthermore, a bid of the Stalking Horse Bidder at the Auction will be deemed a Qualified Bid notwithstanding that such a bid (A) entitles the Stalking Horse Bidder to a break-up fee on the same terms as the Stalking Horse Bid, (B) does not include a Good Faith Deposit, and (C) does not include information set forth in clauses (iii), (iv), (v), (ix), (xii), or (xiii).

5. <u>Bid Deadline.</u>

All Qualified Bids must be received by each of the parties listed below prior to the Bid Deadline.

**Debtors**:

Joel Macdonald
Robert Bardunias
1185 Sixth Avenue, 3rd Floor
New York, New York 10036
joel@getswift.co
rob@getswift.co

**Debtors' Counsel**:

Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
(212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

6. <u>Determination of Qualified Bidders.</u>

The Debtors shall, by no later than 5:00 p.m. (prevailing Eastern Time) on September 19, 2022, (i) determine, in their business judgment, whether a Potential Bidder is a Qualified Bidder, (ii) notify each such Potential Bidder that its Written Offer is a Qualified Bid and that such Potential Bidder is a Qualified Bidder, and (iii) provide a copy of the Opening Qualified Bid (defined below) to each Qualified Bidder.

7. <u>No Break-Up Fee or Bid Protections.</u>

No Modified APA may include any break-up fee or expense reimbursement or other similar bid protections.

8. <u>"As Is, Where Is".</u>

Except as otherwise provided in the Final APA (as defined below), the Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors or their estates except to the extent set forth in the Final APA as approved by the Court. Except as otherwise provided in the Final APA, all of the Debtors' right, title and interest in the Assets subject thereto, as applicable, shall be sold free and clear of all liens,

claims, interests and encumbrances (collectively, the "Liens") in accordance with sections 363 and 365 of the Bankruptcy Code, with such Liens to attach to the net proceeds of the Sale.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and inspection of any documents relating to the Assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Procedures or, as to the Successful Bidder(s) and the Backup Bidder(s), the terms of the Sale(s) as set forth in the final form of the applicable APA or Modified APA (the "Final APA"), which shall be on terms mutually acceptable to the Successful Bidder and Backup Bidder, on the one hand, and the Debtors, on the other hand.

9.     Auction.

If the Debtors have determined that there are one or more Qualified Bidders (other than the Stalking Horse Bidder), the Debtors shall conduct an Auction to determine the highest and otherwise best Qualified Bid. This determination shall take into account any factors the Debtors, in their business judgment, reasonably deem relevant and may include, among other things, the following: (i) the amount and type of the consideration; (ii) the number, type and nature of any changes to the APA requested by a Qualified Bidder in its respective Modified APA; (iii) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; and (v) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof.

The Auction shall commence at 10:00 a.m. (prevailing Eastern Time) on September 20, 2022, at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 501, New York, New York 10020, or such other place and time as determined by the Debtors, and continue thereafter until completed. The Debtors reserve the right to cancel, postpone, or continue the Auction or conduct the Auction virtually by video conference.

Except as otherwise permitted in the Debtors' discretion, only the Debtors, the Qualified Bidders, and any creditor that submits a written request to attend to the Debtors in advance of the Auction, and, in each case, their respective professionals, shall be entitled to attend the Auction. Only a Qualified Bidder is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

(i)     Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative, unless alternate arrangements are made with the Debtors to attend the Auction virtually.

(ii)    Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules

are (i) not inconsistent with the Bid Procedures Order, the APA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any order of the Court entered in connection with these Chapter 11 Cases, (ii) disclosed to each Qualified Bidder, and (iii) designed, in the Debtors' business judgment, to result in the highest and otherwise best offer for the Assets.

(iii)    The Debtors will arrange for the actual bidding at the Auction to be transcribed. Each Qualified Bidder shall designate a single individual to be its spokesperson during the Auction.

(iv)    Each Qualified Bidder participating in the Auction must confirm on the record, at the commencement of the Auction and again at the conclusion of the Auction, that it has not engaged in any collusion with the Debtors or any other Qualified Bidder regarding these Bid Procedures, the Auction or any proposed transaction relating to the Assets.

(v)    Prior to the Auction, the Debtors shall identify the highest and best of the Qualified Bids received (the "Opening Qualified Bid"). Subsequent bidding will continue in minimum increments valued at not less than $50,000 cash or in such amounts as to be determined by the Debtors prior to, and announced at, the Auction.  Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee. Each Qualified Bidder (other than the Stalking Horse Bidder) shall provide evidence of its financial wherewithal and ability to consummate the Sale at the increased Purchase Price.

(vi)    All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then-current highest and best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then-current highest and best bid.

(vii)    In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction in accordance with the terms and provisions of these Bid Procedures; provided, however, that any such modifications to the APA or Modified APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors in their business judgment.

(viii)    Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, (i) identify and determine in their business judgment the highest and best Qualified Bid for the Assets (a "Successful Bid") and the entity or entities submitting such Successful Bid (the "Successful Bidder"), (ii) advise the Qualified Bidders of such

determination, and (iii) require the Successful Bidder to deliver an executed Final APA, which reflects its bid and any other modifications submitted and agreed to during the Auction, prior to commencement of the Sale Hearing.

(ix) The Debtors will also determine which Qualified Bid, if any, is the next highest and best Qualified Bid to the Successful Bid, and will designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated Sale. A Qualified Bidder who submitted a Qualified Bid and is designated a Backup Bid is a "Backup Bidder". Each Backup Bid shall remain open and binding until the Backup Bid Expiration Date.

10. Sole Qualified Bidder.

If, by the Bid Deadline, there is no Qualified Bidder other than the Stalking Horse Bidder, (i) the Stalking Horse Bid shall be deemed the Successful Bid and the Stalking Horse Bidder shall be deemed the Successful Bidder, (ii) the Debtors shall not hold an Auction, and (iii) the Debtors shall proceed at the Sale Hearing and seek approval from the Court of the Stalking Horse Bid.

11. Bid Protection.

In the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors shall pay to the Stalking Horse Bidder, in consideration of its being the Stalking Horse Bidder, the Break-Up Fee in accordance with the terms and conditions set forth in the APA and as approved by the Court in the Bid Procedures Order; *provided*, *however*, that the Stalking Horse Bidder shall have the right (but not the obligation) to increase its Stalking Horse Bid at the Auction by using, as a credit, the amount of the Break-Up Fee. No other bidder will be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.

12. Sale Hearing.

The Sale Hearing will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge  on September 23, 2022 at 11:00 a.m. (prevailing Eastern time), at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom No. 617, New York, NY 10004 or by way of a telephonic hearing through Court Solutions. At the Sale Hearing, the Debtors shall present the results of the Auction, if one is held, to the Court and seek approval of the Successful Bid and any related Backup Bid.

Following the Sale Hearing and entry of a Sale Order approving the Sale of the Assets to a Successful Bidder, if such Successful Bidder fails to consummate the Sale for any reason, the Backup Bidder shall be designated the Successful Bidder and the Debtors shall be authorized to close such Sale with the Backup Bidder without further order of the Court; provided, however, counterparties to any Contracts for which a Backup Bidder is deemed the new Successful Bidder shall receive written notice of the identity of the Backup Bidder being deemed the Successful Bidder, and shall have seven (7) days to object to the Backup Bidder's adequate assurance of future performance under any Assigned Contract to be assumed and assigned, with the Court to hold a subsequent hearing, if necessary, to determine any unresolved objections. The Successful Bidder and Backup Bidder (if any) should be represented by counsel at the Sale Hearing.

13.     <u>Consummation of the Purchase.</u>

(a)     Closing Date; Good Faith Deposit

The Successful Bidder shall consummate the Sale contemplated by the Successful Bid (the "<u>Purchase</u>") on or before the Closing Date. If the Successful Bidder successfully consummates the Purchase by the Closing Date, such Successful Bidder's Good Faith Deposit, if any, shall be applied to the purchase price of the Purchase.

If the Successful Bidder either: (i) fails to consummate the Purchase on or before the Closing Date, (ii) breaches the Final APA, or (iii) otherwise fails to perform, the Debtors shall, without further order of the Court, deem such Successful Bidder to be a "<u>Defaulting Buyer</u>."

The Debtors shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Buyer and (b) seek all available damages from such Defaulting Buyer occurring as a result of such Defaulting Buyer's failure to perform in accordance with the terms of the APA or Modified APA, as applicable, and the Sale Order.

(b)     <u>Backup Purchaser.</u>

Upon a determination by the Debtors that the Successful Bidder is a Defaulting Buyer, the Debtors may consummate a Sale with the Backup Bidder on the terms and conditions of the Backup Bid (the "<u>Backup Purchase</u>") without further order of the Court.

If the Backup Bidder consummates the Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price of the Backup Purchase. In the event that the Debtors seek to consummate the Backup Purchase with the Backup Bidder and such Backup Bidder (i) fails to consummate the Backup Purchase, (ii) breaches the Final APA, or (ii) otherwise fails to perform, the Debtors may, in their discretion, and without further order of the Court, deem such Backup Bidder to be a "<u>Defaulting Backup Buyer</u>" and shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Backup Buyer, and (b) to the extent provided for under the APA or Modified APA, seek all available damages from such Defaulting Backup Buyer occurring as a result of such Defaulting Backup Buyer's failure to perform in accordance with the terms of the APA or Modified APA, as applicable, and the Sale Order.

14.     <u>Return of Good Faith Deposits.</u>

Good Faith Deposits shall be held in a non-interest bearing escrow account. Except for those of the Successful Bidder and Backup Bidder(s), the Debtors shall promptly return the Good Faith Deposits of (i) all Qualified Bidders within five (5) business days following conclusion of the Auction; and (ii) the Backup Bidder after the Backup Bid Expiration Date.

15. DIP Lender Credit Bid.

The DIP Lender shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the then outstanding DIP Obligations in support of the Stalking Horse Bid.

16. Consent to Jurisdiction and Authority as a Condition to Bidding

All Potential Bidders shall be deemed to have (i) consented to the core jurisdiction of the Court to enter an order or orders, which shall be binding in all respects, in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale; (ii) waived any right to jury trial in connection with any disputes relating to the Bid Procedures, the Auction, the construction and enforcement of any purchase agreement or any other document relating to the Sale; and (iii) consented to entry of a final order or judgment in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

17. Reservation of Rights.

The Debtors shall retain all rights to any of their assets that are not subject to the Sale that is approved by the Court at the Sale Hearing.

18. Modifications.

Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may modify the Bid Procedures in any manner that is not inconsistent with or otherwise in contravention of the other terms of these Bid Procedures, the Bid Procedures Order, or the APA, including, without limitation, (a) waiving the terms and conditions set forth herein with respect to any or all potential bidders, (b) imposing additional terms and conditions with respect to any or all potential bidders, (c) extending the deadlines set forth herein or the date for the Auction and/or Sale Hearing (which may occur in open court); or (d) amending the Bid Procedures as they may determine to be in the best interests of their estates; *provided that* all material modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction.

Dated: _____, 2022
New York, New York

Respectfully submitted,

**BARCLAY DAMON LLP**

*By:* _____
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and
Debtors-in-Possession*

14

**Exhibit 2**

**Notice of Bid Procedures, Auction Date and Sale Hearing**

**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
In re:                                                        : Chapter 11, Subchapter V
                                                              :
   GETSWIFT, INC., *et al.*,                                 : Case No. 22-11057
                                                              : Main Case
                         Debtors. : Jointly Administered
-------------------------------------------------------------- x

**NOTICE OF BID PROCEDURES, AUCTION DATE AND SALE HEARING**

**PLEASE TAKE NOTICE THAT:**

1.     On August 2, 2022, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the *Motion for Entry of Orders (I)(A) Approving Bid Procedures Relating to the Sale of Substantially all of the Assets of GetSwift, Inc., (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protection, and (E) Granting Related Relief* (the "Bid Procedures Motion"); *and (II)(A) Authorizing the Sale of Substantially all of the Assets of GetSwift, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief* [Docket No. 9] (the "Sale Motion" and together with the Bid Procedures Motion, the "Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Court"). Copies of the Motion and the related asset purchase agreement are available by written request to Debtors' proposed counsel at the contact information listed above.

2.     By order dated _____, 2022, the Court approved the Bid Procedures Motion [Docket No. ●] (the "Bid Procedures Order").

3.     The Debtors are seeking bids for all or substantially all of the assets of GetSwift, Inc. that comprise their SaaS business (the "Assets"). The proposed sale will be free and clear of

1

any and all liens, claims, encumbrances, and other interests pursuant to section 363 of the Bankruptcy Code.

4.      All interested parties are invited to submit a Written Offer to purchase the Assets in accordance with the terms and conditions of the Bid Procedures attached hereto as **Exhibit A** and the Bid Procedures Order. The deadline to submit a Written Offer (the "Bid Deadline") is **September 14, 2022 at 5:00 p.m. (prevailing Eastern Time)**.

5.      Prior to the Bid Deadline, a Potential Bidder that desires to purchase the Assets shall deliver its Written Offer in accordance with the Bid Procedures.

6.      Pursuant to the Bid Procedures Order, in the event that the Debtors receive one or more Qualified Bids by the Bid Deadline (other than the Stalking Horse Bid), the Debtors shall conduct an Auction to determine the highest and otherwise best bid with respect to the Assets. The Auction shall commence at **10:00 a.m. (prevailing Eastern Time) on September 20, 2022,** at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 501, New York, NY 10020, or at such other place and time as the Debtors shall notify all parties in interest attending the Auction. If no Qualified Bids are received by the Bid Deadline other than the Stalking Horse Bid, the Debtors shall seek approval of the Stalking Horse Bid at the Sale Hearing.

7.      Objections, if any, to the Sale of the Assets to any Successful Bidder and/or the other relief requested in the Motion, other than the relief approved in the Bid Procedures Order, must be in writing and filed with the Court **on or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time)**, provided that objections solely stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder) may be filed at any time prior to the commencement of the Sale Hearing.

8.      The Sale Hearing shall be conducted by the Court **on September 23, 2022 at 11:00 a.m. (prevailing Eastern Time)**, or on such other date as the Court may direct.

Dated:  _____, 2022          Respectfully submitted,
        New York, New York

                                   **BARCLAY DAMON LLP**

                                   *By:* _____
                                   Janice B. Grubin
                                   Ilan Markus
                                   Scott L. Fleischer
                                   1270 Avenue of the Americas, Suite 501
                                   New York, New York 10020
                                   Telephone:  (212) 784-5800
                                   jgrubin@barclaydamon.com
                                   imarkus@barclaydamon.com
                                   sfleischer@abrclaydamon.com

                                   *Proposed Counsel to Debtors and*
                                   *Debtors-in-Possession*

## Exhibit 3

**Notice of Assumption or Assumption and Assignment**

**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------------- x | | |
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| GETSWIFT, INC., *et al.*, | : | Case No. 22-11057 |
| | : | Main Case |
| Debtors. | x | Jointly Administered |
| -------------------------------------------------------------- | | |

## NOTICE OF ASSUMPTION OR ASSUMPTION
## AND ASSIGNMENT OF ASSIGNED CONTRACTS

**PLEASE TAKE NOTICE THAT:**

1.      On _____, 2022, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. ●] (the "Bid Procedures Order") on the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") (i) approving the bid procedures (as modified or amended, the "Bid Procedures") to be implemented in connection with a sale (the "Sale") of all or substantially all of the assets of GetSwift, Inc. (the "Assets"), (ii) establishing procedures in connection with the potential assumption or assumption and assignment to the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures Order) of certain executory contracts and unexpired leases (each a "Contract" and, collectively, the "Contracts" and once assumed, or assumed and assigned, an "Assigned Contract") and the corresponding cure amounts (the "Cure Amounts") to be paid in connection with the assumption or assumption and assignment, (iii) approving the notice procedures (the "Notice Procedures") to advise parties in interest and Potential Bidders (as defined in the Bid Procedures) of the Bid Procedures, the auction of the Assets (the "Auction"), the hearing on the Sale (the "Sale Hearing"), and the Debtors' intent to assume or assume and assign to the Successful Bidder or Backup Bidder the Assigned Contracts and the corresponding Cure Amounts, and (iv) granting related relief.

2.      Pursuant to the Bid Procedures Order, the Debtors have listed, on **Exhibit A** annexed hereto, each Contract that may become an Assigned Contract. In addition, for each

Contract, the Debtors have estimated the Cure Amount owed under such Contract including the actual pecuniary loss to the non-debtor party resulting from any defaults under such Contract including, but not limited to, all claims, demands, rights to refunds due to overpayments that the non-debtor parties can assert under the Contracts whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to the Contracts calculated as of _____ [●], 2022. The Cure Amount for an Assigned Contract represents the amount the Debtors believe must be paid, pursuant to section 365 of the Bankruptcy Code, to compensate the respective non-debtor party in connection with the potential assumption or assumption and assignment of such Assigned Contract.

3.     Objections to the Cure Amounts or proposed assumption or assumption and assignment of an Assigned Contract, whether or not such party previously has filed a proof of claim with respect to amounts due under the applicable Contract, and/or objections to the potential assumption of such Contract, must be filed with the Court, together with all documentation supporting such cure claim or objection, so as to be **actually received** by **September 14, 2022 at 5:00 p.m. (prevailing Eastern Time)**. In the event no objection is timely filed with respect to a Contract, the non-debtor counterparty to such Contract shall be deemed to have consented to the Cure Amount proposed by the Debtors. Notwithstanding the foregoing, as provided below, each non-debtor party to such Assigned Contract shall retain the right to object, at the Sale Hearing, to the assumption or assumption and assignment of its Assigned Contract based solely on the issues of (i) whether the Successful Bidder or Backup Bidder, as applicable, can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, and (ii) any alleged change to the Cure Amount between the filing of an initial, timely filed Contract Objection and the Sale Hearing.

4.     The Debtors and the Successful Bidder or Backup Bidder, as applicable, reserve the right to designate which, if any, executory contracts or unexpired leases will be assumed or assumed and assigned. Inclusion of a contract or lease on **Exhibit A** hereto does not indicate that the Successful Bidder or Backup Bidder, as applicable, will determine to have the Debtors assume or assume and seek assignment of such Contract. The Debtors may seek to have any Contract that is not designated to become an Assigned Contract by the Debtors and the Successful Bidder or Backup Bidder, as applicable, rejected at the Sale Hearing.

5.     The inclusion of a contract or lease on **Exhibit A** hereto shall not constitute or be deemed a determination or an admission by the Debtors that such document is in fact, an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

6.     A hearing to consider approval of the Sale and to determine the Cure Amounts and assumption or assignment issues for any non-debtor parties to Contracts that filed timely objections and that have been designated to be assumed or assumed and assigned will be held on **September 23, 2022 at 11:00 a.m. (prevailing Eastern Time)** before the Honorable Michael E. Wiles at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 617, New York New York 10004 or by way of a telephonic hearing through Court Solutions. Objections to adequate assurance of future performance with respect to any Successful

Bidder or Backup Bidder besides the Stalking Horse Bidder, and any supplemental Cure Amount objections if an initial objection was timely filed, may be asserted up to the commencement of the Sale Hearing.

7.     Pursuant to the Motion, the Debtors are requesting an order from the Court (the "Sale Order") that will provide, among other things, that the Debtors' assumption or assumption and assignment of the Assigned Contracts to the Successful Bidder or Backup Bidder, as applicable, under the provisions of the Sale Order and any additional orders of this Court, and payment of any Cure Amount is authorized, so that no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by the Successful Bidder or Backup Bidder, as applicable, under such Assigned Contract or (b) otherwise take action against the Successful Bidder or Backup Bidder, as applicable, as a result of Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract. If the Court enters the Sale Order, each non-debtor party to an Assigned Contract hereby will be forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Successful Bidder or Backup Bidder, as applicable, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the closing of the Sale or, against the Successful Bidder or Backup Bidder, as applicable, any counterclaim, defense, setoff, recoupment, claim of refund or any other Claim asserted or assertable against the Debtors; (ii) imposing or charging against the Successful Bidder or Backup Bidder, as applicable, any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption or assumption and assignment to the Successful Bidder or Backup Bidder, as applicable, of any Assigned Contract; or (iii) contesting the Cure Amount.

Dated: New York, New York
_____, 2022

**BARCLAY DAMON LLP**

*By:* _____
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and*
*Debtors-in-Possession*

# DISCLOSURE SCHEDULE

THIS DISCLOSURE SCHEDULE is being delivered in connection with the **Asset Purchase Agreement** (the "**Agreement**") dated as of October ___, 2022, among **[_____]**, a [_____][1] (the "**Buyer**"), GETSWIFT, INC., a Delaware corporation (the "**Seller**"), and GETSWIFT TECHNOLOGIES LIMITED, a British Columbia corporation ("**Ultimate Parent**", and together with Seller, the "**Selling Parties**"). The section numbers in this Disclosure Schedule correspond to the section numbers in the Agreement; *provided*, *however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated in any other section of the Agreement where such disclosure would be appropriate and clearly apparent on its face. Capitalized terms used but not defined herein shall have the same meanings given them in the Agreement.

---

[1] **Note to Draft**: Special Purpose Vehicle to be formed by Retail Ecommerce Ventures LLC or one of its subsidiaries.

74822608v1

**SCHEDULE 1.1(B)[2]**

**ASSIGNED CONTRACTS**

1. Terms of Service, among GetSwift Limited, ACN: 604 611 556 and its subsidiaries (including Seller) and the users of the Services (as defined therein), available at https://getswift.co/terms-of-service/ as of July 28, 2022, including all exhibits and attachments thereto (the "**GSW Terms**").

2. Terms of Service, among Seller and the users of the Service (as defined therein), available at https://app.schedulingplus.com/site/subscriber_agreement as of July 28, 2022, including all exhibits and attachments thereto (the "**Scheduling Plus Terms**").

3. Master Services Agreement, dated February 12, 2020, between GetSwift, Inc. and Eplexity, LLC (the "**Eplexity Agreement**").

---

[2] **Note to Draft**: To be completed prior to Closing.

SCHEDULE **1.2(E)**

**EXCLUDED CONTRACTS**[3]

---

[3] **Note to Draft**: To be completed prior to Closing.

74822608v1

**SCHEDULE 1.2(H)**

**EXCLUDED ASSETS**

- Any and all stock, securities, or other equity ownership interests in any other business entity, including, without limitation, Parent, Ultimate Parent, or GetSwift d.o.o.

- All right, title, and interest in and to the Actions described in Schedule 2.9, all of which are Excluded Liabilities.

- the call option to purchase capital stock of Logo d.o.o. pursuant to the Share Purchase Agreement, dated April 6, 2022, among GetSwift, Inc. Miodrag Veljković, and Sanja Veljković.

4

232-10057-new Doc 95-1 Filed 02/09/30/23 Entered 02/09/30/23 23:04:10 Main Exhibit A Pg 104 of 148

SCHEDULE 1.3(B)

ASSUMED ACCOUNTS PAYABLE[4]

---

[4] **Note to Draft**: To be completed prior to Closing.

5

SCHEDULE 1.8(B)

**ALLOCATION SCHEDULE**

Buyer and Selling Parties, and each of their respective Affiliates shall use the allocation methodology below to report, act and file Tax Returns (including but not limited to IRS Form 8594).

| | |
|---|---|
| Class I Assets | Actual amount of Class I Assets, if any. |
| Class II Assets | GAAP book value as of the Closing, if any. |
| Class III Assets | GAAP book value as of the Closing. |
| Class IV Assets | GAAP book value as of the Closing. |
| Class V Assets | GAAP book value as of the Closing. |
| Class VI and VII Assets | Any residual portion not allocated to Class I-V Assets, above. |

6

23-10157-mew Doc 95 Filed 02/27/23 Entered 02/27/23 23:04:10 Main Document Pg 106 of 148

**SCHEDULE 1.9(B)**

**EXECUTORY CONTRACTS AND CURE COSTS**

1.  See attached. [5]

---

[5] **Note to Draft**: To attach Exhibit A to Notice of Assumption or Assumption and Assignment.

74822608v1

**SCHEDULE 2.3**

**CONTRACTS REQUIRING CONSENT**

- None.

**SCHEDULE 2.9**

**ACTIONS**

- **John Wilson Litigation:** Former employee John Wilson brought suit against Seller in the United States District Court for the Northern District of Georgia, Atlanta Division. In the complaint, Wilson alleges claims for breach of contract related to his former employment by Seller. More specifically, Wilson alleges his entitlement to $400,000 of severance pay as well as for the award of performance shares and stock options. Seller is vigorously defending the lawsuit and has alleged counterclaims for breach of fiduciary duty, among other things. The case is in its infant stages of discovery and the full extent of the relevant information is not yet known. Seller is also investigating a potential claim against its former legal counsel for malpractice based upon performance and a potential conflict of interest related to the Wilson claim.

- **Plaza 7000 LLC Litigation:** Plaza 7000 LLC filed its Complaint in District Court for the County of Arapahoe, Colorado for unlawful detainer alleging that Seller is in default in connection with alleged obligations under a lease concerning Suite 200. In the Complaint, Plaza 7000 LLC alleges that on November 4, 2020, Seller was "served," by posting, with a Demand for Payment of Rent or Possession of the Leased Premises, providing thirty (30) days within which it could pay the sum of $69,574.53 or deliver possession of the property. At the time of the alleged posting of the Demand, Seller's employees were working remotely in response to Arapahoe County being listed at "Safer at Home Level 2" due to rising COVID-19 case rates. An order of default judgment was filed on February 16, 2021, in the amount of $102,472.19 together with attorneys' fees and costs. Seller only became aware of this action upon conducting its own annual audit. Upon learning of the order, Seller obtained counsel and commenced an investigation of this matter. The opposing party has not made any efforts to enforce the judgement.

- **DBP Earnout Claim:** Delivery Biz Pro ("**DBP**") sellers, Judd Payne and Erick Prohs, are entitled to earnouts from Seller in connection with the sale of DBP to Seller. In May, a letter was sent to both Mr. Payne and Mr. Prohs advising any earn-out amounts which they may be entitled to are subject to a significant deduction for the substantial damages incurred by Seller. Specifically, Seller incurred losses a result of the intentional destruction of the Marketplace Connect ("**MPC**") website. It has also come to Seller's attention that certain reports from 2019 and 2020 were retrospectively adjusted in the amount of $77,209.50. Judd Payne and Erick Prohs have not responded to the may letter.

- Payment dispute with respect to the Eplexity Contract, which dispute will be settled prior to the Closing.

9

**SCHEDULE 2.10**

**BENEFIT PLANS**

1.  GETSWIFT, INC. 2020 OMNIBUS EQUITY COMPENSATION PLAN

## SCHEDULE 2.11

## REAL PROPERTY

- None.

SCHEDULE 2.14(B)(I)

REGISTERED INTELLECTUAL PROPERTY

**Trademark Applications and Registrations**

| Mark | Cntry. | App. Serial # | Reg. # | Status | Latest Owner of Record | Record Owner as of immediately Prior to the Closing | Due Dates* |
|------|--------|---------------|--------|--------|------------------------|-----------------------------------------------------|-----------|
| DELIVERY BIZ PRO | United States (US) | 85908666 | 4461515 | Active | GETSWIFT, INC. | GETSWIFT, INC. | Renewal due 01/08/2024 |
| GETSWIFT | United States (US) | 79193269 | N/A | Dead | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | N/A |
| GETSWIFT (and Design) getswift | United States (US) | 87196930 | N/A | Dead | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | N/A |
| GETSWIFT | WIPO (WO) | 1312709 | 1312709 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal Due 06/02/2026 |
| GETSWIFT | Australia (AU) | 1747951 | 1747951 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal due 01/22/2026 |
| GETSWIFT (and Design) getswift | Australia (AU) | 1798083 | 1798083 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal due 09/21/2026 |

12

| Mark | Cntry. | App. Serial # | Reg. # | Status | Latest Owner of Record | Record Owner as of immediately Prior to the Closing | Due Dates* |
|---|---|---|---|---|---|---|---|
| LIQUORUN EST. 2013 (and Design)  | Australia (AU) | 1574111 | 1574111 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal due 08/19/2023 |
|  | Australia (AU) | 1640365 | N/A | Inactive | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | N/A |
| GETSWIFT (and Design)  | European Union (EM) | 15901754 | 15901754 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal Due 07/10/2026 |
| GETSWIFT (and Design)  | New Zealand (NZ) | 1052373 | 1052373 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal Due 09/21/2026 |
| GETSWIFT (and Design)  | United Kingdom (UK) | 00915901754 | 00915901754 | Active | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | Renewal Due 10/07/2026 |
| GETSWIFT | Canada (CA) | 1785620 | N/A | Inactive | Distributed Logistics Pty. Ltd. | GETSWIFT, INC. | N/A |

*No known due dates over the next 6 months.

**As indicated above, certain trademark applications and registrations are owned by Seller's Affiliates, but which will have been assigned to Seller prior to the Closing.

13

**Patent Applications**

| Pat. App. # | Pat. App. Pub. # | Cntry | Filing Date | Status | Listed Inventors | Latest Owner of Record | Record Owner as of immediately Prior to the Closing | Due Dates* |
|---|---|---|---|---|---|---|---|---|
| 63/082,258 | N/A | U.S. | September 23, 2020 | Expired | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | N/A |
| 63/118,364 | N/A | U.S. | November 25, 2020 | Expired | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | N/A |
| 63/131,064 | N/A | U.S. | December 28, 2020 | Expired | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | N/A |
| 63/216,830 | N/A | U.S. | June 30, 2021 | Expired | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | N/A |
| 17/481,847 | US 2022/0092516 | U.S. | September 22, 2021 | Pending | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | None yet |

74822608v1

| Pat. App. # | Pat. App. Pub. # | Cntry | Filing Date | Status | Listed Inventors | Latest Owner of Record | Record Owner as of immediately Prior to the Closing | Due Dates* |
|---|---|---|---|---|---|---|---|---|
| 17/481,870 | US 2022/0092520 | U.S. | September 22, 2021 | Pending | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | None yet |
| 17/481,887 | US 2022/0092521 | U.S. | September 22, 2021 | Pending | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | None yet |
| 17/482,030 | US 2022/0092519 | U.S. | September 22, 2021 | Pending | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | None yet |
| PCT/US2021/051510 | WO 2022/066739 | WIPO | September 22, 2021 | Pending | Bane Hunter, Joel MacDonald, Robert Bardunias | No assignment of record from inventors. | GETSWIFT, INC. | 30 month national filing due date: Dec. 23, 2022 |

*Known due dates over the next 6 months.

Joel MacDonald and Robert Bardunias have executed an Assignment – Worldwide dated September 14, 2021, transferring to Seller, the ownership of their respective patent rights in the above-referenced patent applications. Bane Hunter (**"Hunter"**) has not executed such

15

assignment. Pursuant to Hunter's September 24, 2016 employment agreement with GetSwift Limited f/k/a Distributed Logistics Group Pty Ltd (**"Company"**), Company or its subsidiary owns "… [a]ny discovery or invention or secret process or improvement in procedure made or discovered by the Employee, while employed in the service of the Company, in direct connection with or in any way affecting or relating to the direct Business of the Company or of any of its Subsidiaries or capable of being used or adapted for use in or in connection with the Business shall immediately be disclosed to the Company …." Furthermore, pursuant to such employment agreement, Hunter is obligated to "… execute all instruments and do all things necessary for vesting the letters patent or other similar protection, when obtained, and all right, title and interest in the letters patent or similar protection in the Company or its nominee absolutely and as sole legal and beneficial owner or in such other person as the Board may require."

During the week of July 25, 2022, Seller and Seller's patent counsel (Christopher King, Esq. of the law firm, Foley & Lardner LLP) reviewed the claims of the above-referenced patent applications and concluded that Hunter was erroneously listed as an inventor for such applications. Accordingly, Seller's patent counsel is prepared to file with the United States Patent and Trademark Office, inventor correction submissions to remove Hunter from the inventorship of such applications.

**Domain Name Registrations**

Domain name: www.getswift.co
Registrar: CCI REG S.A.
Registrar IANA ID: 1607
Domain Status: clientTransferProhibited
Registry Registrant ID: [REDACTED FOR PRIVACY][6]
Registrant Name: [REDACTED FOR PRIVACY]
Registrant State/Province: CO
Registrant Country: US
Name Server: ns-393.awsdns-49.com
Name Server: ns-1911.awsdns-46.co.uk
Name Server: ns-543.awsdns-03.net
Name Server: ns-1052.awsdns-03.org

---

[6] **Note to Draft:** Please provide screenshot of registration via email to ensure that this is GetSwift, Inc.]

74822608v1

**(b)(ii) – Unregistered Material IP**

1.  The following common law trademark:



2.  The following social media accounts:
    - Facebook: @getswiftco
    - Instagram: getswift_
    - LinkedIn: getswift-co
    - Twitter: @getswift_
    - YouTube: GetSwift

3.  GetSwift software program, including Seller's custom-developed source code and data libraries therein.

4.  Scheduling Plus software program, including Seller's custom-developed source code and data libraries therein.

5.  Delivery Business Pro software program, including Seller's custom-developed source code and data libraries therein.

6.  Lists of actual and prospective customers.

7.  All Intellectual Property described at https://getswift.atlassian.net/wiki/home

17

SCHEDULE 2.14(C)

**In-Bound IP Agreements**

1. Eplexity Agreement
2. Master Services Agreement, dated January 7, 2018, between GetSwift, Inc. and Capax Global LLC (the "**Capax Agreement**").
3. Consulting Agreement, dated December 7, 2019, between GetSwift, Inc. and Bit by Byte Limited (a/k/a BBB), which shall have been amended in form and substance reasonably acceptable to Buyer to provide for a present assignment of Work Product (as defined therein).

**Out-Bound IP Agreements**

4. GSW Terms
5. Scheduling Plus Terms

## SCHEDULE 2.15

## CONTRACTS

1. IP Agreements Set forth on Schedule 2.14.

**Business Unit: Delivery Biz Pro**

As used herein, "**DBP Subscriber Agreement**" means the Terms and Conditions, in substantially the form made available to Buyer (available as of July 26, 2022 at: https://demo9.deliverybizpro.com/Agreements/DBP_Subscriber_Agreement.pdf)

1. DBP Subscriber Agreement between GetSwift, Inc. and A Simpler Place in Time, Inc., and associated Order dated April 16, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2521883003.
2. DBP Subscriber Agreement between GetSwift, Inc. and A Table, LLC, and associated Order, dated May 29, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521883021.
3. DBP Subscriber Agreement between GetSwift, Inc. and Able Foods PYT LTD, and associated Order, dated August 27, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883083.
4. DBP Subscriber Agreement between GetSwift, Inc. and Alternative Structures International dba Kahumana Organic Farms
5. DBP Subscriber Agreement between GetSwift, Inc. and Apple Valley Creamery, and associated Order dated February 16, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521883108
6. DBP Subscriber Agreement between GetSwift, Inc. and Atrium Productions dba AVL box, and associated Order dated May 29, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883207.
7. DBP Subscriber Agreement between GetSwift, Inc. and Bella Vacca Jersey's Ltd, and associated Order dated October 2, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521887139.
8. DBP Subscriber Agreement between GetSwift, Inc. and Berkshire Organics, and associated Order dated June 16, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883263.
9. Software Subscription Agreement, dated August 28, 2018, between GetSwift, Inc. and Bikeable, Inc. dba Dundern Market, available at: https://ws.onehub.com/workspaces/1327015/folders/2537438301
10. DBP Subscriber Agreement between GetSwift, Inc. and Box Fresh Pty Ltd, and associated Order dated January 1, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521883292.
11. DBP Subscriber Agreement between GetSwift, Inc. and Brake Bread LLC, and associated Order dated July 25, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883309.
12. Software Subscription Agreement, dated December 1, 2016, between GetSwift, Inc. and Bryson Farms, SENC, available at: https://ws.onehub.com/workspaces/1327015/files/2521883327.

13. Software Subscription Agreement, dated December 1, 2016, between GetSwift, Inc. and Radius Foods, LLC dba Carlton Farms, available at: https://ws.onehub.com/workspaces/1327015/files/2521883363 .

14. DBP Subscriber Agreement between GetSwift, Inc. and Chesapeake Bay Dairy, and associated Order dated February 21, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521883372

15. DBP Subscriber Agreement between GetSwift, Inc. and Collective Harvest, and associated Order dated June 30, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883380.

16. DBP Subscriber Agreement between GetSwift, Inc. and Counter Culture LLC, dba Farm Link Hawaii, and associated Order dated March 18, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883754 .

17. Software Subscription Agreement, dated August 1, 2018, between GetSwift, Inc. and Cowichan Milk Company, LTD, available at: https://ws.onehub.com/workspaces/1327015/files/2521883420 .

18. Software License and Services Agreement, dated February 11, 2014, between GetSwift, Inc. and Crescent Ridge Dairy, Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2521883473 .

19. DBP Subscriber Agreement between GetSwift, Inc. and CV Harves[t] Box, and associated Order dated August 31, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883514 .

20. DBP Subscriber Agreement between GetSwift, Inc. and Danzeisen Dairy, and associated Order dated April 13, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883526 .

21. DBP Subscriber Agreement between GetSwift, Inc. and DC Cutting Board LLC, and associated Order dated December 26, 2019, available at: https://ws.onehub.com/workspaces/1327015/folders/2521883530 .

22. DBP Subscriber Agreement between GetSwift, Inc. and DoorStep (formerly: Kappers' Big Red Barn Inc.)

23. DBP Subscriber Agreement between GetSwift, Inc. and Dyper, Inc., and associated Order dated February 25, 2021 , available at: https://ws.onehub.com/workspaces/1327015/files/2521883706

24. Software Subscription Agreement, dated January 16, 2019, between GetSwift, Inc. and Dunromin Farms Ltd., available at: https://ws.onehub.com/workspaces/1327015/files/2521883717.

25. DBP Subscriber Agreement between GetSwift, Inc. and Farm Bound Organics LTD, and associated Order dated March 20, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883740 .

26. DBP Subscriber Agreement between GetSwift, Inc. and EPMOV Inc. dba Farm Cart Organics, and associated Order dated June 16, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521883743 .

27. DBP Subscriber Agreement, dated June 12, 2013, between GetSwift, Inc. and Farmhouse Delivery Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2537442006 .

74822608v1

28. DBP Subscriber Agreement between GetSwift, Inc. and Farm to Fork Colorado, LLP, and associated Order dated March 7, 2019, available at: https://ws.onehub.com/workspaces/1327015/folders/2521883759 .

29. DBP Subscriber Agreement, dated October 24, 2012, between GetSwift, Inc. and Front Porch Milk, LLC, available at: https://ws.onehub.com/workspaces/1327015/files/2521883798.

30. DBP Subscriber Agreement between GetSwift, Inc. and Farm To People, and associated Order dated March 10, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521883845.

31. DBP Subscriber Agreement between GetSwift, Inc. and It's Organic, and associated Order dated September 22, 2011, available at: https://ws.onehub.com/workspaces/1327015/folders/2537735737

32. DBP Subscriber Agreement between GetSwift, Inc. and Farmer's Best Home Delivery, LLC, and associated Order dated ___ , available at:____

33. DBP Subscriber Agreement between GetSwift, Inc. and Farmhouse Delivery, Inc., and associated Order dated June 12, 2013, available at: https://ws.onehub.com/workspaces/1327015/files/2521883974.

34. Software License and Services Agreement, dated July 22, 2013, between GetSwift, Inc. and Fresh Harvest, Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2521884051.

35. DBP Subscriber Agreement between GetSwift, Inc. and Fresh Fix, LLC, and associated Order dated January 8, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884066.

36. Software Subscription Agreement, dated November 18, 2016, between GetSwift, Inc. and Rolling Ventures, LLC dba Back Porch Organics, available at: https://ws.onehub.com/workspaces/1327015/files/2521884073.

37. DBP Subscriber Agreement between GetSwift, Inc. and The Veggie Bin, LLC [dba Front Porch Pickings], and associated Order dated March 9, 2013, available at: https://ws.onehub.com/workspaces/1327015/folders/2521884083

38. Custom Development Retainer Agreement, dated December 15, 2020, between GetSwift, Inc. and Front Porch Pickings (FPP) [the veggie bin], available at: https://ws.onehub.com/workspaces/1327015/files/2521884087

39. DBP Subscriber Agreement between GetSwift, Inc. and 2583723 Ontario Corp. dba Fruit Suite, and associated Order dated October 1, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521884077.

40. Heads of Agreement, dated April 1, 2017, between GetSwift, Inc. and GWD Operations Pty Ltd, available at: https://ws.onehub.com/workspaces/1327015/files/2521884595.

41. DBP Subscriber Agreement between GetSwift, Inc. and Go Local Produce dba The Alexander Fruit Company, and associated Order dated December 5, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521884615.

42. DBP Subscriber Agreement between GetSwift, Inc. and Good Apple LLC, and associated Order dated October 7, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884637.

43. DBP Subscriber Agreement between GetSwift, Inc. and GDFD2U Inc., and associated Order dated March 4, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521886064 .

44. Software License and Services Agreement, dated September 21, 2012, between GetSwift, Inc. and Farm Box LA, Limited Liability Company, available at: https://ws.onehub.com/workspaces/1327015/files/2521883897.

45. DBP Subscriber Agreement between GetSwift, Inc. and Harry's Delivery Limited, and associated Order dated July 15, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884678.

46. DBP Subscriber Agreement between GetSwift, Inc. and Homestead Creamery, Inc., and associated Order dated April 17, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2537506878

47. DBP Subscriber Agreement between GetSwift, Inc. and Hoover's Dairy, and associated Order dated June 5, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884719.

48. Software License and Services Agreement, dated January 11, 2012, between GetSwift, Inc. and The Hudson Milk Co., Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2521884758

49. DBP Subscriber Agreement between GetSwift, Inc. and Hungry Harvest, and associated Order dated March 5, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884805.

50. DBP Subscriber Agreement between GetSwift, Inc. and Intervale Center, Inc., and associated Order dated October 2, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521884831.

51. DBP Subscriber Agreement between GetSwift, Inc. and Island Point Distribution, Inc. t/as BC Organics Diary, and associated Order dated ___, available at: ___

52. DBP Subscriber Agreement between GetSwift, Inc. and Ivy's Diaper Service, and associated Order dated January 21, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521884897.

53. DBP Subscriber Agreement between GetSwift, Inc. and Fergus Inc. (fka Jardin Des Anges), and associated Order dated June 21, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521884018.

54. DBP Subscriber Agreement between GetSwift, Inc. and Kahumana Organics Farm, Alternative Structures International, and associated Order dated November 19, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2521883122

55. Software License and Services Agreement, dated May 26, 2010, between GetSwift, Inc. and King Brothers Dairy, LLC, available at: https://ws.onehub.com/workspaces/1327015/files/2521884955.

56. DBP Subscriber Agreement between GetSwift, Inc. and Kitchen Doula LLC, and associated Order dated March 6, 2022, available at: https://ws.onehub.com/workspaces/1327015/files/2521884972.

57. Software Subscription Agreement, dated August 21, 2015, between GetSwift, Inc. and Limestone Organic Creamery Ltd., available at: https://ws.onehub.com/workspaces/1327015/files/2521884978.

58. Software Subscription Agreement, dated March 18, 2016, between GetSwift, Inc. and Local Farm OK, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885003

59. Software Subscription Agreement, dated October 13, 2016, between GetSwift, Inc. and Beaumont & Coffman LLC dba Local Harvest Delivery, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885010

60. DBP Subscriber Agreement between GetSwift, Inc. and Taber Abercy dba Locavore Delivery, and associated Order dated March 4, 2019, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885019.

61. DBP Subscriber Agreement between GetSwift, Inc. and Long Table Grocery, and associated Order dated June 1, 2020, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885022.

62. DBP Subscriber Agreement between GetSwift, Inc. and Mad Giant (Pty) Ltd, and associated Order dated July 1, 2020, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885034.

63. DBP Subscriber Agreement between GetSwift, Inc. and Mary's Land Farm LLC, and associated Order dated September 20, 2021, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885039.

64. DBP Subscriber Agreement between GetSwift, Inc. and MEEL, LLC, and associated Order dated November 23, 2020, available at:
https://ws.onehub.com/workspaces/1327015/files/2521886919

65. Software License and Services Agreement, dated October 31, 2012, between GetSwift, Inc. and Mill-King Market and Creamery, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885108 .

66. Software License and Services Agreement, dated November 2, 2021, between GetSwift, Inc. and Mother Earth's Produce, LLC, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885117.

67. DBP Subscriber Agreement between GetSwift, Inc. and SmartBasil, LLC dba The Neighborhood Harvest, and associated Order dated December 4, 2014, available at:
https://ws.onehub.com/workspaces/1327015/folders/2537740328

68. DBP Subscriber Agreement between GetSwift, Inc. and Oahu Fresh, and associated Order dated May 7, 2020, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885160.

69. Software License and Services Agreement, dated June 1, 2010, between GetSwift, Inc. and October Kitchen, LLC, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885178.

70. Software Subscription Agreement, dated August 13, 2018, between GetSwift, Inc. and Oddbox Delivery Ltd., available at:
https://ws.onehub.com/workspaces/1327015/files/2521885232.

71. DBP Subscriber Agreement between GetSwift, Inc. and Ooooby Limited, and associated Order dated October 23, 2018, available at:
https://ws.onehub.com/workspaces/1327015/files/2537740528 .

72. Software License and Services Agreement, dated February 22, 2013, between GetSwift, Inc. and ORCHARD At The OFFICE, LLC, available at:
https://ws.onehub.com/workspaces/1327015/files/2521885249.

74822608v1

73. DBP Subscriber Agreement between GetSwift, Inc. and Pacific Coast Harvest, and associated Order dated February 7, 2013, available at: https://ws.onehub.com/workspaces/1327015/folders/2537740698

74. DBP Subscriber Agreement between GetSwift, Inc. and Pasture Pure LLC dba Tara Firms Farm, and associated Order dated March 4, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2537740952

75. DBP Subscriber Agreement between GetSwift, Inc. and Seed to Spoon, LLC dba Perfectly Imperfect Produce, and associated Order dated March 18, 2018, available at: https://ws.onehub.com/workspaces/1327015/folders/2537741137

76. DBP Subscriber Agreement between GetSwift, Inc. and LAC143, LLC, dba Pet Wants, and associated Order dated, available at: https://ws.onehub.com/workspaces/1327015/folders/2537741305

77. DBP Subscriber Agreement between GetSwift, Inc. and Philly Foodworks LLC, and associated Order dated October 7, 2016, available at: https://ws.onehub.com/workspaces/1327015/folders/2537741469

78. DBP Subscriber Agreement between GetSwift, Inc. and Plan B Organic Farm, and associated Order dated May 14, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2537741960

79. DBP Subscriber Agreement between GetSwift, Inc. and PURE SIMPLE MARKET LLC, and associated Order dated January 25, 2022, available at: https://ws.onehub.com/workspaces/1327015/files/2521885296.

80. Software License and Services Agreement, dated May 1, 2008, between GetSwift, Inc. and Reeds Dairy, Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2521885343.

81. DBP Subscriber Agreement between GetSwift, Inc. and Royal Crest Dairy, and associated Order dated September 25, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521885376.

82. Software License and Services Agreement between GetSwift, Inc. and Sandhills Farm to Table Cooperative, available at: https://ws.onehub.com/workspaces/1327015/files/2521885385.

83. DBP Subscriber Agreement, dated March 16, 2021, between GetSwift, Inc. and Savenor's Supply Co., available at: https://ws.onehub.com/workspaces/1327015/files/2521885390.

84. Software Subscription Agreement, dated March 7, 2018, between GetSwift, Inc. and Senior Solutions, available at: https://ws.onehub.com/workspaces/1327015/files/2521885396.

85. Software Subscription Agreement, dated May 20, 2015, between GetSwift, Inc. and Shatto Home Delivery, LLC, available at: https://ws.onehub.com/workspaces/1327015/files/2521885432

86. DBP Subscriber Agreement between GetSwift, Inc. and 4P Foods, and associated Order dated April 14, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521885440.

87. Software Subscription Agreement, dated December 1, 2017, between GetSwift, Inc. and 10513733 Canada, Ltd., available at: https://ws.onehub.com/workspaces/1327015/files/2521886757.

24

88. Software License and Services Agreement, dated January 13, 2010, between GetSwift, Inc. and Los Poblanos Organics, Ltd. Co., available at: https://ws.onehub.com/workspaces/1327015/files/2521885477.

89. Software License and Services Agreement, dated February 3, 2009, between GetSwift, Inc. and Tony Brusco, dba South Mountain Veggies, available at: https://ws.onehub.com/workspaces/1327015/files/2521885519.

90. DBP Subscriber Agreement between GetSwift, Inc. and Snuck Farm, and associated Order dated May 25, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521885530.

91. DBP Subscriber Agreement between GetSwift, Inc. and Standard Fisheries Corp. dba Standard Fish Co., and associated Order dated May 24, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521885550.

92. DBP Subscriber Agreement between GetSwift, Inc. and Thatcher Farm, Inc., and associated Order dated July 14, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521885586.

93. Software Subscription Agreement, dated September 15, 2017, between GetSwift, Inc. and The Fruit People Ltd, available at: https://ws.onehub.com/workspaces/1327015/files/2521885594.

94. DBP Subscriber Agreement between GetSwift, Inc. and The GrowHaus, and associated Order dated August 10, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521885620.

95. DBP Subscriber Agreement between GetSwift, Inc. and The Waterman's Wife, LLC, and associated Order dated April 27, 2020, available at: https://ws.onehub.com/workspaces/1327015/files/2521885630.

96. DBP Subscriber Agreement between GetSwift, Inc. and Top O' The Morn Farms, and associated Order dated January 5, 2012, available at: https://ws.onehub.com/workspaces/1327015/folders/2537742449 .

97. DBP Subscriber Agreement between GetSwift, Inc. and Top Shelf Feeds Inc, and associated Order dated March 12, 2021, available at: https://ws.onehub.com/workspaces/1327015/folders/2537742447 .

98. DBP Subscriber Agreement between GetSwift, Inc. and Triangle Urban Farm LLC, and associated Order dated November 20, 2020, available at: https://ws.onehub.com/workspaces/1327015/folders/2537742440 .

99. DBP Subscriber Agreement between GetSwift, Inc. and Two River Dairy, and associated Order dated April 10, 2015, available at: https://ws.onehub.com/workspaces/1327015/folders/2537742437 .

100. DBP Subscriber Agreement between GetSwift, Inc. and Volleman's Home Delivery, and associated Order dated March 29, 2021, available at: https://ws.onehub.com/workspaces/1327015/files/2521886447.

101. DBP Subscriber Agreement between GetSwift, Inc. and Five Anchors LLC dba Washington's Green Grocer, and associated Order dated February 17, 2022, available at: https://ws.onehub.com/workspaces/1327015/files/2521885703.

102. DBP Subscriber Agreement between GetSwift, Inc. and Worthy Flavors LLC, and associated Order dated March 2, 2022, available at: https://ws.onehub.com/workspaces/1327015/files/2521885715.

103. DBP Subscriber Agreement between GetSwift, Inc. and Yellow Bird Food Shed LLC, and associated Order dated March 11, 2019, available at: https://ws.onehub.com/workspaces/1327015/files/2521885728.

## Business Unit: GetSwift

1. Term Sheet, dated August 1, 2019, between GetSwift Inc. and Thousand Oaks Healthcare LLC. Link: https://ws.onehub.com/workspaces/1327015/files/2528449894.

2. Term Sheet, dated March 19, 2021 between GetSwift, Inc. and Soho Intertrade Co, Ltd., available at: https://ws.onehub.com/workspaces/1327015/files/2528447419.

3. Term Sheet, dated April 30, 2020 between GetSwift, Inc. and The Flatiron Catering Company LLC, available at: https://ws.onehub.com/workspaces/1327015/files/2528446988

4. Term Sheet, dated July 1, 2021 between GetSwift, Inc. and Fresh Ventures Group PTY LTD, available at: https://ws.onehub.com/workspaces/1327015/files/2528446991

5. Joint Business Agreement, dated September 20, 2021, between GetSwift, Inc. and Uber Technologies, Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2528447660

6. Term Sheet, between GetSwift, Inc. and Flux Connectivity Inc., available at: https://ws.onehub.com/workspaces/1327015/files/2528447663

7. Term Sheet, between GetSwift Inc. and Smitty's Restaurant. Link: https://ws.onehub.com/workspaces/1327015/files/2528446992

8. Term Sheet, dated April 20, 2021 between GetSwift, Inc. and ShiftPixy Inc, available at: https://ws.onehub.com/workspaces/1327015/files/2528447458

9. Term Sheet, dated April 3, 2020 between GetSwift, Inc. and 4R Restaurant Group, LLC available at: https://ws.onehub.com/workspaces/1327015/files/2528449834

| BASE (app.getswift.co) | |
|---|---|
| Unique Count | Total |
| Organizations | 118 |

| Merchants | 243 |
|-----------|-----|

| ENT (live.getswift.co) |
|------------------------|
| Heineken - Egypt |
| YUM! Qatar - Sterling |
| KFG |

The following parties are parties to the GSW Terms:

| Organization | Merchant |
|--------------|----------|
| (app.getswift.co) | |
| Red Rooster | RR6571 Albany |
| Red Rooster | RR2677 Armidale |
| Red Rooster | RR4703 Ayr |
| Red Rooster | RR4589 Dalby |
| Red Rooster | RR6560 Ellenbrook |
| Red Rooster | RR6544 Esperance |
| Red Rooster | RR4713 Gladstone |
| Red Rooster | RR4754 Glenmore |
| Red Rooster | RR4756 Gracemere |
| Red Rooster | RR2603 Griffith |
| Red Rooster | RR4615 Gympie |
| Red Rooster | RR6592 Kalamunda |
| Red Rooster | RR6556 Kalgoorlie |
| Red Rooster | RR2640 Kurri Kurri |

| | |
|---|---|
| Red Rooster | RR2623 Lake Haven |
| Red Rooster | RR4525 Mt. Isa |
| Red Rooster | RR4752 North Rockhampton |
| Red Rooster | RR4753 South Rockhampton |
| Red Rooster | RR6600 Northam |
| Red Rooster | RR4619 Warwick QLD |
| Red Rooster | RR6527 Woodvale |
| Red Rooster | RR4755 Yeppoon |
| Red Rooster | RR2653 Gosford West |
| Red Rooster | RR2658 Erina |
| Red Rooster | RR 2724 Tamworth Foodcourt |
| Red Rooster | RR6607 Port Kennedy |
| Red Rooster | RR2686 Grafton |
| Red Rooster | RR4512 Charters Towers |
| Red Rooster | RR2689 Tuggerah DT |
| Red Rooster | 2634 Kempsey |
| Mitre10 | Clennett's Mitre 10 |
| Mitre10 | Clennett's Mitre 10 |
| Mitre10 | Cornwells Mitre 10 |
| Mitre10 | Cornwells Mitre 10 |
| Mitre10 | Fagg's Mitre 10 South Geelong |
| Mitre10 | Fagg's Mitre 10 South Geelong |
| Mitre10 | Kunda Park |
| Mitre10 | Kunda Park |

74822608v1

| Mitre10 | Sunshine Coast |
|---------|----------------|
| Mitre10 | Sunshine Coast |
| Mitre10 | Doyles HTH |
| Mitre10 | Doyles HTH |
| Mitre10 | Petrie's Mitre 10 Port Macquarie |
| Mitre10 | Petrie's Mitre 10 Port Macquarie |
| Mitre10 | Pambula Mitre 10 DC |
| Mitre10 | Pambula Mitre 10 DC |
| Mitre10 | Petrie's T&H Taree |
| Mitre10 | Petrie's T&H Taree |
| Mitre10 | Petrie's Mitre 10 Mudgee |
| Mitre10 | Petrie's Mitre 10 Mudgee |
| Mitre10 | Petrie's Mitre 10 Bathurst |
| Mitre10 | Petrie's Mitre 10 Bathurst |
| Mitre10 | Wide Bay |
| Mitre10 | Wide Bay |
| Mitre10 | Petries Mitre 10 Coffs Harbour |
| Mitre10 | Petries Mitre 10 Coffs Harbour |
| Mitre10 | Western |
| Mitre10 | Western |
| Mitre10 | DMS Demo - VIC |
| Mitre10 | DMS Demo - VIC |
| Mitre10 | Womersley's Trade DC |
| Mitre10 | Womersley's Trade DC |

74822608v1

| Mitre10 | FAW Home Timber Hardware |
|---------|--------------------------|
| Mitre10 | FAW Home Timber Hardware |
| Mitre10 | Barossa Mitre 10 |
| Mitre10 | Barossa Mitre 10 |
| Mitre10 | Tait/TT/CV |
| Mitre10 | Tait/TT/CV |
| Mitre10 | Bayswater Timber Mitre 10 |
| Mitre10 | Bayswater Timber Mitre 10 |
| Mitre10 | King's Mitre 10 |
| Mitre10 | King's Mitre 10 |
| Mitre10 | Pulbrook Trade |
| Mitre10 | Pulbrook Trade |
| Mitre10 | PETRIES TRADECENTRE ORANGE |
| Mitre10 | PETRIES TRADECENTRE ORANGE |
| Mitre10 | Versatile Mitre 10 |
| Mitre10 | Versatile Mitre 10 |
| Mitre10 | Becks Launceston |
| Mitre10 | Becks Launceston |
| Mitre10 | Becks Devonport |
| Mitre10 | Becks Devonport |
| Mitre10 | Millicent Mitre 10 |
| Mitre10 | Millicent Mitre 10 |
| Mitre10 | Hudsons Rouse Hill |
| Mitre10 | Hudsons Rouse Hill |

74822608v1

| Mitre10 | Brisbane |
| Mitre10 | Brisbane |
| Mitre10 | Mitre 10 Goulburn |
| Mitre10 | Mitre 10 Goulburn |
| Mitre10 | Melton Timber & Hardware |
| Mitre10 | Hudson capalaba |
| Mitre10 | Hudson capalaba |
| Mitre10 | Scone Timber & Hardware |
| Mitre10 | Scone Timber & Hardware |
| Mitre10 | Maclean Mitre10 |
| Mitre10 | Maclean Mitre10 |
| Mitre10 | Macksville Mitre 10 |
| Mitre10 | Macksville Mitre 10 |
| Mitre10 | Mitre 10 Woolgoolga |
| Mitre10 | Mitre 10 Woolgoolga |
| Mitre10 | Petries Gunnedah |
| Mitre10 | Petries Gunnedah |
| Mitre10 | Park Road Timber & Hardware |
| Mitre10 | Park Road Timber & Hardware |
| Mitre10 | Hume & Iser Pty Ltd |
| Mitre10 | Hume & Iser Pty Ltd |
| Mitre10 | Diamond Valley Mitre 10 |
| Mitre10 | Diamond Valley Mitre 10 |
| Mitre10 | Provans Timber & Hardware |

74822608v1

| Mitre10 | Provans Timber & Hardware |
|---------|---------------------------|
| Mitre10 | Margaret River |
| Mitre10 | Margaret River |
| Mitre10 | Hudsons Wagga Wagga |
| Mitre10 | Hudsons Wagga Wagga |
| Mitre10 | Kilmore Mitre 10 |
| Mitre10 | Kilmore Mitre 10 |
| Mitre10 | Benalla Mitre 10 |
| Mitre10 | Benalla Mitre 10 |
| Mitre10 | Border Builders Mitre 10 |
| Mitre10 | Border Builders Mitre 10 |
| Mitre10 | Hudson HTH Glendale |
| Mitre10 | Hudson HTH Glendale |
| Mitre10 | Achesons Mitre 10 |
| Mitre10 | Achesons Mitre 10 |
| Mitre10 | WB Hunter Shepparton |
| Mitre10 | Beaconsfield Mitre10 |
| Mitre10 | Beaconsfield Mitre10 |
| Mitre10 | T M & H Mitre 10 Trade Centre |
| Mitre10 | T M & H Mitre 10 Trade Centre |
| Mitre10 | Drouin Home Timber & Hardware |
| Mitre10 | Drouin Home Timber & Hardware |
| Mitre10 | Porters M10 Mackay |
| Mitre10 | Porters M10 Mackay |

74822608v1

| Mitre10 | G Gay & Co Mitre 10 |
| --- | --- |
| Mitre10 | G Gay & Co Mitre 10 |
| Mitre10 | Porters M10 Whitsunday |
| Mitre10 | Porters M10 Whitsunday |
| Mitre10 | McLaren Vale Mitre 10 |
| Mitre10 | McLaren Vale Mitre 10 |
| Mitre10 | Permewans Hamilton Mitre 10 |
| Mitre10 | Permewans Hamilton Mitre 10 |
| Mitre10 | Ponting Bros M10 |
| Mitre10 | Ponting Bros M10 |
| Mitre10 | T M & H Mitre 10 |
| Mitre10 | K & B Timber |
| Mitre10 | Hardings Geelong |
| Mitre10 | Hardings Geelong |
| Mitre10 | Petries Mitre 10 Dubbo |
| Mitre10 | Petries Mitre 10 Dubbo |
| Mitre10 | Hardings Dandenong |
| Mitre10 | Hardings Dandenong |
| Mitre10 | Hardings Reservoir |
| Mitre10 | Hardings Reservoir |
| Mitre10 | Murphys Mitre 10 |
| Mitre10 | Murphys Mitre 10 |
| Mitre10 | Costa's Mitre 10 |
| Mitre10 | Costa's Mitre 10 |

74822608v1

| Mitre10 | Dippers Home Hardware |
|---------|----------------------|
| Mitre10 | Dippers Home Hardware |
| Billiard Factory | Houston |
| Billiard Factory | Houston |
| Click2Order | CB Eats |
| Click2Order | CB Eats |
| Click2Order | C2O Demo |
| Click2Order | C2O Demo |
| Click2Order | Nish Eats - Antigonish |
| Click2Order | Nish Eats - Antigonish |
| Click2Order | Gander |
| Click2Order | Gander |
| Click2Order | Corner Brook |
| Click2Order | Corner Brook |
| Click2Order | Grand Falls-Windsor |
| Click2Order | Grand Falls-Windsor |
| Click2Order | Poppy Shop |
| Click2Order | Poppy Shop |
| Click2Order | Happy Valley-Goose Bay |
| Click2Order | Happy Valley-Goose Bay |
| Click2Order | Clarenville, NL |
| Bistro KURIER by RAS | Bistro KURIER BA |
| Bistro KURIER by RAS | Bistro KURIER ZA |
| Bistro KURIER by RAS | Bistro KURIER KE |

74822608v1

| | |
|---|---|
| Bistro KURIER by RAS | Bistro KURIER BB |
| Bistro KURIER by RAS | Bistro KURIER NR |
| Bistro KURIER by RAS | Bistro KURIER PO |
| Bistro KURIER by RAS | Bistro KURIER TT |
| Org: The Pure Water Specialists | The Pure Water Specialists |
| Org: Global Expert Shipping | Global Expert Shipping |
| Org: Global Expert Shipping | Global Expert Shipping |
| Org: Global Expert Shipping | Haypost |
| Org: The Flower Run | The Flower Run |
| Org: Culinary Care | Culinary Care |
| Org: Mr Cream | Mr Cream |
| Org: Mr Cream | Mr Cream |
| Org: The Real Good Life | The Real Good Life - Wauwatosa |
| Org: The Printing Hub | The Printing Hub |
| Org: JCS PARTS | JCS PARTS |
| Org: Skycare Pharmacy | Skycare Pharmacy |
| Org: Pizza Pomodoro | Pizza Pomodoro |
| Org: Brookaire | E. Rutherford |
| Org: Brookaire | E. Rutherford |
| Org: Brookaire | York |
| Org: Brookaire | York |
| Org: Print Tekk Printing and Mailing | Print Tekk Printing and Mailing |
| Org: NAF | NAF Kylie Stimac |
| Org: NAF | NAF Kylie Stimac |

| | |
|---|---|
| Org: Parcelle | Parcelle |
| Org: Parcelle | Parcelle |
| ABALOBI ICT4Fisheries | Fish with a Story (By ABALOBI) |
| Org: Mobile Beauty Co. | Mobile Beauty Co. |
| Org: Mobile Beauty Co. | Mobile Beauty Co. |
| Org: MYSEAT.SG | [MYSEAT.SG](MYSEAT.SG) |
| Org: MYSEAT.SG | [MYSEAT.SG](MYSEAT.SG) |
| Org: MEDI MAN | FLOWERFUL |
| Org: MEDI MAN | FLOWERFUL |
| DropIt Delivery | Island Fresh Box |
| DropIt Delivery | Island Fresh Box |
| Org: Your Canna Club | Your Canna Club |
| Org: Your Canna Club | Your Canna Club |
| Org: Rite Away Pharmacy | Rite Away Pharmacy |
| Org: Flowers A bunch | Flowers A bunch |
| Cartly-ORG | Cartly |
| Cartly-ORG | Cartly |
| Quick | Quick |
| Org: Lucky Farms | Lucky Farms |
| Org: Lucky Farms | Lucky Farms |
| Restaurant Sushibox | Tuktuk Livraison |
| Restaurant Sushibox | Tuktuk Livraison |
| Drinkies - Philippines | Drinkies Makati |
| Drinkies - Philippines | Drinkies Makati |

74822608v1

| | |
|---|---|
| Drinkies - Philippines | Drinkies QC |
| Drinkies - Philippines | Drinkies QC |
| Org: Evolution Couriers | flowers of southport |
| 757 Food Finder | FEED YOUR ASS! |
| 757 Food Finder | FEED YOUR ASS! |
| Org: HPXpress | HPXpress |
| Org: A La Minute | A La Minute |
| Org: A La Minute | A La Minute |
| Org: SLE Equipment | SLE Equipment |
| Org: SLE Equipment | SLE Equipment |
| Org: Black Sheep Restaurant | Black Sheep Restaurant |
| Nirvana Home Collection | Nirvana Home Collection |
| Org: Tom&Sawyer | Tom&Sawyer |
| Org: Tom&Sawyer | Tom&Sawyer |
| Org: Allfasteners | Allfasteners |
| Org: Allfasteners | Allfasteners |
| Org: SnapGrab Delivery | SnapGrab Delivery |
| Org: SnapGrab Delivery | SnapGrab Delivery |
| Autolac Industries | Autolac Industries |
| Autolac Industries | Pinnacle Paints |
| Org: Mode Flooring Logistics | Mode Flooring Logistics |
| Org: Two Boots Jersey City | Two Boots Jersey City |
| Org: Two Boots Jersey City | Two Boots Jersey City |
| Org: Kids Services | Kids Services |

37

| | |
|---|---|
| Org: LOCAL'd DC | LOCAL'd DC |
| Org: LOCAL'd DC | LOCAL'd DC |
| Org: Wheelaround Rentals | Wheelaround Rentals |
| Org: Get Better Doctors | Get Better Doctors |
| Org: Get Better Doctors | Get Better Doctors |
| Org: Buzz Buddy Winston Heights (on Edmonton Trail | Buzz Buddy Winston Heights (on Edmonton Trail NE) |
| Org: Buzz Buddy Winston Heights (on Edmonton Trail | Buzz Buddy Winston Heights (on Edmonton Trail NE) |
| Org: APC | APC |
| Org: Shoppr | Shoppr |
| Org: UZ Marketing | UZ Marketing |
| Org: UZ Marketing | UZ Marketing |
| Livraison D Boyer Inc | Boston Pizza 19/440 |
| Livraison D Boyer Inc | Yuzu Sushi 19/440 |
| Livraison D Boyer Inc | Belle Province 19/440 |
| Livraison D Boyer Inc | PFK Vimont |
| Livraison D Boyer Inc | Gualdieri |
| Org: Sherman | Sherman |
| Org: Sherman | Sherman |
| Org: EfurnitureNY | EfurnitureNY |
| Org: EfurnitureNY | EfurnitureNY |
| Chris Hughes | BudsRus |
| Chris Hughes | BudsRus |
| Tailwind Delivery | Tailwind Delivery |
| HAYMES PAINT SHOP SUNSHINE COAST | HAYMES PAINT SHOP SUNSHINE COAST |

| ShiftPixy Corporate | Nacho Nukes |
|---|---|
| ShiftPixy Corporate | Nacho Nukes |
| Org: Burgies | Burgies Campbellfield |
| Org: Burgies Hoppers | Burgies Hoppers |
| Org: Venue Restaurant & Lounge | Venue Restaurant & Lounge |
| Org: Venue Restaurant & Lounge | Venue Restaurant & Lounge |
| Org: Uno Pizza Kit | Uno Pizza Kit |
| Org: Uno Pizza Kit | Uno Pizza Kit |
| Orbital Kitchens | Flatiron Catering Company |
| Orbital Kitchens | Flatiron Catering Company |
| Kuzeta B.V. | Kuzeta B.V. |
| Bring Me A Bag | Bring Me A Bag |
| Bring Me A Bag | Bring Me A Bag |
| Org: Microgreen Depot | Microgreen Depot |
| Org: Microgreen Depot | Microgreen Depot |
| Org: Oahu Fresh | Oahu Fresh |
| Org: Oahu Fresh | Oahu Fresh |
| Urban Farm | Victoria |
| Urban Farm | Victoria |
| Cafasso's Fairway Market | Fairway Home Delivery |
| Cafasso's Fairway Market | Fairway Home Delivery |
| Delivery Express | Delivery Express |
| Delivery Express | Delivery Express |
| Washingtons Green Grocer | Washington's Green Grocer |

74822608v1

| | |
|---|---|
| Washingtons Green Grocer | Washington's Green Grocer |
| New Dragon | New Dragon |
| New Dragon | New Dragon |
| WeDo Movings | WeDo Movings |
| WeDo Movings | WeDo Movings |
| TCS Document Services | TCS Document Services |
| Hudson Kitchens | Hudson Streams |
| RuffKatSS Delivery | RuffKatSS Delivery |
| RuffKatSS Delivery | RuffKatSS Delivery |
| Soho Hospitality | Soho Pizza |
| Green Pharm Kalkaska | Green Pharm Kalkaska |
| Green Pharm Kalkaska | Green Pharm Kalkaska |
| Green Pharm Kalkaska | Green Pharm Hazel Park |
| Green Pharm Kalkaska | Green Pharm Hazel Park |
| Woodland Building Supply | Woodland Building Supply |
| Woodland Building Supply | Woodland Building Supply |
| Bridge Eats | SOUTH Pop's Taphouse |
| Bridge Eats | NORTH Pop's Taphouse |
| Bridge Eats | Kingsmen Ale House |
| Bridge Eats | Mojo's Craft Pub & Grill |
| Bridge Eats | The Duke |
| Bridge Eats | Bridge Bud Supply |
| Cannabis Post | Cannabis Post |
| Cannabis Post | Cannabis Post |

74822608v1

| | |
|---|---|
| Flavour Makers Pty Ltd | Flavour Makers Van |
| MattInc.co | Matt |
| MattInc.co | Matt |
| Zubugy | Zubugy Greensboro |
| Zubugy | Zubugy Greensboro |
| Savenor's Market | Savenor's Cambridge |
| Savenor's Market | Savenor's Cambridge |
| Helping Hands Transportation | Helping Hands Transportation |
| Toss & Co. Limited | Toss |
| Paint Right Maroochydore | Paint Right Maroochydore |
| PETERBOROUGH HARDWARE | Nicholas Robert Srour |
| ALL Industries | The 420 Doctor |
| ALL Industries | The 420 Doctor |
| EJ Restaurant Swift Current Inc. | Edo Japan Swift Current |
| Foody | Foody |
| Foody | Foody |
| Home Eatz Asia Pte Ltd | HomeEatzDelivery |
| Dishdash Restaurant Group | Dishdash Sunnyvale |
| Pure | Pure New Baltimore Medical & Recreational Cannabis |
| Pure | Pure New Baltimore Medical & Recreational Cannabis |
| Dalrock Microgreens | Brittany Butcher |
| Brama | Brama |
| Brama | Brama |
| North Coast Joint Ventures | ArborSide |

| North Coast Joint Ventures | North Coast Provisions - Sault Ste. Marie |
|---|---|
| Dank Drop HQ | Dank Drop |
| Dank Drop HQ | Dank Drop |
| Pico Delivers | UCLA Lu Valle Commons |
| Pico Delivers | UCLA Lu Valle Commons |
| Pico Delivers | GF2Go |
| Island Meds | Island Meds |
| Island Meds | Island Meds |
| Breedsville Provision Center | Higher Breed |
| Foodie Goodie | Testing Account |
| Foodie Goodie | Testing Account 2 |
| Foodie Goodie | Sai Wan |
| Foodie Goodie | Shau Kei Wan |
| Foodie Goodie | Chai Wan |
| Foodie Goodie | To Kwa Wan |
| Foodie Goodie | Kowloon City |
| Kitchen Doula | Kitchen Doula |
| Kitchen Doula | Kitchen Doula |
| Wish Pontiac LLC | Burton Cannabis Company |
| Great Foods2go Inc. | 1Delivery |
| Vlad-GSW | FoodDelivery-M1 |
| Burger Urge | Windsor |
| jobran | m.jobran |
| Domino's Thailand TESTING | Domino's Thailand TESTING |

74822608v1

**Business Unit: Scheduling Plus**

1. Reseller Agreement, dated July 14, 2016, between GetSwift, Inc. and Epicor Software Corporation, available at: https://ws.onehub.com/workspaces/1327015/folders/2521881628

**SCHEDULE 2.16**

**RELATED PARTY TRANSACTIONS**

- None.

**SCHEDULE 2.17**

**SUBSIDIARIES**

- GetSwift d.o.o

74822608v1

# EXHIBIT B

**Glynn, Megan J.**

| | |
|---|---|
| **From:** | O'Neil, Michael <MONeil@taftlaw.com> |
| **Sent:** | Thursday, October 13, 2022 3:05 PM |
| **To:** | Markus, Ilan; Grubin, Janice B |
| **Cc:** | Fleischer, Scott L; Fazio, Mark F.; Wetzel, Ashley |
| **Subject:** | In re GetSwift, Inc. - Sale Closing [IWOV-Active.FID3117673] |

Ilan and Janice,

On behalf of REV, we offer the following observations, in the same order Ilan used below:

1.      REV will not be increasing its deposit or seeking additional extensions.
2.      Given what it has learned in the last two weeks, with regard to Get Swift's business arrangements with Eplexity and the control that Eplexity has over Get Swift's assets and otherwise, REV will not be closing on the transaction tomorrow, or ever.

REV's decision to not address additional points and/or specific inaccuracies in your several recent notes should not be construed as an admission of any sort.
REV reserves and preserves all rights and remedies available to it.

**Taft /**

**Michael P. O'Neil**
Partner and Practice Group Chair
Licensed in Arizona, Indiana and Illinois
MONeil@taftlaw.com
Dir: 317.713.3561   |   Cell: 317.902.1153
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023

111 E. Wacker Drive, Suite 2800
Chicago, IL 60601

2375 E. Camelback Road, Suite 600
Phoenix, AZ 85016

**Taft Bio**
**taftlaw.com**



Jaffe is joining Taft, effective Dec 31, 2022.
Learn more **here.**

This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**From:** Markus, Ilan <IMarkus@barclaydamon.com>
**Sent:** Wednesday, October 12, 2022 2:16 PM
**To:** Fazio, Mark F. <MFazio@taftlaw.com>; O'Neil, Michael <MONeil@taftlaw.com>; Wetzel, Ashley <AWetzel@taftlaw.com>
**Cc:** Grubin, Janice B <JGrubin@barclaydamon.com>; Fleischer, Scott L. <SFleischer@barclaydamon.com>
**Subject:** In re GetSwift, Inc. - Sale Closing [IWOV-Active.FID3117673]
**Importance:** High

Michael, Mark, and Ashley:

As you know, aside from accommodating REV's request to push back the sale approval hearing (and other related deadlines), REV has sought and obtained from the Debtors consent to an extension of the original October 3, 2022 closing date under the Sale Order and REV APA, as well as a further extension until this Friday, October 14, 2022.  These two REV extensions have cost the Debtors tens of thousands of dollars in fees, salaries, and other costs associated with prolonging the Debtors' operation of the SaaS business that the Sale Order requires REV to purchase.

The Debtors have repeatedly requested a closing update since the closing date was extended to this Friday, and REV has not provided an update.  Obviously, what the lack of any promised update means is that REV has yet to determine that it will close this Sale notwithstanding the provisions of the Sale Order (to which REV agreed) requiring REV to close.

Please be advised that

1.    The Debtors will not agree to a request by REV to further extend Friday's closing date unless by tomorrow, Thursday, October 14, 2022, at 4 p.m. (EST) (a) it receives from REV a signed agreement to extend the Sale Closing Date for one more week, (b) that agreement provides that REV must increase the deposit from $280K to $1 million; (c) such additional $720K deposit has been received by the Debtors; and (d) REV waives all of its rights to return of the entire $1M deposit, if any.

2.    Unless REV has closed or is in the process of closing on its purchase of the Debtors' SaaS assets as of noon (EST) on this Friday, then the Debtors intend to (a) declare REV a Defaulting Buyer under the Sale Order, reserve all of its rights to pursue REV in the Bankruptcy Court for all possible damages under the REV APA, the Sale Order, and applicable bankruptcy and non-bankruptcy law, and (b) turn to the Stalking Horse Bidder/Backup Bidder to close on its Stalking Horse Bid.  Again, given the silence regarding REV's commitment to close on Friday, the time and monetary costs incurred by the Debtors, their estates, and their creditors associated with the two prior fire drills REV initiated when seeking to get more time to close, and the shortness of time until REV must close or default, we have alerted the Stalking Horse Bidder/Backup Bidder today of the possibility that the Debtors will demand that it close on the Sale shortly after noon (EST) on Friday.

2

The Debtors reserve all of their rights and remedies, on behalf of themselves, their bankruptcy estates, their creditors, and all other parties-in-interest, under the Sale Order, the REV APA, all other relevant documents, applicable law, equity, and otherwise, to recover all of its damages against REV in connection with the Debtors, the Debtors' pending bankruptcy cases, the Sale process, the Sale Order, the REV APA and any other actions or inactions taken by REV.

The Debtors look forward to learning whether REV will close or not.  Time is of the essence.  Janice Grubin and I are available to discuss on our cells at your convenience.  Thank you - Ilan

**Ilan Markus**

Pronouns: he/him/his
Partner

**BARCLAY DAMON** LLP

545 Long Wharf Drive • Ninth Floor • New Haven, CT 06511
D: (203) 672-2661 • F: (203) 654-3265 • C: (203) 258-8207
E: IMarkus@barclaydamon.com

**www.barclaydamon.com** • **vCard** • **Profile**

This electronic mail transmission is intended only for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message.