Michael P. O'Neil
Tracy N. Betz
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone:    (317) 713-3500
Facsimile:    (317) 713-3699

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **GETSWIFT, INC.,** | **Case No. 22-11057 (MEW)** |
| **Debtor.** | |
| **GetSwift Technologies Limited,**<br>**Plaintiff,**<br>**v.**<br>**Retail Ecommerce Ventures, LLC,**<br>**Defendant** | **Adversary Proceeding No.**<br>**23-01015 (MEW)** |

## DFENDANT'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Retail Ecommerce Ventures, LLC , the defendant ("REV" or "Defendant"), files its answer to the Amended Complaint filed by GetSwift Technologies Limited ("GSI" or "Plaintiff"), and states the following:

## NATURE OF THE ADVERSARY PROCEEDING

1.    This is an action based upon REV's repudiation of its irrevocable, Court-approved bid to purchase the Debtors' Saas business pursuant to the letter and spirit of sections 105(a) and 363(b) of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

**ANSWER**:    The allegations of Paragraph 1 are legal conclusions, so no answer is required. To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 1; accordingly, it denies them.

2.    The Debtors' SaaS business was a delivery and workforce management software-as-service (SaaS) platform that was utilized by clients in over 70 countries and across more than 70 different verticals to automate and manage their local delivery operations and delivery drivers (the "SaaS business").

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 2; accordingly, it denies them.

3.    The SaaS business offered a suite of software, products, and services and focused on business and logistics automation, and further included ecommerce and marketplace ordering, workforce management, data analytics and augmentation, business intelligence, route optimization, cash management, task management, shift management, asset tracking, real-time alert, and cloud communications, among other features.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 3; accordingly, it denies them.

4.    Prior to and at the scheduled auction held on September 28, 2022, REV made the highest and best bid for the Debtors' SaaS business through its binding offer to purchase it for: (i) $2,800,000 in cash consideration; (ii) an unsecured promissory note in the principal amount of $1,500,000, and (iii) the assumption of up to $1,000,000 in assumed accounts payable and cure costs, for total consideration of $5,300,000 (the "REV Bid"). The Debtors accepted REV's offer, subject to higher and better bids at the auction, together with REV's required $280,000.00 deposit (the "REV Deposit").

2

**ANSWER**: REV admits only that it bid for the Debtors' business and that the actual bid documents speak for themselves. REV denies the remaining allegations of Paragraph 4.

5.      Before making its Bid, REV had access to Debtors' data room full of information about its Saas business (which was available to any potential purchaser that signed a non-disclosure agreement), and was permitted to conduct as much due diligence regarding Debtors' assets as REV saw fit.

**ANSWER**: Deny.

6.      After performing its due diligence, REV submitted the binding and irrevocable REV Bid to purchase Debtors' SaaS business from the Debtors.

**ANSWER**: REV admits only that it submitted a bid  and denies the remaining allegations in Paragraph 6.

7.      REV and the Debtors negotiated and entered into an Asset Purchase Agreement ("APA") for the purchase of Debtors' Saas business on an "As Is, Where Is, and With All Faults" basis; that APA, along with the proposed transaction itself, was approved by this Court on September 30, 2022.  A copy of the APA is attached hereto as Exhibit A.

**ANSWER**: Rev admits only that the document attached to the Complaint as Exhibit A appears to be a true and correct copy of the APA. REV further states that the APA speaks for itself and denies any allegations inconsistent with the language in the APA.

8.      In making its Bid, REV represented that it was committed to, and had the financial wherewithal to close on, the purchase of Debtors' SaaS business.

**ANSWER**: REV states that the documents, including the APA, speak for themselves and denies any allegations inconsistent with the language in the bid and/or the APA.

9.    As a result of these and other required representations and actions by REV, the Debtors declared REV a "qualified bidder" under the Court-ordered bidding and sale procedures.

**ANSWER**:    The allegations of Paragraph 9 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 9; accordingly, it denies them.

10.    REV repeated its representation regarding its financial capacity to close on the purchase through its binding representations in the APA attesting to its financial ability to close. APA § 4.7.

**ANSWER**:    The allegations of Paragraph 10 are legal conclusions, so no answer is required.  REV further states that the APA speaks for itself and denies any allegations inconsistent with the language in the APA.

11.    Following the Court's approval of the Sale and APA on September 30, 2022, REV sought and obtained two extensions of the deadline for REV to close on the Sale.

**ANSWER**: REV admits the parties entered into two amendments to the APA and denies the remaining allegations.

12.    Prior to the expiration of that extended period, counsel for REV sent an email to counsel for the Debtors on October 13, 2022 stating that REV would not close because it had determined- weeks after its due diligence period expired and it made its irrevocable "as-is, where-is, with all faults" binding commitment to buy the SaaS business - that a vendor, Eplexity, an IT and cloud services consultant, had too much "control" over certain aspects of the SaaS business.

**ANSWER**: As to the allegations of Paragraph 12 which contain legal conclusions, no answer is required.  To the extent a response is required, REV lacks sufficient information to admit

or deny the allegations of Paragraph 12; accordingly, it denies them.  As to the remaining allegations, REV denies them.

13.     Although the time for REV's due diligence in connection with the SaaS business had long passed at that point, in that October 13, 2022 email, REV emphatically and unequivocally told the Debtors that it would never close on the Court-approved Sale.

**ANSWER**: Deny.

14.     Specifically, REV stated: "Given what it has learned in the last two weeks, with regard to GetSwift's business arrangements with Eplexity and the control that Eplexity has over GetSwift's assets and otherwise, REV will not be closing on the transaction tomorrow, or ever." A copy of the referenced communication is attached hereto as Exhibit B (emphasis added).

**ANSWER**: REV states that Exhibit B speaks for itself and denies any allegations inconsistent with Exhibit B.

15.     Since informing the Debtors that it would never close on the Sale, REV has stated in communications to its investors its intent to "temporarily pause all interest and principal payments on [its] notes and all cash payments on [its] PDUs and preferred stock."

**ANSWER**: REV states that the allegations in paragraph 15 are vague and ambiguous, therefore REV lacks sufficient information to admit or deny the allegations; accordingly it denies them.

16.     These communications demonstrate that the real reason why REV failed to close on the Sale was because of financial troubles it had communicated to its investors that it was experiencing - rather than anything to do with Eplexity, a vendor to the SaaS business.

**ANSWER**: Deny.

17.     Ultimately, and at great additional expense to their bankruptcy estates, the Debtors sold their Saas business to SF2 GSW, LLC, the "Stalking Horse" Bidder and the backup bidder ("SF2"), at a significantly lower total price than REV's binding offer.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 17; accordingly, it denies them.

18.     The Debtors' ability to close on the Sale to SF2, which assumed the Eplexity contract as part of the Sale without objection, demonstrates that it was possible for Eplexity to close on the Sale.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 18; accordingly, it denies them.

19.     As a result of REV's unjustified, unilateral breach of the APA, Debtors were forced to accept an inferior offer for the SaaS business that, among other things, reduced the cash Debtors were to receive from the sale from $2,500,000 under the APA down to $1,370,000.

**ANSWER**: Deny.

20.     This adversary proceeding seeks to recover the difference in value between the REV Bid and SF2's "Stalking Horse" bid ("SF2 Bid").

**ANSWER**:    The allegations of Paragraph 20 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 20; accordingly, it denies them.

21.     The relief sought is necessary to place the Debtors' estates and their creditors in no worse position than they would have been in if REV had fulfilled its obligations and upheld its representations under the Court-approved APA.

**ANSWER**:    The allegations of Paragraph 21 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 21; accordingly, it denies them.

22.    The cash component of the Debtors' damages - before the additional attorneys' fees, costs, and expenses directly incurred by the Debtors' estates and creditors as a result of REV's failure to close on the Sale and to close on the SF2 Bid - is $1,130,000.

**ANSWER**:    The allegations of Paragraph 22 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 22; accordingly, it denies them.

## JURISDICTION AND VENUE

23.    The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

**ANSWER**:    The allegations of Paragraph 23 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 23; accordingly, it denies them.

24.    This adversary proceeding arises in the cases entitled *In re Getswift Inc., et al.,* Case No. 22-11057 (MEW), under subchapter V of chapter 11 of the Bankruptcy Code, pending in the United States Bankruptcy Court for the Southern District of New York (the "Court").

**ANSWER**:    The allegations of Paragraph 24 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 24; accordingly, it denies them.

25.    This is a core proceeding under 28 U.S.C. § 157 and with respect to any claims hereunder which may be deemed non-core, the Debtors consent to the entry of final orders and judgments by this Court.

**ANSWER**:    The allegations of Paragraph 25 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 25; accordingly, it denies them.

26.    Venue is proper under 28 U.S.C. §§ 1408 and 1409.

**ANSWER**:    The allegations of Paragraph 26 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 26; accordingly, it denies them.

27.    The statutory predicates for this adversary proceeding are sections 105 and 363 of the Bankruptcy Code.

**ANSWER**:    The allegations of Paragraph 27 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 27; accordingly, it denies them.

## PARTIES

28.    Plaintiffs are debtors-in-possession in the above-captioned cases pending in this Court.

**ANSWER**:    The allegations of Paragraph 28 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 28; accordingly, it denies them.

29.    Defendant is a corporation organized and existing under the laws of Delaware with an address under the APA for notice purposes of c/o Taft Stettinius & Hollister LLP, 200 Public Square, #3500, Cleveland, OH 44114, Attention: Mark Fazio, Esq.

**ANSWER**: Admit.

## BACKGROUND

30.    On August 2, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter V of chapter 11 the Bankruptcy Code in the Court by commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 30; accordingly, it denies them.

31.    No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases and no statutory committees have been appointed or designated.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 31; accordingly, it denies them.

32.    On the Petition Date, the Debtors filed a motion to approve, *inter alia*, bid procedures for the sale of the Debtors' SaaS business to SF2 (the "Stalking Horse") or another buyer, and ultimately the sale of such business [Docket No. 9] (the "Sale Motion").

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 32; accordingly, it denies them.

33.    On August 12, 2022 the Court entered an order approving the bid procedures set forth in the Sale Motion [Docket No. 34] (the "Bid Procedures Order"), which set September 14, 2022 as the deadline for the submission of bids.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 33; accordingly, it denies them.

34.    On August 23, 2022, pursuant to the Bid Procedures Order, the Debtors filed their Notice of Assumption or Assumption and Assignment of Assigned Contracts [Docket No. 46] (the "Cure Notice"), which identified, among other things, each Contract that may become an Assigned Contract as that term is used in the APA.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 34; accordingly, it denies them.

35.    For each Contract in the Cure Notice, the Debtors estimated the Cure Amount owed under such Contract as of August 22, 2022. The deadline for any party to file an objection to the Cure Amounts, adequate assurances of future performance, and/or the proposed assumption or assumption and assignment of an Assigned Contract to SF2 was September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) (the "Contract Objection Deadline"). No objections were filed or received by the Contract Objection Deadline.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 35; accordingly, it denies them.

36.    Debtors received one competing bid for the Assets - the REV Bid - which was delivered via letter from REV's counsel on September 14, 2022 and stated that:

> the Purchase Agreement does not include any conditions precedent to our
>
> client's ability to enter into the Purchase Agreement . . . The Sale will be
>
> on an As-Is, Where-Is Basis in accordance with Section 8 of the Bid
>
> Procedures. . . That Bid is also not subject to any financing contingency
>
> and REV has demonstrated, or will demonstrate, to your satisfaction its

ability to consummate the proposed transaction on or before October 3,

2022.

**ANSWER**:  REV admits it sent a letter to Debtors on September 14, 2022, but denies

Paragraph 36 sets forth the complete language of the September 14, 2022 letter. REV lacks

sufficient information to admit or deny the remaining allegations of Paragraph 36; accordingly, it

denies them.

37.    In accordance with the Bid Procedures Order, REV provided the Debtors and its

contract counterparties with adequate assurance of future performance information that, among

other things, led the Debtors to deem REV a "qualified bidder."

**ANSWER**:    REV states that the bid documents speak for themselves and deny any

language inconsistent with those documents.  As to the remaining allegations, REV lacks sufficient

information to admit or deny the allegations of Paragraph 37; accordingly, it denies them.

38.    Per the irrevocable REV Bid, REV committed to buy the Debtors' SaaS business

on the following economic terms: (i) $2,800,000 in cash consideration (compared to $2,500,000

in the Stalking Horse Bid); (ii) an unsecured promissory note in the principal amount of $1,500,000

(compared to $1,000,000 in the Stalking Horse Bid), and (iii) the assumption of up to $1,000,000

in assumed accounts payable and cure costs (equal to the Stalking Horse Bid), for total

consideration of $5,300,000 compared to the $4,500,000 in consideration under the Stalking Horse

Bid.  In conjunction with its bid, REV submitted a cash deposit of $280,000 (the "REV Deposit").

**ANSWER**:    REV states the bid documents speak for themselves and deny an language

inconsistent with those documents.  REV admits it submitted a cash deposit of $280,000.  REV

denies the remaining allegations in paragraph 38.

39.     The REV Bid triggered an Auction under the Bid Procedures Order, which was conducted on September 28, 2022 at noon (EST).

**ANSWER**: REV lacks sufficient information to admit or deny the allegations of Paragraph 39; accordingly, it denies them.

40.     With no additional bids made, the Debtors declared the REV Bid to be the highest and best bid and, thus, the Successful Bidder at the end of the Auction.

**ANSWER**:   The allegations of Paragraph 40 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 40; accordingly, it denies them.

41.     The Debtors declared the Stalking Horse Bid to be the Backup Bid and the Stalking Horse Bidder the Backup Bidder, and the Auction concluded.

**ANSWER**:   REV lacks sufficient information to admit or deny the allegations of Paragraph 41; accordingly, it denies them.

42.     On September 30, 2022, the Court conducted the Sale Hearing and approved the Sale to REV on the terms set forth in the REV Bid and pursuant to the APA [Docket No. 95] (the "Sale Order").

**ANSWER**:   REV lacks sufficient information to admit or deny the allegations of Paragraph 42; accordingly, it denies them.

43.     At REV's request, the Debtors, SF2, the Debtors' DIP lender, Galactic Ventures LLC ("Galactic"), and REV entered into the Agreement to Amend (i) REV APA, (ii) SF2 APA and (iii) DIP Loan Agreement [Docket No. 96] to extend certain deadlines in order to preserve REV's ability to timely close on the Sale through October 3, 2022.

**ANSWER**: REV admits it entered into the Agreement to Amend [Docket No. 96].  REV denies the remaining allegations in Paragraph 43.

44.    Again at REV's request, the Debtors, SF2, Galactic, and REV entered into the Further Agreement to Amend (i) REV APA, (ii) SF2 APA and (iii) DIP Loan Agreement [Docket No. 98] to further extend certain deadlines in order to preserve REV's ability to timely close on the Sale through October 7, 2022.

**ANSWER**: REV admits it entered into the Agreement to Amend [Docket No. 98].  REV denies the remaining allegations in Paragraph 44.

45.    On October 13, 2022, REV informed the Debtors via email that it would not close on the Court-approved sale (the "Failure to Close"). Specifically, REV stated: "REV will not be closing on the transaction tomorrow, or ever." (emphasis added).

**ANSWER**:  REV states that the written document is the best evidence, speaks for itself, and denies any allegations inconsistent with the language of that document.

46.    Later that same day, the Debtors advised SF2, the Backup Bidder under the Sale Order, that due to REV's Failure to Close, SF2 was now required to purchase the Debtors' SaaS business pursuant to the Sale Order under the terms of its Stalking Horse Bid.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 46; accordingly, it denies them.

47.    On October 14, 2022, the Debtors and Galactic entered into the Agreement to Further Amend DIP Loan Agreement [Docket No. 99] to further extend certain deadlines in the DIP Loan Agreement following discussions with SF2 and Galactic.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 47; accordingly, it denies them.

48.     Thereafter, the Debtors worked with SF2 to enter into an amended asset purchase agreement.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 48; accordingly, it denies them.

49.     On November 15, 2022, the Court entered a supplemental sale order approving the sale of the Debtors' Saas business to SF2 [Docket No. 113] (the "Supplemental Sale Order"). The Supplemental Sale Order approved the Debtors' sale to SF2 under the following economic terms, as compared to the REV Sale Court-approved terms:

| Consideration Offered | REV Bid | SF2 Bid | Loss to Estates |
|---|---|---|---|
| Cash component of the purchase price: | $2,500,000 | $1,370,000 | ($1,130,000) |
| Promissory note: | $1,000,000 | $ 750,000 | ($ 250,000) |
| Cure Cost Cap increase: | $1,000,000 | $1,130,000 | $ 130,000 |
| **TOTAL LOSS TO ESTATES** | | | **($1,250,000)** |

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 49; accordingly, it denies them.

50.     The difference between the consideration that the Debtors' estates were entitled to receive under the REV Sale and what they ultimately received in connection with the sale of the Assets under the SF2 Sale, includes, without limitation, the loss of $1,130,000 in immediately accessible cash.

**ANSWER**:    The allegations of Paragraph 50 are legal conclusions, so no answer is required.  To the extent a response is required, Defendant lacks sufficient information to admit or deny the allegations of Paragraph 50; accordingly, it denies them.

51.    If the Debtors' estates solely recover the lost cash compensation from this lawsuit, the Debtors expect that GSI's creditors are likely to receive a significant distribution their allowed claims against the estates.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 51; accordingly, it denies them.

52.    Despite demand, REV has failed to pay or reimburse the Debtors' estates for the damages it caused by failing to close on the Sale pursuant to, and as required by, the REV APA and the Sale Order.

**ANSWER**: Deny.

53.    REV has never asked that the REV Deposit be returned to it.

**ANSWER**:    There was no deadline to ask for deposit back and given Debtor's precarious financial position REV did not need to engage in a futile act; however, see REV's counterclaim herein where REV seeks a return of all three deposits.

54.    The Supplemental Sale Order also authorized the Debtors to assume and assign their contract with Eplexity (the "Eplexity Contract") to SF2.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 54; accordingly, it denies them.

55.    Effective November 30, 2022, the Eplexity Contract was assumed by the Debtors and assigned to and accepted by SF2.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 55; accordingly, it denies them.

56.    SF2 is currently operating the Saas business it bought from the Debtors and is using Eplexity's services pursuant to the assigned Eplexity Contract.

**ANSWER**:    REV lacks sufficient information to admit or deny the allegations of Paragraph 56; accordingly, it denies them.

### FIRST CLAIM FOR RELIEF - BREACH OF CONTRACT

57.    To the extent applicable, the Debtors incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**: REV incorporates by this reference each and every answer set forth in paragraphs 1 through 56 above as if fully set forth herein.

58.    After the time for it to conduct any additional due diligence of the Debtors' Saas business expired, REV submitted an offer to the Debtors, in the form of the irrevocable REV Bid, to purchase the SaaS business from the Debtors.

**ANSWER**: REV admits it submitted a bid.  REV further states the documents speak for themselves and denies any allegations inconsistent with the language of the documents.

59.    Thereafter, the Debtors accepted the REV Bid and the parties prepared and executed the APA memorializing the terms of the Sale, the terms of which were approved by the Court in the Sale Order.

**ANSWER**: The allegations of Paragraph 59 are legal conclusions, so no answer is required. To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 59; accordingly, it denies them.

60.    Accordingly, the parties entered into a binding contract for the sale of Debtors' Saas business and received the Court's approval to proceed with the transaction.

**ANSWER**:    The allegations of Paragraph 60 are legal conclusions, so no answer is required.  To the extent a response is required, REV lacks sufficient information to admit or deny the allegations of Paragraph 60; accordingly, it denies them.

61.      Once the Sale Order entered, REV was contractually and legally obligated to close on the Court-approved Sale pursuant to the APA and the Sale Order.

**ANSWER**:  Deny.

62.      Before the Sale transaction could be completed, REV unilaterally repudiated the REV Bid and affirmatively stated that it would "never" close on the Court-approved Sale.

**ANSWER**: REV admits that it informed Debtors it would not close, but denies any implication or allegation of wrongdoing.

63.      On October 13, 2022, REV informed the Debtors via email that it would not close on the Court-approved sale (the "Failure to Close").

**ANSWER**: REV admits that it informed Debtors it would not close, but denies any implication or allegation of wrongdoing.

64.      Specifically, REV stated: "REV will not be closing on the transaction tomorrow, **or ever.**" (emphasis added).

**ANSWER**: REV states that the written document is the best evidence and states the document speaks for itself.  REV further denies any allegation inconsistent with the language of the documents.

65.      At the time REV repudiated its contract obligations, the Debtors had fully performed under the APA, satisfied the express closing conditions thereunder, and were thus ready, willing, and able to complete the Asset Sale to REV pursuant to the APA.

**ANSWER**:  Deny.

66.      REV's actions in connection with the REV APA and Sale Order were without justification.

**ANSWER**: Deny.

67.     REV materially breached the Court-authorized REV APA by failing and refusing to purchase the Saas business.

**ANSWER**: Deny.

68.     The Debtors and their bankruptcy estates have been damaged by REV's breach of the REV APA and refusal to perform thereunder.

**ANSWER**:    The allegations of Paragraph 68 are legal conclusions, so no answer is required.  To the extent a response is required, REV denies.

69.     Pursuant to the Bid Procedures Order, the REV APA and the REV Sale Order, the REV Deposit has been forfeited to the Debtors.

**ANSWER**:    The allegations of Paragraph 69 are legal conclusions, so no answer is required.  To the extent a response is required, REV denies.

70.     Beyond the difference between the consideration that the Debtors' estates were entitled to receive under the REV Sale and what they ultimately received in connection with the sale of the Assets under the SF2 Sale, the Debtors have also been caused to suffer damages including, without limitation, incurring the net cost of operating the SaaS business for the additional time, expense, and loss of value, until the November 30, 2022 closing of the SF2 Sale, and all attorneys' fees that the Debtors' estates have incurred in connection with REV's breach of the REV APA and REV Sale Order.

**ANSWER**:    Deny.

**SECOND CLAIM FOR RELIEF - ATTORNEYS' FEES AND COSTS AWARD**

71.     To the extent applicable, the Debtors incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:  REV incorporates by this reference each and every answer set forth in paragraphs 1 through 70 above as if fully set forth herein.

72.    The Debtors have incurred attorneys' fees, expenses, and costs in connection with this action, including spending time attempting to consummate the REV Sale and close on the SF2 APA, and time that otherwise would not have been incurred but for the Defendant's breaches of the APA.

**ANSWER**:    Deny.

73.    Therefore, the Debtors are entitled to an award of attorneys' fees and costs in an amount to be determined at trial, but no less than $100,000.

**ANSWER**:    The allegations of Paragraph 73 are legal conclusions, so no answer is required.  To the extent a response is required, REV denies.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof where such burden is otherwise on plaintiffs as a matter of applicable substantive or procedural law, REV asserts the following affirmative defenses and reserves the right to assert additional defenses as information becomes available.

1.    The Complaint fails to state a claim upon which relief may be granted.

2.    REV had no obligation to consummate the transaction where Debtors failed to satisfy conditions precedent, including but not limited to, Section 6.1(k) of the REV APA, where on September 28, 2022 Eplexity's counsel, Brooks Fortune, averred to REV's counsel, Mark Fazio, that the current version of the Eplexity Agreement would not be assumed by REV and Eplexity would therefore require REV to enter into a new agreement with less favorable terms.

3.    Debtors' Complaint must fail as a result of their prior material breach of the agreements between the parties.

19

4.      Debtors' damages, if any, are barred or reduced by Debtor's failure to mitigate their damages.

5.      Debtors' fail to join indispensable or necessary parties, including Eplexity.

6.      Debtors' claims are barred as the result of *force majeure.*

7.      Debtors' claims are barred by the doctrine of frustration of purpose.

8.      Debtors' claims are barred by the doctrine of impossibility of performance.

9.      Debtors' claims are barred by the doctrine of unclean hands.

10.     Debtors' claims are barred by the doctrine of undue influence.

11.     Debtors' claims are barred by the doctrine of unilateral mistake of fact, wherein REV was of the belief that the Eplexity Agreement could be assumed by REV under its current terms, Debtors did not correct this mistaken belief, and thus, REV's entering into the APA was unconscionable.

12.     Alternatively, Debtors' claims are barred by the doctrine of mutual mistake of fact, wherein REV and Debtors were of the belief, at the time of entering into the APA, that the Eplexity Agreement could be assumed by REV under its current terms, which turned out to be false.

13.     Debtors' claims are barred by the doctrine of waiver.

14.     Debtors' claims are barred by the doctrine of *In pari delicto.*

15.     Debtors' damages, if any, were caused by persons other than REV, including Debtors themselves, Eplexity, and potentially others.

16.     Debtors' claims are barred by fraud and/or fraud in the inducement, and REV incorporates the allegations set forth in its Counterclaim for fraud as asserted below as if fully stated herein.  Debtors' claims are barred where:

a.  Debtors defrauded REV in connection with REV's entering into the REV Bid, the APA, the First Amendment, and the Second Amendment.

b.  Debtors knew that their cloud deployment was not cost-optimized, and when Kelly Kamm with REV suggested to Debtors that there was room for improvement and cost-savings, Debtors agreed that this was something they explored and was doable, yet omitted the Eplexity relationship was a blocking hindrance to this activity. Debtors also omitted the fact that the current version of the Eplexity Agreement could not be assumed by REV and Eplexity would therefore require REV to enter into a new agreement with less favorable terms.

c.  Debtors knowingly made these false representations or omissions with the intent to obtain funds from REV.

d.  REV fraudulently induced REV to enter into the REV Bid, the APA, the First Amendment, and the Second Amendment under the terms and conditions set forth in those agreements.

e.  REV justifiably relied on Debtors' material misrepresentations and active concealment regarding Eplexity's control over the production environment and that REV could not assume the current version of the Eplexity Agreement when entering into the REV Bid, the APA, the First Amendment, and the Second Amendment to its detriment.

f.  As a result of Debtors' fraudulent acts in connection with the REV Bid, the APA, the First Amendment, and the Second Amendment, REV incurred

damages including but not limited to out-of-pocket expenses, missed future

opportunities, and other damages in an amount to be determined at trial.

17.    Debtors' claims are barred by the doctrine of setoff and/or recoupment.

18.    Debtors' damages are subject to reduction as a consequence of Debtor's breach.

19.    REV reserves the right to raise additional affirmative and other defenses.

**WHEREFORE,** the Defendant respectfully requests that this Court enter judgment in its

favor and against Debtors.

### DEFENDANT'S COUNTERCLAIM AGAINST DEBTORS'

Retail Ecommerce Ventures, LLC, the counterclaimant ("REV"), files its counterclaim

against GetSwift, Inc. and GetSwift Technologies Limited (collectively "Debtors"), and states the

following:

1.    REV is a corporation organized and existing under the laws of Delaware.

2.    On or around August 25, 2022, REV became interested in purchasing the Debtors'

business which consisted of a fleet management, delivery and workforce management software-

as-service platform (SaaS).

3.    On September 8, 2020, REV executed a nondisclosure agreement with Debtors and

in exchange, was provided access to the data room for Debtors.

4.    Over the next few weeks, REV engaged in due diligence, including a review of the

data room, discussions with Joel MacDonald and Robert Bardunias, and others at Debtors, and a

review of all contracts material to the sale.

5.    Through due diligence, REV learned that Debtors had a contractual relationship

with a vendor known as Eplexity.  Eplexity served as Debtors' root administrator of the production

environment for all of Debtors' critical data.

6.      One of the driving reasons for REV's continued interest in GetSwift was REV's awareness that Debtors were significantly overpaying Eplexity for platform expenses, as much as 60-70% of its revenues.  REV understood that value would only be realized where REV takes control of the environment from Eplexity, resulting in a cost savings of 30-40%.  If not for the ability to do such a conversion, REV would never have been interested in GetSwift.

7.      Starting on September 14, 2022 at 9 a.m. through September 23, during regular Zoom calls, both Joel MacDonald and Robert Bardunias, on behalf of Debtors, provided information to Kelly Kamm, Alex Mehr, and Tai Lopez of REV specifically related to its contract and relationship with Eplexity.  MacDonald and Bardunias understood REV's goal to reduce the platform costs, and that this was the core value proposition to REV.

8.      In an attempt to induce REV to place a bid and/or eventually sign the APA, Debtors provided REV with access to the GitHub Repository, which allowed REV to view and validate the code related to the SaaS.  Kamm, on behalf of REV, accessed and reviewed this information, ultimately concluding that the Debtors owned the infrastructure and that its code was well written, but badly deployed.  He understood Debtors' hosting/platform costs to be extraordinarily high and unsustainable.

9.      The outrageous amounts being paid to Eplexity to maintain the platform created an opportunity for costs savings for REV where it intended to take over the platform and hosting. Both MacDonald and Bardunias agreed with REV's assessment that it could take over the platform and realize these savings, supporting REV's understanding.  Neither ever suggested or implied, let alone directly stated that the production for GetSwift was essentially held captive by Eplexity and that REV would not be permitted to make its contemplated changes, thus, it could not realize its

23

projected savings.  Instead, both MacDonald and Bardunias agreed that REV would be able to realize significant cost savings by taking over the platform.

10.    Despite its statements and omissions to REV, Debtors were aware, at all times, that REV would not be in a position to move the data from Eplexity's hosting environment and that GetSwift was bound to continue working with Eplexity, despite Eplexity's inefficient running of the platform and code.  Further, Debtors were aware that they did not own the infrastructure.  As a result, REV would be at the mercy of Eplexity control over the environment.  In other words, the production side of the business to be purchased by REV was held captive by Eplexity which would prevent REV from realizing cost savings and technical efficiencies.

11.    REV had no way of knowing that Debtors had made false and/or misleading statements regarding its relationship with Eplexity and the ability to transfer the data to a different platform.  Further, Debtors stayed silent on multiple occasions where they had a duty to speak as to its relationship with Eplexity and Eplexity's control of its data.

12.    At all times, REV believed and understood, as a result of statements made by Debtors, that it could take over the environment in place of Eplexity.  Had REV known this was not true, it would have ceased its communications with Debtors, never submitted a bid, and certainly would never have entered into the APA.

13.    As a result of, and in reliance on, the documents shared in due diligence and the false and/or misleading statements made by Debtors, on or around September 14, 2022, REV signed and submitted its bid in accordance with the Bid Procedures Order issued by this Court [Docket No. 34] (the "REV Bid").

14.    Along with the REV Bid, and pursuant to its terms, REV submitted a cash deposit of $280,000.

15.     On September 20, 2022, Eplexity, through its attorney, contacted REV's attorney to discuss the potential purchase of Debtors by REV.  During this call, Eplexity confirmed Debtors owed over $700,000 in unpaid accounts receivable.  Eplexity also discussed the current master service agreement and statement of work under which both Debtors and Eplexity were currently operating.  REV was aware Debtors owed certain amounts to Eplexity, but was unaware that Eplexity planned to terminate the current agreement and force the purchaser of Debtors to enter into a new agreement with Eplexity with less favorable terms.

16.     REV did not have any understanding of the extent of Eplexity's demands at this time and remained unaware that REV would be unable to remove the data from Eplexity.  In reliance on Debtors' statements and omissions, preventing REV from having this misunderstanding about Eplexity, REV entered into an asset purchase agreement (the "APA") for the purchase of Debtors' company, effective September 19, 2022.

17.     On September 28, 2022, this Court held an Auction in accordance with the Bid Procedures Order, at which, at the end of the Auction, Debtors declared the REV Bid to be the successful bidder.

18.     On September 28, 2022, after REV was declared the successful bidder, Eplexity contacted REV, providing it with several documents including a settlement agreement for payment of the $754,829.11 in outstanding accounts receivable and a revised statement of work.  Notably, the statement of work required a minimum spend that was at least $416,000 more than the minimum amounts set forth under the current, effective statement of work.  At this time, REV still believed it would be able to remove Debtors' data from Eplexity, have REV become the platform executive for all data, and reduce the platform costs.

19.    On September 30, 2022, this Court conducted the sale hearing and approved the sale to REV on the terms set forth in the REV Bid and in the APA.

20.    At the time of the sale hearing, REV was unaware that it would not be able to remove Debtors' data from Eplexity and onto a REV-approved platform under REV's executive control.

21.    Over the next few days, REV became increasingly concerned about the role of Eplexity with Debtors and whether or not Debtors were being complete and accurate in the information they provided in relation to Eplexity's relationship with Debtors.

22.    On October 2, 2022, Alex Mehr and Joel MacDonald had additional calls regarding the issues with Eplexity.

23.    Around this time, Debtors finally admitted to REV that the agreement with Eplexity was a "problem."  Debtors admitted that they did not own the hosting environment, thus, they could not fix the problems that were causing the drastic costs associated with running GetSwift without the direct participation of Eplexity, who had already shown themselves to Debtors as either unwilling or unable to make changes. This had been a problem for Debtors in the past as on at least one prior occasion, Eplexity had been unable to fix its cloud architecture, despite having been paid an additional sum by Debtors to do so.

24.    Around this same time, Eplexity threatened REV that if it did not receive immediate payment on outstanding amounts owed by Debtors, it would cut off access Debtors' access to their data.  Any such disruption in service would have been disastrous to Debtors as the production environment Eplexity was managing is where all platform business took place; this disruption would cause the platform to lose customers and business.

25.     On October 3, 2022, as a result of the new information REV learned for the first time, REV and all relevant parties entered into the Agreement to Amend the APA to extend certain deadlines to close on the sale through October 7, 2022 (the "First Amendment").  In consideration for this extension, REV paid an additional $75,000.

26.     As REV was becoming more and more alarmed by this newly disclosed information related to Eplexity, Debtors became desperate to keep REV on the line.  Debtors tried to induce REV to continue with the purchase.  On October 6, 2022, during a phone call, MacDonald and Bardunias informed Kamm and Mehr they had a solution to help REV extract the data from Eplexity.  MacDonald and Bardunias stated they would go into the platform during the middle of the night and take over access to the Eplexity-managed AWS environment by revoking Eplexity's keys and users.  Debtors represented that this would result in a few weeks where Eplexity would be unable to get access, which Debtors could use to export its platform to another environment. REV became even more troubled after hearing Debtors' outrageous solution to breach the contract with Eplexity and create potential legal issues with a vendor REV would need to manage.

27.     As of October 7, 2022, REV was still attempting to reconcile the information it had recently learned about Eplexity with the information initially shared by Debtors, and thus REV and all relevant parties entered into a second Agreement to Amend the APA to extend certain deadlines to close on the sale through October 14, 2022 (the "Second Amendment").   In consideration for this extension, REV paid an additional $50,000.

28.     On that same day, a Zoom call took place between Kamm, MacDonald, and at least one other person.

29.     Shortly after October 7, 2022, given what REV learned over the prior two weeks with regard to Debtors' business arrangements with Eplexity and the control Eplexity had over the

GetSwift assets, REV determined it would not be closing on the transaction.  While Debtors had represented to REV that we would be able to make the needed changes to reduce platform costs and make the business viable, REV had confirmed that the ability to do so was hampered by a bad vendor relationship that was holding the production environment hostage, and who had already shown a disregard toward improving the deployment and reducing costs; in fact, Eplexity instead were attempting to raise the run costs through new contracts.  Thus, REV concluded that it would not go through with the sale.

30.     Debtors have never returned to REV any of the deposits amounts paid by REV totaling $405,000.

## Count I – Fraud/Fraud in the Inducement

31.     REV incorporates by reference the allegations contained in the previous paragraphs of this Counterclaim as if fully rewritten herein.

32.     Debtors defrauded REV in connection with REV's entering into the REV Bid, the APA, the First Amendment, and the Second Amendment.

33.     Debtors knew that their cloud deployment was not cost-optimized, and when Kamm suggested to Debtors that there was room for improvement and cost-savings, Debtors agreed that this was something they explored and was doable, yet omitted the Eplexity relationship was a blocking hindrance to this activity.  Debtors also omitted the fact that the current version of the Eplexity Agreement could not be assumed by REV and Eplexity would therefore require REV to enter into a new agreement with less favorable terms.

34.     Debtors knowingly made these false representations or omissions with the intent to obtain funds from REV.

35.     REV fraudulently induced REV to enter into the REV Bid, the APA, the First
Amendment, and the Second Amendment under the terms and conditions set forth in those
agreements.

36.     REV justifiably relied on Debtors' material misrepresentations and active
concealment regarding Eplexity's control over the production environment and that REV could
not assume the current version of the Eplexity Agreement when entering into the REV Bid, the
APA, the First Amendment, and the Second Amendment to its detriment.

37.     As a result of Debtors' fraudulent acts in connection with the REV Bid, the APA,
the First Amendment, and the Second Amendment, REV incurred damages including but not
limited to out-of-pocket expenses, the deposits paid to Debtors, missed future opportunities, and
other damages in an amount to be determined at trial.

WHEREFORE, REV respectfully requests the Court enter judgment in its favor and against
Debtors on their claim for fraud and award REV its damages in an amount to be established at
trial, prejudgment interest, costs, attorneys' fees, and all other just and proper relief.

Dated: April 14, 2023                    Respectfully submitted,

                                         TAFT STETTINIUS & HOLLISTER LLP

                                    By:  /s/ Michael P. O'Neil_____
                                         Michael P. O'Neil Admitted *Pro Hac Vice*
                                         Tracy N. Betz Admitted *Pro Hac Vice*

                                         Counsel for Retail Ecommerce Ventures, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2023 I caused a copy of the foregoing *Defendant's Answer to Plaintiffs' Amended Complaint* to be electronically filed and served via the United States Bankruptcy Court for the Southern District of New York's CM/ECF system upon the following parties in this case:

Tracy Betz    tbetz@taftlaw.com

Ilan Marcus    imarkus@barclaydamon.com; ilan-markus-4670@ecfpacerpro.com

Michael Patrick O'Neil    moneil@taftlaw.com

/s/ *Michael P. O'Neil*
Michael P. O'Neil

TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone:    (317) 713-3500
Facsimile:    (317) 713-3699